**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CASA DE MARYLAND, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| U.S. DEPARTMENT OF HOMELAND | ) |
| SECURITY, *et al.*, | ) |
| | ) |
| Defendants. | ) |

Civil Case No. 17-cv-2942 (RWT)

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO**
**DISMISS OR, IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................. 1

FACTUAL ALLEGATIONS NOT ADDRESSED IN GOVERNMENT'S MOTION AND
STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS A GENUINE
DISPUTE .......................................................................................................... 2

LEGAL STANDARDS ...................................................................................... 5

ARGUMENT ..................................................................................................... 7

I.    THERE IS NO BASIS TO DISMISS THE COMPLAINT UNDER RULE 12(b)(1)..... 7

    A.  The Claims Asserted in the Complaint Are Justiciable ............................... 7

        1.  The Government's Justiciability Arguments Do Not Apply to the Non-APA Claims... 7

        2.  The APA Claims Are Justiciable ................................................. 9

    B.  Plaintiffs Have Standing ....................................................................... 17

        1.  The Individual Plaintiffs Indisputably Have Standing................................. 18

        2.  The Organizational Plaintiffs Have Standing ...................................... 19

II.   THERE IS NO BASIS TO DISMISS THE COMPLAINT UNDER RULE 12(b)(6)... 24

    A.  The Complaint Alleges Multiple Violations of the Administrative Procedures Act. 24

        1.  Plaintiffs Have Stated a Claim Under the APA .......................................... 24

        2.  The DACA Rescission Memo is a Substantive Rule Subject to Notice-and-Comment
            Rulemaking. ........................................................................... 35

    B.  The Complaint States a Claim for Violations of the Equal Protection Clause ......... 41

    C.  The Complaint States Claims for Violations of the Due Process Clause .................. 46

        1.  The Complaint Alleges Violations of Procedural Due Process ................................... 47

        2.  The Complaint Alleges Violations of Substantive Due Process................................... 52

    D.  The Complaint States a Claim for Equitable Estoppel ............................................. 54

III.  DEFENDANTS' ARGUMENTS REGARDING A NATIONWIDE INJUNCTION
      ARE PREMATURE AND LEGALLY INCORRECT............................................. 56

CONCLUSION ....................................................................................................... 58

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abourezk v. Reagan*,
  785 F.2d 1043 (D.C. Cir. 1986) ....................................................................................... 23, 24

*Alaska v. U.S. Dep't of Transp.*,
  868 F.2d 441 (D.C. Cir. 1989) ............................................................................................... 38

*Albino v. United States*,
  78 F. Supp. 3d 148, 163 (D.D.C. 2015) ................................................................................. 11

*Am. Bus Ass'n v. United States.*,
  627 F.2d 525 (D.C. Cir. 1980) .......................................................................................... 37, 38

*Am. Legal Found. v. FCC.*,
  808 F.2d 84 (D.C. Cir. 1987) ................................................................................................. 21

*Am. Med. Ass'n v. Reno*,
  57 F.3d 1129 (D.C. Cir. 1995) ............................................................................................... 10

*Am. Tel. & Tel. Co. v. FCC*,
  974 F.2d 1351 (D.C. Cir. 1992) ............................................................................................. 34

*Amfac Resorts, LLC v. U.S. Dep't of Interior*,
  143 F. Supp. 2d 7 (D.D.C. 2001) ........................................................................................... 27

*Angeles v. Dist. Dir., INS*,
  729 F. Supp. 479 (D. Md. 1990) ............................................................................................ 55

*Arpaio v. Obama*,
  797 F.3d 11, 17 (D.C. Cir. 2015) ........................................................................................... 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................................................. 6

*Batalla Vidal v. Duke*,
  No. 1:16-cv-04756-NGG-JO ................................................................................................. 26

*Batalla Vidal v. Duke*,
  No. 16-4756, 2017 WL 5201116 (E.D.N.Y. Nov. 9, 2017) .......................................... *passim*

*Bd. of Regents of State Colleges v. Roth*,
  408 U.S. 564 (1972) .......................................................................................................... 48, 49

*Beck v. McDonald*,
  848 F.3d 262 (4th Cir. 2017) ................................................................................................... 6

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
239 U.S. 441 (1915) ......................................................................................52

*Bostic v. Shaefer*,
760 F.3d 352 (4th Cir. 2014) ......................................................................5, 18

*Botezatu v. INS*,
195 F.3d 311 (7th Cir. 1999) ............................................................................17

*Bowen v. Mass.*,
487 U.S. 879 (1988) ..........................................................................................57

*Bowen v. Mich. Acad. of Family Physicians*,
476 U.S. 667 (1986) ............................................................................................9

*Brown Express, Inc. v. United States*,
607 F.2d 695 (5th Cir. 1979) ............................................................................37

*by the Univ. of Tex. Sw Med. Ctr. V. Nassar*,
133 S. Ct. 2517 (2013) ........................................................................................7

*Chamber of Commerce of U.S. v. U.S. Dept. of Labor*,
174 F.3d 206 (D.D.C. 1993) ............................................................................37

*Chen Zhou Chai v. Carroll*,
48 F.3d 1331 (4th Cir. 1995) ......................................................................37, 41

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) ....................................................................................36, 39

*Clarke v. Secs. Indus. Ass'n*,
479 U.S. 388 (1987) ..........................................................................................23

*Cmty. Nutrition Inst. v. Young*,
818 F.2d 943 (D.C. Cir. 1987) ....................................................................38, 39

*Consumer Energy Council v. FERC*,
673 F.2d 425 (D.C. Cir. 1982) ....................................................................40, 41

*Cox v. Louisiana*,
379 U.S. 559 (1965) ..........................................................................................54

*Cty. of Sacramento v. Lewis*,
523 U.S. 833 (1988) ................................................................................52, 53, 54

*Dawkins v. Witt*,
318 F.3d 606 (4th Cir. 2003) ............................................................................56

*Dep't of Commerce v. U.S. House of Representatives*,
525 U.S. 316 (1990)...........................................................................5, 16, 17, 44

*Elec. Privacy Info. Ctr. v. U.S. Dep't. of Homeland Sec.*,
653 F.3d 1 (D.C. Cir. 2011) ...........................................................................39

*Equal Rights Ctr. v. Equity Residential*,
798 F. Supp. 2d 707 (D. Md. 2011) ...............................................................19

*Fares v. U.S. Immigration and Naturalization Service*,
50 F.3d 6 (4th Cir. 1995) ...............................................................................35

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).......................................................................................29

*Fed'n of Am. Immig. Reform, Inc. v. Reno*,
93 F.3d 897 (D.C. Cir. 1996) .........................................................................24

*Ford Motor Co. v. NLRB*,
305 U.S. 364 (1939).......................................................................................41

*Franklin v. Massachusetts*,
505 U.S. 788 (1992).........................................................................................8

*Friends of Back Bay v. U.S. Army Corps of Eng'rs*,
681 F.3d 581 (4th Cir. 2012) .........................................................................25

*Garcia v. Neagle*,
660 F.2d 983 (4th Cir. 1981) ...........................................................................8

*Gardner v. City of Balt. Mayor & City Council*,
969 F.2d 63 (4th Cir. 1992) ...........................................................................49

*Gay v. Wall*,
761 F.2d 175 (4th Cir. 1985) ...........................................................................6

*Goldfarb v. Mayor & City Council of Balt.*,
791 F.3d 500 (4th Cir. 2015) ...........................................................................6

*Greater Bos. Television Corp. v. FCC*,
444 F.2d 841 (D.C. Cir. 1970).......................................................................28

*Greene v. Carson*,
256 F. Supp. 2d 411 (S.D.N.Y. 2017).............................................................28

*Guardian Fed. Sav. and Loan Ass'n v. Fed.l Sav. & Loan Ins. Corp.*,
589 F.2d 658 (D.C. Cir. 1978) .......................................................................38

*Harris v. McRae*,
   448 U.S. 297 (1980) ...................................................................................42

*Harrods Ltd. v. Sixty Internet Domain Names*,
   302 F.3d 214 (4th Cir. 2002) ........................................................................6

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ..............................................................................19, 21

*Hawkins v. Freeman*,
   195 F.3d 732 (4th Cir. 1999) ..................................................................53, 54

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ....................................................................12, 13, 14, 15

*Heckler v. Cmty Health Serv's of Crawford Cty., Inc.*,
   467 U.S. 51 (1984) ....................................................................................55

*Hill v. Lockheed Martin*,
   354 F.3d 277 (4th Cir. 2004) (en banc) ..........................................................7

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ..................................................................................22

*I.C.C. v. Brotherhood Of Locomotive Engineers*,
   482 U.S. 270 (1987) ..................................................................................12

*In re United States*,
   No. 17-72917, 2017 WL 5505730 (9th Cir. Nov. 16, 2017) .....................26, 27, 29

*Inova Alexandria Hosp. v. Shalala*,
   244 F.3d 342 (4th Cir. 2001) ........................................................................8

*INS v. St. Cyr.*,
   533 U.S. 289 (2001) ................................................................................9, 15

*Int'l Ass'n of Machinists & Aerospace Workers v. Haley*,
   482 F. App'x 759 (4th Cir. 2012) ................................................................53

*Int'l Refugee Assistance Project v. Trump*,
   857 F.3d 554 (4th Cir. June 15, 2017) .......................................................44, 46

*Int'l Refugee Assistance Project v. Trump*,
   No. 17-0361, 2017 WL 4674314 (D. Md. Oct. 17, 2017) .............12, 13, 21, 22, 23, 24, 46

*Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*,
   874 F.2d 205 (4th Cir. 1989) ...................................................................36, 37

*Kapps v. Wing,*
    404 F.3d 105 (2d Cir. 2005) ................................................................. 52

*Kenney v. Glickman,*
    96 F.3d 1118 (8th Cir. 1996) ................................................................ 12

*Kent v. Dulles,*
    357 U.S. 116 (1958) ............................................................................. 19

*Kerr v. Marshall Univ. Bd. of Gov.,*
    824 F.3d 62 (4th Cir. 2016) .................................................................. 52

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    134 S.Ct. 1377 (2014) .................................................................... 23, 24

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ............................................................................. 10

*Mach Mining, L.L.C. v. E.E.O.C.,*
    135 S. Ct. 1645 (2015) ........................................................................... 9

*Mada-Luna v. Fitzpatrick*
    813 F.2d 1006 (9th Cir. 1987) ....................................................... 13, 40

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ............................................................................. 58

*Mallette v. Arlington Cty. Emp's Supplemental Ret. Sys. II,*
    91 F.3d 630 (4th Cir. 1996) .................................................................. 51

*Martin v. Saint Mary's Dep't of Social Serv's,*
    346 F.3d 502 (4th Cir. 2000) ................................................................ 53

*McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.,*
    545 U.S. 844 (2005) ............................................................................. 46

*McNary v. Haitian Refugee Ctr.,*
    498 U.S. 479 (1991) ..................................................................... 9, 16, 19

*Md. Highways Contractors Ass'n, Inc. v. Maryland,*
    933 F.2d 1246 (4th Cir. 1991) .............................................................. 21

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
    463 U.S. 29 (1983) ........................................................... 28, 31, 32, 40

*Municipality of Anchorage v. United States,*
    980 F.2d 1320 (9th Cir. 1992) .............................................................. 38

*N. Carolina Growers' Ass'n v. United Farm Workers,*
   702 F.3d 755 (4th Cir. 2012) ........................................................38

*Nat'l Association of Regulatory Utility Commissioners v. Dep't of Energy,*
   851 F.2d 1424, 1431 (D.C. Cir. 1988) ........................................37

*Nat'l Min. Ass'n v. McCarthy,*
   758 F.3d 243 (D.C. Cir. 2014) ....................................................38

*Nat'l Taxpayers Union, Inc. v. United States.,*
   68 F.3d 1428 (D.C. Cir. 1995) ....................................................21

*Office of Pers. Mgt. v. Richmond,*
   496 U.S. 414 (1990) ....................................................................55

*Organized Vill. Of Kake v. U.S. Dep't of Agric.,*
   795 F.3d 956 (9th Cir. 2015) ......................................................31

*Ostergren v. Cuccinelli,*
   615 F.3d 263 (4th Cir. 2010) ......................................................58

*Otsuka Pharm. Co. v. Burwell,*
   No. 15-852, 2015 WL 1579127 (D. Md. Apr. 8, 2015)................27

*Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Sec.,*
   No. 16-1015, 2017 WL 3189446 (D. Md. July 27, 2017) ......26, 27

*Perales v. Casillas*
   903 F.2d 1043 (5th Cir. 1990) ....................................................15

*Perry v. Sindermann,*
   408 U.S. 593 (1972)....................................................................49

*Petroleum Comm'ns, Inc. v. FCC,*
   22 F.3d 1164 (D.C. Cir. 1994) ....................................................34

*Plyler v. Doe,*
   457 U.S. 202 (1982)....................................................................43

*Quinteros-Mendoza v. Holder,*
   556 F.3d 159 (4th Cir. 2009) ......................................................10

*Raley v. Ohio,*
   360 U.S. 423 (1959)....................................................................54

*Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.,*
   673 F.3d 294 (4th Cir. 2012) ........................................................7

*Reno v. American-Arab Anti-Discrimination Committee*,
    525 U.S. 471(1999) ....................................................................................16, 17, 44

*Retail, Wholesale & Dep't Store Union v. NLRB*,
    466 F.2d 380 (D.C. Cir.1972) ............................................................................34

*Richardson v. Town of Eastover*,
    922 F.2d 1152 (4th Cir. 1991) ...........................................................................51

*Richmond Tenants Org., Inc. v. Kemp*,
    956 F.2d 1300 (4th Cir. 1992) ...........................................................................58

*Robbins v. Reagan*
    780 F.2d 37, 47 (D.C. Cir. 1985) ......................................................................15

*Romer v. Evans*,
    517 U.S. 620 (1996) ..........................................................................................54

*Royster v. Bd. of Tr's of Anderson Cty. Sch. Dist. No. Five*,
    774 F.2d 618 (4th Cir. 1985) .............................................................................49

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*,
    547 U.S. 47 (2006) ........................................................................................5, 18

*Ruttenberg v. Jones*,
    No. 07-1037, 2008 WL 2436157 (4th Cir. June 17, 2008) ...............................49

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015) .............................................................................51

*Sierra Club v. Jackson*,
    833 F. Supp. 2d 11 (D.D.C. 2012) ....................................................................31

*Sierra Club v. Larson*
    882 F.2d 128, 132 (4th Cir. 1989) ....................................................................14

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ...................................................................*passim*

*Texas v. United States*,
    86 F. Supp. 3d 591 (S.D. Tex. 2015) ................................................................26

*Thompson v. Dep't of Labor*,
    885 F.2d 551 (9th Cir. 1989) .............................................................................29

*Tri-County Paving, Inc. v. Ashe County*,
    281 F.3d 430 (4th Cir. 2002) .............................................................................47

*U.S. DHS, 2007-01: DHS* ..........................................................................................35

*U.S. Steel Corp. v. EPA*,
    649 F.2d 572 (8th Cir. 1981) ................................................................41

*U.S. v. Mitchell*,
    39 F.3d 465 (4th Cir. 1994) ................................................................36

*United States ex rel. Parco v. Morris*,
    426 F. Supp. 976 (E.D. Pa. 1977) ....................................................41

*United States v. Armstrong*,
    517 U.S. 456 (1996)................................................................8, 44, 45

*United States v. Batchelder*,
    442 U.S. 114 (1979)................................................................................9

*United States. v. Cox*,
    964 F.2d 1431 (4th Cir. 1992) ..........................................................56

*United States v. Lopez-Collazo*,
    824 F.3d 453 (4th Cir. 2016) ............................................................48

*United States v. Penn. Indus. Chem. Corp.*
    411 U.S. 655, 675 (1973) ..................................................................56

*United States v. Texas*,
    136 S. Ct. 2271 (2016)................................................................26, 29

*Vasquez v. Aviles*,
    639 F. App'x 898 (3d Cir. 2016) ......................................................17

*Velasquez-Garcia v. Holder*,
    760 F.3d 571 (7th Cir. 2014) ............................................................34

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252 (1977)................................................................42, 43, 46

*Wade v. United States*,
    504 U.S. 181 (1992)................................................................................9

*Washington v. Davis*,
    426 U.S. 229 (1976)................................................................42, 45

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ..........................................................14

*Watkins v. U.S. Army*,
    875 F.2d 699 (9th Cir. 1989) ......................................................55, 56

*Webster v. Doe,*
  486 U.S. 592 (1988)....................................................................................8

*White Tail Park, Inc. v. Stroube,*
  413 F.3d 451 (4th Cir. 2005) ................................................................6, 20

*Yassini v. Crosland,*
  618 F.2d 1356 (9th Cir. 1980) (Gov. Br. 51) ..........................................52

*Zadvydas v. Davis,*
  533 U.S. 678 (2011).........................................................................16, 44, 48

## STATUTES

5 U.S.C. § 551(5) .........................................................................................36

5 U.S.C. §§ 553 ................................................................................... *passim*

5. U.S.C. § 604 ......................................................................................10, 25

5 U.S.C. §§ 701(a) ....................................................................8, 9, 10, 12

5 U.S.C. § 702 ....................................................................................8, 9, 23

5 U.S.C. § 706(2)(A)..........................................................................25, 57

8 U.S.C. § 1182(a)(9)(B)(v) ......................................................................17

8 U.S.C. § 1226a(b)(1)..............................................................................17

8 U.S.C. § 1229c(e).....................................................................................17

8 U.S.C. § 1252 (2005) .................................................................................9

8 U.S.C. § 1252(g) ............................................................................. *passim*

28 U.S.C. § 2201 ........................................................................................57

E-Government Act of 2002,
  Pub. L. No. 107-347, 116 Stat. 2899 .............................................33, 35

## OTHER AUTHORITIES

DEPT. OF JUS., OFFICE OF PRIVACY AND CIVIL LIBERTIES, PRIVACY IMPACT
  ASSESSMENTS: OFFICIAL GUIDANCE (last revised Mar. 2012),
  https://www.justice.gov/opcl/docs/2012-doj-pia-manual.pdf.................35

MEMORANDUM, M-03-22, OMB GUIDANCE FOR IMPLEMENTING THE PRIVACY
  PROVISIONS OF THE E-GOVERNMENT ACT OF 2002 (Sept. 26, 2003) ......................35

**INTRODUCTION**

On September 5, with the stroke of a pen ending DACA, senior Government officials upended the lives of 800,000 immigrants who were brought to this country as children, stripping them of their right to work and visit family members living overseas, impairing their ability to pursue an education, and putting all in fear that they will soon be deported separating many from U.S. citizen family members.  This action was the culmination of a long series of threats and derogatory statements by senior Government officials against persons of Mexican, Central American, and Latino heritage, and the Government readily acknowledges that 93 percent of the affected individuals have such ancestry.  While the Government decided to rescind DACA, it maintains other deferred action programs that do not have similar demographics.

Under well-established legal principles, the Government's actions violate both the Equal Protection and Due Process Clauses of the Constitution; and the manner in which the Government rescinded DACA violates federal laws (including the Administrative Procedure Act (APA)) and basic principles of fairness and equity.  Courts have found similar challenges justiciable and comparable government action to be illegal and unconstitutional.

The Government's motion is little more than a bald request to insulate the September 5 action and immunize the Government officials who made this discriminatory decision from scrutiny.  Ignoring the correct pleading standards, the Government has submitted a trial brief masquerading as a Rule 12 motion predicated on (i) factual proffers found nowhere in the Complaint raising contested issues of fact, (ii) a bowdlerized presentation of the Complaint that simultaneously omits material allegations and mischaracterizes Plaintiffs' claims, and (iii) a misleading discussion of the key legal principles (the "Motion" or the "Government's Motion").

Our Constitution and laws specifically provide for judicial review under these circumstances—where there is patent evidence that the Government is proceeding outside of

constitutional norms and in violation of the law.  It is for this reason that Judge Garaufis in the

Eastern District of New York, hearing a similar challenge to the DACA rescission, rejected the

Government's arguments, *see Batalla Vidal v. Duke*, No. 16-4756, 2017 WL 5201116, at *8-13

(E.D.N.Y. Nov. 9, 2017) (attached as Freedman Decl.  Ex. 1)[1], and no court has found that the

Government's arguments have merit.  This Court should not be the first.  The motion should be

denied.

## FACTUAL ALLEGATIONS NOT ADDRESSED IN GOVERNMENT'S MOTION AND STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS A GENUINE DISPUTE

Under the relevant pleading standards (discussed below), (i) the Court's consideration of

the Government's 12(b)(6) motion must be based on the well-pled allegations in the Complaint,

and (ii) the Government's motion for summary judgment must be denied if there are material facts

in dispute.  The Government's Motion fails to address the following facts:

1.  In promoting DACA, the Government promised that Dreamers would be able to obtain

employment authorization, travel outside the United States for educational, employment, or

humanitarian purposes, attend educational institutions, be eligible for Social Security and

disability, and be present in the United States.  Compl. ¶¶ 10, 72-78, 135-136.

2.  In actively promoting DACA, the Government promised Dreamers that the personal

information they submitted with their applications would not be shared with immigration

enforcement authorities such as ICE or CBP, with very limited exceptions for specifically

described circumstances.  Compl. ¶¶ 10-16, 79-91.  To reinforce this Commitment, DHS (i)

adopted a Privacy Impact Assessment specifically prohibiting such sharing other than those limited

---

[1] The Declaration of John A. Freedman ("Freedman Decl.") in Opposition to the Government's Motion to Dismiss or For Summary Judgment is filed herewith.  All Exhibits to the Freedman Declaration will be designated as "Ex."

specified circumstances and making clear that the protections of the Privacy Act would extend to DACA recipients, and (ii) senior DHS officials affirmed that the commitment "must continue to be honored." Compl. ¶¶ 82-88.

3. 93 percent of the over 800,000 individuals who have received DACA are of Mexican, Central American, or Latino descent. Compl. ¶¶ 24, 157, 159.

4. The Government recognized that DACA created certain rights that could not be taken away without due process, and adopted a comprehensive set of Standard Operating Procedures to administer the DACA program the ("SOP") (Ex. 23). Compl. ¶¶ 78, 137. The SOP contained procedures to safeguard DACA applicant information. Compl. ¶ 88.

5. Pursuant to the SOP, the Government routinely sent renewal notices (referred to as "180-day notices") to DACA recipients starting 180 days prior to their expiration. *See Batalla Vidal* Interrogatory Response No. 9 (Ex. 2).

6. On February 20, 2017, DHS Secretary Kelly announced new enforcement priorities, but specifically left DACA intact. Compl. ¶ 111 n.64 (Ex. 3).

7. On June 15, 2017, DHS Secretary Kelly announced further changes to enforcement priorities, but again specifically left DACA intact. (Ex. 4).

8. On or about July 15, 2017, the Government stopped sending 180-day renewal notices to DACA recipients to inform them that their DACA was expiring. *See Batalla Vidal* Interrog. Resp. No. 9 (Ex. 2).

9. The decision to rescind DACA followed a long series of threats and derogatory statements by senior Government officials against persons of Mexican, Central American, and Latino heritage. The Complaint identifies a sample of 18 such statements and four threats, which have continued to the present. Compl. ¶¶ 25, 94-96 & 111.

10.  In August 2017, approximately 15 DHS employees participated in a meeting to discuss the rescission of DACA.  Hamilton 10/20/17 Tr. 94-96 (Ex. 5).  Other than from Duke, there are no materials from any of these individuals in the Administrative Record.

11.  Also in August 2017, representatives of DHS, the Department of Justice, and the White House participated in a meeting to discuss the rescission of DACA.  Hamilton 10/20/17 Tr. 102-105 (Ex. 5).  Other than from Duke, there are no materials from any of these individuals in the Administrative Record.

12.  The decision to rescind DACA was jointly made by the Department of Justice and DHS.  Sept. 14, 2017 *Batalla Vidal* Tr. 13, 26 (Ex. 6).

13.  When the Government rescinded DACA, it left numerous other deferred action programs in place.  Compl. ¶¶ 5, 68, 159.  None of these programs benefit the number of Mexican, Central American, or Latino individuals who are beneficiaries of DACA.  Compl. ¶¶ 68, 157-60.

14.  The Government did not follow notice-and-comment procedures in rescinding DACA, nor did it follow the SOP.  Compl. ¶¶ 118-119, 121.

15.  As detailed in the Complaint, the Government has revoked the prohibition on sharing DACA applicant data with immigration enforcement officials.  This is evident from the number of instances in which deportation proceedings have been started against Dreamers, as well as (i) the April 27, 2017 DHS memorandum purporting to rescind all privacy commitments to Dreamers, (ii) the DHS guidance on the Rescission, and (iii) Acting Secretary Duke's public denial that there was any information sharing prohibition.  Compl.  ¶¶ 108-112.

16.  Following September 5, the Government did not send notices to DACA recipients eligible to renew their DACA status advising them that their DACA renewal applications must be received by October 5, 2017.  *See Batalla Vidal* Interrog. Resp. No. 9. (Ex. 2).

17.   Of the approximately 154,200 individuals who were eligible to renew their DACA prior to the October 5, 2017 deadline, only approximately half (78,975) submitted renewals.  The Government has been rejecting more than half of the renewal requests.  *Batalla Vidal* Interrog. Resp. No. 7. (Ex. 2).

18.   The Government has not been following the SOP or otherwise providing DACA recipients the opportunity to be heard concerning the termination of their DACA status, their work authorizations, or their advance parole requests.  Compl. ¶¶ 97-106, 134-139.

19.   Both before and following the September 5 decision, the President stated that he had the authority to reinstate DACA without congressional authorization. Compl. ¶¶ 123-124.

## LEGAL STANDARDS

The Government's summary of the relevant legal standards, Gov. Br. 12-14, omits certain important points governing the Court's review of the motion.

1.   The Government's Rule 12(b)(1) motion is a partial one, in that its justiciability arguments do not address certain counts in the complaint (Counts I-III, VI & VII) and it does not contest the standing of the Individual Plaintiffs.  The partial nature of the motion is fatal to the Government's 12(b)(1) arguments, as courts have held that the presentation of a single justiciable claim is sufficient to deny a Rule 12(b)(1) motion.  *See, e.g.*, *Bostic v. Shaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (citing *Dep't of Commerce v. U.S. House of Representatives,* 525 U.S. 316, 330 (1990) ("a case is justiciable if. . . plaintiffs have standing as to a particular defendant"); *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006)  ("[T]he presence of one party with standing is sufficient to satisfy Article III's case or controversy requirement").  Beyond these threshold issues, in deciding a Rule 12(b)(1) challenge, "the plaintiff is afforded the same procedural protection as she would receive under a Rule 12(b)(6) consideration," and thus the Court must accept the facts alleged in the complaint as true.  *Beck v. McDonald*, 848 F.3d 262,

270 (4th Cir. 2017) (internal quotation marks omitted).  In determining a Rule 12(b)(1) motion, the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005) (relying on affidavits to find plaintiffs have standing).  The Court must deny a Rule 12(b)(1) motion "if the complaint alleges sufficient facts to invoke subject matter jurisdiction."  *Beck*, 848 F.3d at 270.

2.  In deciding a Rule 12(b)(6) motion, a court must assess whether the Complaint contains sufficient factual matter, accepted as true, "to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable."  *Id.*  The Court's review is limited to "'well-pled facts in the complaint[, which it must view] in the light most favorable to the plaintiff.'"  *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).

3.  Citing the same grounds as its Rule 12(b)(6) motion, the Government has also moved for summary judgment under Rule 56.  Gov. Br. 31 n.6.  A court may convert a Rule 12(b)(6) motion into one for summary judgment only if the nonmoving party has had "a reasonable opportunity to present all the material that is pertinent to the motion."  *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985).  A nonmoving party may file a declaration under Rule 56(d) to demonstrate that a reasonable opportunity for discovery has not been afforded.  *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 245 (4th Cir. 2002).  Plaintiffs are submitting a Rule 56(d) declaration with this opposition identifying the specific areas where facts essential to the opposition are not available.  *See* Declaration of Elizabeth J. Bower ("Rule 56(d) Decl.").

On the merits, a court may enter summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," and in conducting the review, the court must "construe the evidence in the light most favorable" to the non-moving party and "draw all reasonable inferences in [the non-moving party's] favor." *Hill v. Lockheed Martin*, 354 F.3d 277 (4th Cir. 2004) (en banc), *abrogated on other grounds by the Univ. of Tex. Sw Med. Ctr. V. Nassar,* 133 S. Ct. 2517 (2013). Here, the Government has not supported the Motion with a Rule 56(c) statement of material facts as to which there is no dispute. "[W]here the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing." *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012).

## ARGUMENT

## I.   THERE IS NO BASIS TO DISMISS THE COMPLAINT UNDER RULE 12(b)(1).

The Government's partial Rule 12(b)(1) motion is without merit.  This is evident because (i) the Government's arguments regarding justiciability do not apply to most of the claims in the Complaint (Counts I-III, VI and VII); (ii) the Government does not contest the standing of many of the Plaintiffs, and (iii) the District Court for Eastern District of New York decisively rejected these arguments in a parallel case involving a similar challenge to DACA.  *See Batalla Vidal v. Duke*, No. 16-4756, 2017 WL 5201116, at *8-13 (E.D.N.Y. Nov. 9, 2017).  Under well-established legal principles, the claims are justiciable and Plaintiffs have standing.

### A.   The Claims Asserted in the Complaint Are Justiciable

#### 1.   The Government's Justiciability Arguments Do Not Apply to the Non-APA

Claims

The Government spends the first ten pages of its argument contending that the DACA rescission is presumptively unreviewable under the APA and the INA.  Gov. Br. 15-21 (citing 5 U.S.C. § 702(a)(2)); *Id.* 21-24 (citing 8 U.S.C. § 1252(g)).  As discussed below, the Government is wrong.  In any event, this argument does not apply to Plaintiffs' non-APA claims.  "[E]ven where action is committed to absolute agency discretion by law, courts have assumed the power to review allegations that an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations."  *Garcia v. Neagle*, 660 F.2d 983, 988 (4th Cir. 1981).  Moreover, "even if agency action is committed to its discretion by law, a court may still determine whether the action is constitutional . . . because the Due Process Clause provides a manageable standard that allows for review."  *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 347 (4th Cir. 2001).[2] This review exists to ensure that agencies do not exercise discretion in an unconstitutional manner.

To the extent the Government argues that principles of prosecutorial discretion render the DACA rescission unreviewable, Gov. Br. 15-21, such an argument ignores the Supreme Court's clear statement that "a prosecutor's discretion is 'subject to constitutional constraints.'"  *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citing *United States v. Batchelder*, 442 U.S. 114, 125 (1979)); *see also Wade v. United States*, 504 U.S. 181, 185-86 (1992) ("[A] prosecutor's discretion when exercising that power is subject to constitutional limitations that district courts can

---

[2] Even where a decision is committed to agency discretion, the Supreme Court has repeatedly declined to find that constitutional claims are presumptively unreviewable. *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 603 (1988) (rejecting the government's assertion that § 701(a)(2) precluded judicial review over individual's constitutional challenge despite the fact that action was a matter "committed to agency discretion by law" and emphasizing that "where Congress intends to preclude judicial review of constitutional claims its intent so must be clear" in order "to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim.") (citation omitted); *Franklin v. Massachusetts*, 505 U.S. 788, 801-03 (1992) (holding constitutional claims justiciable even though the claims were not reviewable under the APA).

enforce. . . . Thus, a defendant would be entitled to relief if a prosecutor refused to file" a motion and "the refusal was based on an unconstitutional motive.").

To the extent the Government argues, that in enacting 8 U.S.C. § 1252(g), Congress stripped courts of the ability to hear constitutional challenges in the immigration context, Gov. Br. 21-24, courts have decisively rejected that argument. *See, e.g.*, *Texas v. United States*, 809 F.3d 134 at 155-64 (5th Cir. 2015) ("Congress has expressly limited or precluded judicial review of many immigration decisions . . . but DAPA is not one of them."), *aff'd by an equally divided court* No. 15-674, 136 S. Ct. 2271 (2016); *Batalla Vidal*, 2017 WL 5201116, at *12-13. There is no evidence—and the Government has not offered any—that Congress intended to abrogate review of the constitutional claims through Section 1252(g). *See INS v. St. Cyr.*, 533 U.S. 289, 300 n.12 (2001) (courts should "not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it"), *superseded by statute on other grounds*, 8 U.S.C. § 1252 (2005).

2.      The APA Claims Are Justiciable

With regard to the APA claims (Counts IV and V), courts have repeatedly rejected the Government's arguments. Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702; *see also id.* § 701(a)(1). Courts apply a strong presumption supporting judicial review of agency decisions. *See Mach Mining, L.L.C. v. E.E.O.C.*, 135 S. Ct. 1645, 1651 (2015); *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986). This principle extends to the immigration context. *See, e.g.*, *McNary v. Haitian Refugee Ctr.*, 498 U.S. 479, 483-84 (1991) ("[G]iven the absence of clear congressional language mandating preclusion of federal jurisdiction . . . the District Court had jurisdiction to hear respondents' constitutional and statutory challenges to INS procedures.").

9

Although Congress may overcome the presumption by committing agency action "to agency discretion by law" or by enacting an express jurisdiction-stripping provision, neither of those exceptions is applicable here. *Quinteros-Mendoza v. Holder*, 556 F.3d 159, 162 (4th Cir. 2009); 5 U.S.C. §§ 701(a)(1)-(2).

a. *The DACA rescission is not an action which was committed to agency discretion by law*. *Batalla Vidal* 2017 WL 5201116, at *9-12. Courts have interpreted the agency discretion exception "extremely narrowly, applying it only 'in those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Quinteros-Mendoza*, 556 F.3d at 162 (citing *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). Here there is clear procedural and substantive law, as well as a "meaningful standard," against which to judge the agency's decision to rescind DACA.

For Plaintiffs' APA claims, the relevant procedural law for this Court to apply comes from the APA. This Court can and should evaluate whether the rescission of DACA complies with the procedural requirements of the APA. *See* 5 U.S.C. §§ 553, 604. Regardless of whether the substance of an agency action is reviewable, the agency's process in making that decision must still be reviewed for compliance with procedural requirements (e.g., for notice and comment and reasoned explanation of departure from prior policy). As the Supreme Court explained in *Lincoln v. Vigil*, whether the agency "was required to abide by the familiar notice and comment provisions of the APA" is a question "quite apart from the matter of substantive reviewability." 508 U.S. at 195-98; *see also Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1134 (D.C. Cir. 1995) ("under the APA the ultimate availability of substantive judicial review is distinct from the question of whether the basic rulemaking strictures of notice and comment and reasoned explanation apply.") (emphasis removed).

The Government's position is also contradicted by the relevant substantive law that the Government cited as the basis for the rescission.  In claiming that the termination was grounded on DACA's alleged illegality, the Government cited judicially manageable standards by which a court can evaluate Plaintiffs' APA claims:  Attorney General Sessions explicitly stated that his recommendation to rescind DACA was mandated by his determination that the program was unlawful.  AR 251.  As the *Batalla Vidal* court recently found, the Government "did not believe that they were exercising discretion when rescinding the program" and thus "their reasons for doing so are within the competence of this court to review."  *Batalla Vidal*, 2017 WL 5201116, at *11.  The inclusion of legal analysis (albeit limited) in the Administrative Record—reflected in Defendants' submission of the Office of Legal Counsel's DAPA opinion and the court decisions in *Texas v. United States* (AR 4-36, 42-228)—confirms that the decision to rescind DACA is squarely within the competence of this Court to review.  Reviewing an agency decision predicated on a legal conclusion clearly is within the purview of this Court.

In response, the Government makes three arguments, none of which is availing.  <u>First</u>, the Government avers that the Acting Secretary engaged in discretion in purportedly balancing "costs and benefits" of maintaining or rescinding the programs.  Gov. Br. 18.  The Government cites *nothing* in the Administrative Record analyzing such costs and benefits, and evidence of "balancing" is entirely missing from the Administrative Record.  *See Albino v. United States*, 78 F. Supp. 3d 148, 163 (D.D.C. 2015) ("[T]he Court's review is limited to the administrative record.")  In any event, any such analysis is predicated on assuming a "substantive legal" conclusion about DACA, which makes the decision "reviewable."  Gov. Br. 18.

Defendants fail in their effort to rely on *I.C.C. v. Brotherhood Of Locomotive Engineers*, 482 U.S. 270, 283 (1987) *("BLE")*, which rejected the proposition that in "giv[ing] a reviewable

reason for otherwise unreviewable action, the action becomes reviewable." *BLE* does not, as Defendants suggest, flip the burden on judicial review. Its reasoning applies only when a court is *already* satisfied that one of the two narrow exceptions in 5 U.S.C. § 701(a) applies, and that the challenged decision is unambiguously discretionary and unreviewable. *See id.* at 283. In deciding in the first instance whether a matter is committed to agency discretion by law, or whether there is instead relevant law to apply, *BLE* does not require this Court to disregard the agency's asserted basis for its decision.

Second, the Government argues that the rescission of DACA is an unreviewable exercise of enforcement discretion entrusted to DHS. Gov. Br. 15-21. The Government, however, identifies no case holding that implementation of a broad agency enforcement policy is an exercise of enforcement discretion immune from judicial review. On the contrary, courts have consistently concluded such broad policies are reviewable. *See, e.g.*, *Int'l Refugee Assistance Project v. Trump*, No. 17-0361, 2017 WL 4674314, at *13 (D. Md. Oct. 17, 2017) ("*IRAP*") (attached as Ex. 7) (subjecting to judicial review Presidential Proclamation indefinitely barring entry of nationals from six countries); *Kenney v. Glickman*, 96 F.3d 1118, 1123-24 (8th Cir. 1996) (agency's adoption of policy setting forth change in enforcement criteria was reviewable). Instead, Defendants rely primarily on cases like *Heckler v. Chaney*, 470 U.S. 821 (1985), challenging decisions to take or refrain from taking specific enforcement actions against particular individuals.[3] As the *Batalla Vidal*, *Texas*, and *IRAP* courts noted, those cases are inapposite for two reasons: first, they involve highly individualized decisions, and second, many of them involve agency *inaction*, rather than

---

[3] Although Defendants cite *Mada-Luna v. Fitzpatrick*, that case undermines Defendants' own contention because although the court stated in dicta that the denial of the individual's request was not reviewable, the court considered the APA challenge to the deferred action operation instructions on the merits. 813 F.2d 1006 (9th Cir. 1987).

the affirmative decision to rescind a program.  *See Batalla Vidal*, 2017 WL 5201116, at *11 (recognizing that rescinding DACA is an "affirmative decision to constrain DHS's prosecutorial discretion [which] cannot be analogized to an exercise of prosecutorial discretion"); *Texas*, 809 F.3d at 165-68 ("Congress did not intend to make immune from judicial review an agency action that reclassifies millions of illegal aliens," and that the Government failed to rebut "the strong presumption of reviewability with clear and convincing evidence that, *inter alia*, it is making case-by-case decisions here"); *IRAP*, 2017 WL 4674314, at *17 (finding jurisdiction to review claims "asserting statutory and constitutional claims challenging a broader policy as opposed to individual . . . determinations").[4]

*Chaney,* and cases following it, are based on the recognition that courts are not well placed to second-guess an agency's "balancing of . . . factors which are particularly within its expertise" as to an individual enforcement matter.  *Chaney*, 470 U.S. at 831.  The DACA rescission is the opposite of the decisions that *Chaney* found unreviewable.[5]  It is a broad policy that changes the immigration status of approximately 800,000 individuals and *prevents* the Government from engaging in the type of individualized exercise of prosecutorial discretion that might be unreviewable under *Chaney*.  The DACA Rescission Memo:

- *requires* Defendants to stop accepting DACA applications;

---

[4] Defendants' reliance on *Arpaio v. Obama* for the proposition that a grant of deferred action is "discretionary and reversible" is misplaced.  797 F.3d 11, 17 (D.C. Cir. 2015).  In reviewing DAPA, *Texas v. United States* recognized that "[r]evocability . . . is not the touchstone for whether agency action is reviewable.  Likewise, to be reviewable agency action, DAPA need not confer public benefits—removing a categorical bar on receipt of those benefits and thereby making a class of persons newly eligible for them 'provides a focus for judicial review.'" 809 F.3d at 167 (quoting *Chaney*, 470 U.S. at 832).  Moreover, the court dismissed Sheriff Arpaio's claims on standing grounds since he possessed a "non-justiciable generalized grievance." *Arpaio*, 797 F.3d at 18.

[5] *Cf. e.g.*, *Washington v. Trump*, 847 F.3d 1151, 1162 (9th Cir. 2017) ("The present case, by contrast, is not about the application of a . . . policy to the particular facts presented in an individual visa application.  Rather, the States are challenging the President's *promulgation* of sweeping immigration policy.").

- *requires* Defendants to only issue renewals for recipients whose DACA permits expire between September 5, 2017 and March 5, 2018, *only if* they apply for renewal by October 5, 2017;
- *requires* Defendants to reject renewals for recipients whose permits expire after March 5, 2018; and
- *requires* Defendants to reject new or pending applications for advance parole for DACA recipients.

AR 255.  The DACA Rescission Memo removes discretion from the process.  The Government has instructed its agents to abandon the exercise of discretion and judgment in individual cases—and mandated that there will be no further deferred action for this class of predominantly Latino individuals.  In imposing a blanket policy that conclusively alters the status of 800,000 young people, the Government has not engaged in any "balancing" of individualized factors.[6]

In addition, *Chaney* relied on the fact that plaintiffs in that case were attempting to obtain judicial review of an agency decision *not* to act, which the Supreme Court carefully distinguished from when an agency does act.  470 U.S. at 832 ("when an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights . . . when an agency *does* act to enforce, that action itself provides a focus for judicial review") (emphasis in original).  The court in *Robbins v. Reagan*, which concerned an APA challenge of a government decision to rescind its commitment to renovate a homeless shelter, emphasized the importance of this distinction:

> Decisions not to take enforcement action generally do not involve exercise of coercive power over individual's liberty or property rights, and thus do not infringe upon areas that courts are called upon

---

[6] *Sierra Club v. Larson*, cited by Defendants, clarifies that "the relevant question here is whether the [statute] provides standards for ascertaining when the [agency] should recommend formal enforcement proceedings be commenced or when the secretary is *required* to make a determination of compliance or non-compliance or to initiate an enforcement action.  As to these points, the statute is silent.  Therefore, there is no law to apply and appellant has failed to overcome the presumption of unreviewability."  882 F.2d 128, 132 (4th Cir. 1989).  Conversely, DACA is a broad policy, not an enforcement action, and the APA properly provides numerous standards against which to assess the policy.

> to protect. By contrast, rescissions of commitments, whether or not they technically implicate liberty and property interests as defined under the fifth and fourteenth amendments, exert much more direct influence on the individuals or entities to whom the repudiated commitments were made.

780 F.2d 37, 47 (D.C. Cir. 1985) (citations omitted). As the court in Robbins concluded, "[r]escissions of prior obligations clearly fall into the 'focused action' category," giving courts a "specific affirmative action to be reviewed." Id. Here, Plaintiffs seek judicial review of an affirmative agency action rescinding protected interests that have been granted to Dreamers, providing a clear focus for judicial review.7

Third, the Government asserts that its arguments about enforcement discretion must be read with "particular force" in the immigration context. Gov. Br. 16-17. This is wrong. The Supreme Court has noted that the "strong presumption in favor of judicial review of administration action" applies even in immigration cases. *St. Cyr*, 533 U.S. at 298 (holding that AEDPA and the IIRIRA did not deprive court of jurisdiction to review an alien's habeas petition); *McNary*, 498 U.S. at 483-84 (finding jurisdiction to hear constitutional and statutory challenges to INS procedures); *Zadvydas v. Davis*, 533 U.S. 678, 696 (2011) (rejecting the government's invocation of a "foreign policy" rationale to preclude judicial review of a detained noncitizen's removal proceeding).

In response, the Government cites *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) ("*AADC*") to argue that review is inappropriate because it could "delay" the removal of aliens from the United States. Gov. Br. 19. The court in *AADC* based its decision on

---

7 Defendants' reliance on *Perales v. Casillas* is unavailing because it relies on plaintiffs seeking status that they do not already have. 903 F.2d 1043 (5th Cir. 1990) (finding decision of whether to affirmatively grant voluntary departure and work authorization was committed to agency discretion by law). This does not, however, cover the present situation where Defendants seek to *remove* rights and interests that it has already granted.

8 U.S.C. § 1252(g), which precludes *individuals* in removal proceedings from seeking judicial review unless there is evidence of "outrageous . . . discrimination." *AADC*, 525 U.S. at 491. Review of a policy determination to eliminate discretion in awarding deferred action for an entire class of predominantly Latino immigrants will not delay or otherwise have any effect on individual removal proceedings. This litigation is proceeding prior to the March 5, 2018 DACA expiration, and Plaintiffs are not challenging any active individual removal proceedings.

b. *Congress has not enacted any statute that strips jurisdiction from this Court*. To the extent the Government argues that 8 U.S.C. § 1252(g) precludes review, Gov. Br. 21-24, that (i) has been rejected by the Courts, and (ii) is demonstrably incorrect. *See, e.g.*, *Batalla Vidal.*, 2017 WL 5201116, at *12-13.

This case raises none of the concerns Section 1252(g) is intended to address: Plaintiffs are challenging the class-wide, policy decision to terminate DACA. Plaintiffs are not attempting to obstruct or collaterally attack any ongoing removal proceedings. The plain text of Section 1252(g) limits judicial review of actions "by or on behalf of *any alien* arising from" certain deportation proceedings in three specifically enumerated circumstances: cases "arising from the decision or action by the Attorney General to *commence* proceedings, *adjudicate* cases, or *execute* removal orders against any alien under this chapter." 8 U.S.C. § 1252(g) (emphasis added).[8] The Supreme Court has explained that § 1252(g) is not "a sort of 'zipper' clause that says 'no judicial

---

[8] In contrast to this case, the cases cited by the Government at pages 22-23 of its brief both involve challenges by individual aliens to removal proceedings in which the petitioner sought deferred action as a means to prevent their removal. *See Vasquez v. Aviles*, 639 F. App'x 898, 901 (3d Cir. 2016) (collateral attack on government's failure to grant deferred action by individual contesting removal proceedings); *Botezatu v. INS*, 195 F.3d 311, 311-12, 314 (7th Cir. 1999) (challenge to government's decision not to grant deferred action after a removal order was already issued).

16

review in deportation cases unless this section provides judicial review.'" *AADC,* 525 U.S. at 482.

As Justice Scalia stated in his majority opinion:

> [Section 1252(g)] applies only to three discrete actions that the Attorney General may take[]. . . . There are of course many other decisions that may be part of the deportation process – such as the decision to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order. It is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings.

*Id.* In light of this, it is not surprising that Defendants' argument has repeatedly been rejected by

other courts considering large-scale grants of deferred action status. For example, the Fifth Circuit

held that Section 1252(g) did not preclude judicial review of DAPA, noting that such an expansive

reading of Section 1252(g) would render numerous other jurisdiction-stripping provisions of the

INA "superfluous." *See Texas*, 809 F.3d at 756-63.[9] Similarly, the Eastern District of New York

ruled that § 1252(g) did not preclude the court from considering Defendants' termination of the

DACA program because the rescission of DACA was not "[a] decision or action . . . to commence

proceedings, adjudicate cases, or execute removal orders against any alien." *See Batalla Vidal*,

2017 WL 520116, at *12 (quoting 8 U.S.C. § 1252(g)). As the Eastern District held, the decision

to rescind DACA does not fall within the specifically delineated scope of § 1252(g). [10]

### B. Plaintiffs Have Standing

---

[9] There are a number of other specific jurisdiction stripping provisions in the INA. *See, e.g.*, 8 U.S.C. § 1182(a)(9)(B)(v) (barring review of waiver of reentry restrictions); *Id.* § 1226a(b)(1) (limiting judicial review of detention of terrorist aliens); *Id.* § 1229c(e) (barring judicial review of regulations limiting eligibility for voluntary departure).

[10] Even if § 1252(g) precluded the Individual Plaintiffs' claims – which it does not – the Organizational Plaintiffs could still bring the claims because §1252(g) applies only to suits "*by or on behalf of any alien.*" 8 U.S.C. § 1252(g) (emphasis added). The Organizational Plaintiffs are clearly not aliens and are pursuing these claims in their own right. *See infra* Section I.B.2.

The Court must consider standing with respect to each separate claim asserted in the Complaint, not with regard to each plaintiff. *Bostic*, 760 F.3d at 371. "[T]he presence of one party with standing is sufficient to satisfy Article III's case or controversy requirement." *Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. at 53 n.2 (no further inquiry necessary where one plaintiff had standing to pursue all claims); *Bostic*, 760 F.3d at 370-71.

1.      The Individual Plaintiffs Indisputably Have Standing

The Government has not contested that the Individual Plaintiffs have standing with respect to each claim.  Gov. Br. 25-29.  On this basis alone, the Court should deny the Government's standing challenges.

In any event, the Individual Plaintiffs easily meet the standard to establish standing.  The Government acknowledges the Individual Plaintiffs include current and former DACA recipients. Compl. ¶¶ 38-55; Gov. Br. 2.  Their claims arise out of the Government's decision to rescind the DACA Program (Counts I, III, IV, V & VII) and the revocation of the prohibition on sharing DACA applicant information with enforcement authorities (Counts II, III, IV, V & VI).  The Individual Plaintiffs have suffered injury-in-fact because, among other reasons:

- "If the DACA program ends, the [Individual Plaintiffs] almost certainly will lose their work authorization, the availability of which turns on their status as recipients of deferred action." *Batalla Vidal*, 2017 WL 5201116, at *15. "Loss of the[] ability to work in the United States is clearly an 'injury in fact.'" *Id.; see also McNary*, 498 U.S. at 491 ("the impact of a denial on the opportunity to obtain gainful employment is plainly sufficient to mandate constitutionally fair procedures in the application process").

- The Rescission Memorandum impaired the ability of the Individual Plaintiffs' to travel abroad by terminating the advance parole option for DACA recipients. Compl. ¶ 18.  Loss of the freedom to travel is an injury in fact.  *Kent v. Dulles*, 357 U.S. 116, 125-26 (1958) (right to travel is a liberty that cannot be taken without due process of law).

- The loss of their deferred action status would make the Individual Plaintiffs subject to removal from the country and their risk of deportation is significantly heightened

by the rescission of the information nondisclosure policy. *Batalla Vidal*, 2017 WL 5201116, at *16.

- The Rescission Memorandum will soon deprive the Individual Plaintiffs of vital benefits such as driver's licenses, bank accounts, financial aid, home ownership, and disability and health benefits. Compl. ¶¶ 101-03, 105-06.

Defendants do not contest these injuries, all of which are directly traceable to the Defendants' decision to rescind DACA and revoke the information sharing prohibition. Compl. ¶¶ 97-128. The entry of an order declaring these actions to be illegal or enjoining them would restore the status quo. *Id.*

2.   The Organizational Plaintiffs Have Standing

The Organizational Plaintiffs have standing both directly and in a representational capacity. With regard to the claims brought on their own behalf, an organization has standing to bring a claim where a defendant's actions have "perceptibly impaired" an organizational plaintiff's ability to carry out its established mission by creating a "drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Equal Rights Ctr. v. Equity Residential*, 798 F. Supp. 2d 707, 725 (D. Md. 2011) (expenditure and diversion of resources to investigate agency's action sufficient to show standing). The Complaint alleges how Organizational Plaintiffs have been directly injured by the DACA rescission. Compl. ¶¶ 29-37. For example, Plaintiffs allege that CASA had to "suspend[] the majority of [its] work to assist DACA renewal applicants" and "reprioritized [its] work to engage with the community and educate them about the rescission of DACA." Compl. ¶ 29. The Complaint further alleges that the DACA rescission has "impaired CASA's mission, as DACA members and their families who live in our communities face an uncertain future that may include loss of employment and potential

permanent separation from their families." Compl. ¶ 29.  In opposition to the Motion, Plaintiffs

are submitting declarations[11] that establish:

- The Organizational Plaintiffs are devoted to improving the lives of individuals in immigrant communities and have had to devote significant resources in response to the rescission of DACA, to the detriment of their other programs.  (CASA Decl. ¶ ¶ 4-5, 8-12 ;  OneAmerica Decl. ¶¶ 2-6, 15, 16, 18; Junta Decl. ¶ ¶ 2-5, 9, 13.)

- The Organizational Plaintiffs have provided services to assist individuals relating to their DACA status, which services are ongoing following the Rescission, and these services have been overwhelmed since the rescission of DACA.  (CASA Decl. ¶ ¶ 8-12;  OneAmerica Decl. ¶ 15; Junta Decl. ¶ ¶ 9-14.)

- The Organizational Plaintiffs lack the capacity to respond to this need and also maintain their other programs.  (CASA Decl. ¶ ¶ 8-12;  OneAmerica Decl. ¶¶ 15-16; Junta Decl. ¶ ¶ 9-14, 16-18.)  For example, CASA was forced to suspend most of its programming (CASA Decl. ¶ ¶ 8-12); OneAmerica had to stay its environmental justice advocacy programming (OneAmerica Decl. ¶ 16); and Junta was forced to abandon its legal permanent resident campaign (Junta Decl. ¶ 9).

In sum, the Organizational Plaintiffs' programming has been "perceptibly impaired," indeed much

of their vital programming has been halted altogether.  Thus, the Organizational Plaintiffs have

sufficiently alleged injury to their own activities to allow them to pursue declaratory and injunctive

relief under the *Havens* line of cases.

In response, the Government ignores this factual proffer and argues the Organizational

Plaintiffs suffer nothing other than "generalized grievances" which should be "rejected out of

hand." Gov. Br. 25-27.  This contention both ignores Plaintiffs' allegations and factual proffer and

misstates the law.  *See, e.g.*, *IRAP*, 2017 WL 4674314, at *13 (standing where defendants' actions

---

[11] On a motion to dismiss for lack of standing, the court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  *White Tail Park, Inc.*, 413 F.3d at 459 (relying on affidavits to find organization had standing).

"imped[ed organizational plaintiffs'] efforts to accomplish their missions by disrupting their ability to raise money, train staff, and convene programs").[12]

The Government also contends that one of the Organizational Plaintiffs (CASA) cannot establish injury because they purportedly have no "ongoing injury," Gov. Br. 27, but this misconstrues the evidence of ongoing injury to the Organizations.  The Government's argument ignores that the rescission of the DACA program will be implemented between the present and March 5, 2020 (when deferred action will end for the last recipient), and that all DACA recipients, as they face the loss of their right to work and risk of deportation will need to assess whether they have other bases to remain in the United States and will need to be counseled on difficult questions, including whether to keep their family together.  (CASA Decl. ¶ ¶ 13-17; OneAmerica Decl. ¶¶ 10-12, 15; Junta Decl. ¶ ¶ 7-10).  CASA and the other Organizational Plaintiffs have and will continue to need to dedicate tremendous resources to this effort.  Moreover, the Government's contention ignores that several of the Organizational Plaintiffs employ DACA recipients in critical roles and their missions will be impacted by their inability to legally employ these valued employees once their DACA expires, and to have to expend resources to recruit, hire, and train replacements.  *See* Compl. ¶ 53; CASA Decl. ¶ 15; OneAmerica Decl. ¶ 17; Junta Decl. ¶ 16.

In addition to the claims they bring on their own behalf, several of the Organizational Plaintiffs bring claims on behalf of their members, who include DACA recipients.  To invoke associational standing on behalf of its members, an organization must establish that (1) "its

---

[12] Defendants cases are inapposite. *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991) (dismissed for mootness; in dicta, association offered no evidence of injury); *Nat'l Taxpayers Union, Inc. v. United States.*, 68 F.3d 1428, 1433-34 (D.C. Cir. 1995) (no injury because mere "frustrated" objectives and speculation as to potential impact on fundraising); *Am. Legal Found. v. FCC.*, 808 F.2d 84, 92 (D.C. Cir. 1987) (no injury where nonprofit had an "'institutional interest' in 'seeing to it that [an agency's] policies are enforced'").

members would otherwise have standing to sue in their own right;" (2) "the interest [the organization] seeks to protect are germane to [its] purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Defendants do not contest that the Organizational Plaintiffs meet the second and third prongs. Gov. Br. 28-29[13]

Rather, the Government contends that the Organizational Plaintiffs lack associational standing because they fail to identify "a specific member with standing for each claim it asserts." Gov. Br. 28. This is a makeweight argument and demonstrably incorrect. The Complaint identifies Jose Aguilar, who is a CASA member and who risks losing his DACA status and work authorization when it expires in March 2019. Compl. ¶ 53. Furthermore, many of the Individual Plaintiffs are CASA members. CASA Decl. ¶ ¶ 13-17. And the record references specific members of CASA, OneAmerica, and Junta who have standing to challenge the DACA rescission and the revocation of the information-sharing prohibition in their own right. CASA Decl. ¶ ¶ 13-17; OneAmerica Decl. ¶¶ 11-12; Junta Decl. ¶¶ 7-8.)[14] Moreover, the Organizational Plaintiffs allege that they assisted on tens of thousands of DACA initial and renewal applications (Compl. ¶¶ 29, 30, 31, 35, 36, 37), engage in community education relating to DACA (Compl. ¶¶ 29, 32, 36), and advocate for a legislative solution for Dreamers (Compl. ¶¶ 33, 34, 37). There can be no

---

[13] Nor could they. The Organizational Plaintiffs are all dedicated to the advancement of immigrants' rights and the empowerment of immigrant communities (*see* Compl. ¶¶ 29-37), making the rescission of DACA clearly germane to their purpose. And there is no reason the Organizational Plaintiffs, as representatives for their members and constituents, cannot effectively prosecute the statutory, constitutional, or common law claims that seek to vacate the unlawful Rescission Memorandum and related agency actions, and enjoin the Defendants from violating the law or disclosing DACA-applicants' personal information to immigration enforcement officials. *See IRAP*, 2017 WL 4674314, at *14 (recognizing that statutory and constitutional challenges to a law could be effectively litigated by representative organizations).

[14] *See IRAP*, 2017 WL 4674314, at *14 (finding declarations describing an individual and another providing only a first name to be sufficient).

serious doubt that the Organizational Plaintiffs have members, on whose behalf they provide these services and advocacy efforts, who have been injured by Defendants' actions. Thus, the Organizational Plaintiffs also have representational standing to pursue these claims.

The Organizations also have standing to bring an action under the APA. The APA confers a cause of action on persons "adversely affected or aggrieved by agency action." 5 U.S.C. § 702; *see also Abourezk v. Reagan*, 785 F.2d 1043, 1050 (D.C. Cir. 1986); *IRAP*, 2017 WL 4674314, at *17. A plaintiff is "aggrieved by agency action" where the interest at issue "*arguably*" falls "within the zone of interests" sought to be protected. *Abourezk*, 785 F.2d at 1050 (emphasis added). "[I]n the APA context," the zone of interests test required to bring a claim is "not especially demanding." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1389 (2014).[15] Under this "lenient approach," "the benefit of any doubt goes to the plaintiff," and suit is "'foreclose[d] . . . only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' Congress authorized that plaintiff to sue." *Id.*

In contending that the Organizational Plaintiffs "lack a cause of action under the APA," Gov. Br. 29, the Government again mischaracterizes the Organizational Plaintiffs' claims. The Organizational Plaintiffs are all dedicated to immigrants and immigrant communities. Compl. ¶¶ 29-37. As discussed *supra*, the Organizations collectively assisted with tens of thousands of DACA initial and renewal applications, employ DACA recipients, advocate on behalf of Dreamers, provide community outreach, education, and support services to undocumented

---

[15] *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388 (1987) is not in conflict. It recites the same lenient test as *Lexmark*, *id*. at 400, and held that a trade association representing securities brokers, dealers, and underwriters was within the zone of interest to challenge a decision of the Comptroller of the Currency to grant national banks permission to open competing discount securities brokerage offices. *Id.* at 403.

childhood immigrants, and provide ongoing support and counseling to DACA recipients who face injury because of the rescission. The Organizations have alleged and described the drain on resources caused by the rescission of DACA, as well as the impact the rescission has and will have on their employees, volunteers, members, and programming. CASA alone "counts 2,300 DACA beneficiaries as members." Compl. ¶ 29; CASA Decl. ¶ 12. These interests of these organizations plainly fall within those directly protected by the INA—far exceeding the standard that they "arguably" fall within the INA's zone of interests–allowing them a cause of action under the APA. Under similar circumstances, courts have not hesitated to find that organizational plaintiffs are within the zone of interests protected by the INA and have a cause of action under the APA. *See, e.g.*, *Abourezk*, 785 F.2d at 1050 (finding standing for an organization that invites foreign nationals to speak at rallies); *IRAP*, 2017 WL 4674314, at *13 (finding standing for organizations that employ or collaborate with foreign nationals affected by President Trump's travel ban).[16]

## II.     THERE IS NO BASIS TO DISMISS THE COMPLAINT UNDER RULE 12(b)(6)

### A.     The Complaint Alleges Multiple Violations of the Administrative Procedures Act

#### 1.     Plaintiffs Have Stated a Claim Under the APA

"The APA provides that a reviewing court is bound to 'hold unlawful and set aside agency action' for certain specified reasons, including whenever the challenged action is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Friends of Back*

---

[16] Defendants' reliance on *Fed'n of Am. Immig. Reform, Inc. v. Reno*, 93 F.3d 897, 901 (D.C. Cir. 1996), ("*F.A.I.R.*") is misplaced. *F.A.I.R.* held that claims asserted by an anti-immigration reform group were not within the zone of interests of the INA because the purported harms—generic, negative effects on employment opportunities, and public services and facilities, on existing members of communities where immigrants may settle—are mere "incidental effects" of the challenged immigration policy. By contrast, the Organizational Plaintiffs seek redress for specific harms to the people directly affected by the agency's behavior, the DACA candidates and recipients.

*Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 586-87 (4th Cir. 2012), (quoting 5 U.S.C. § 706(2)(A)).  Count IV of the Complaint alleges that Defendants violated the APA because their rescission of DACA and revocation of the prohibition on sharing DACA applicants' personal information with enforcement authorities are arbitrary and capricious, contrary to prior determinations of DHS, and unsupported by a reasoned analysis.  In support of this claim, the Complaint contains detailed factual allegations concerning the establishment of DACA and the Government's commitment not to share applicant information with enforcement authorities. Compl. ¶¶ 4-6, 9-16, 67-70, 79-91.  The Complaint also states detailed facts regarding the Government's efforts to induce Plaintiffs and other Dreamers to rely on these commitments, Compl. ¶¶ 9-17, 71-91, and the irregularities in the revocation of these programs and related commitments.  Compl. ¶¶ 18, 21-25, 92-128, 162-166.  For a host of reasons, Count IV pleads a violation of the APA.

a. *The rescission of DACA is not supported by the Administrative Record*.  As an initial matter, the Administrative Record (ECF No.26)—which consists of fourteen documents comprising a total of 256 pages, all of which are publicly available, and 192 of which relate to a wholly separate immigration policy[17]—is woefully incomplete.

It bears emphasis that two other courts considering the Government's decision to rescind DACA have concluded that this Administrative Record is incomplete.  As the Ninth Circuit recently found, "[t]he notion that the head of a United States agency would decide to terminate a program giving legal protection to roughly 800,000 people based on 256 pages of publicly

---

[17] Those 192 pages are the Supreme Court, Fifth Circuit, and district court opinions in a suit challenging a distinct deferred action policy, Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA.  *United States v. Texas*, 136 S. Ct. 2271 (2016); *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015); *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

available documents is not credible." *In re United States*, No. 17-72917, 2017 WL 5505730, at *2 (9th Cir. Nov. 16, 2017) (citations omitted) (denying mandamus). Similarly, the Eastern District of New York held that "plaintiffs . . . have adequately established that the administrative record produced to date is manifestly incomplete." *Batalla Vidal v. Duke*, No. 1:16-cv-04756-NGG-JO, Mem. & Order at 3, Dkt. No. 89 (E.D.N.Y. Oct. 19, 2017) (Ex. 8).

The insufficiency of the Administrative Record is clear from the face of the Government's certification, which states the submitted documents are "a complete copy of the non-privileged documents that were actually considered by Elaine C. Duke . . . in connection with her September 5, 2017 decision to rescind" DACA. That "complete" set of documents is far from the complete record in this case: "[A] complete administrative record should include all materials that 'might have influenced the agency's decision,' and not merely those on which the agency relied in its final decision." *Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Sec.*, No. 16-1015, 2017 WL 3189446, at *13 (D. Md. July 27, 2017) (citation and quotation omitted). The Administrative Record must include "all documents and materials directly or indirectly considered by the agency. . . . The agency may not . . . skew the 'record' for review in its favor by excluding from that 'record' information in its own files which has great pertinence to the proceeding in question" nor may an agency "exclude . . . unfavorable information . . . on the ground that it did not 'rely' on that information in its final decision." *Id*. at *8 (collecting cases).[18] The Record is woefully

---

[18] For this very reason, guidance promulgated by the Department of Justice requires that agencies compiling an administrative record must "include all documents and materials prepared, reviewed, or received by agency personnel and used by or available to the decision-maker, even though the final decision-maker did not actually review or know about the documents or materials" and should include "communications to the agency received from other agencies…[and] documents and materials that support or oppose the challenged agency decision." U.S. DEP'T OF JUST., ENV'T AND NAT. RES. DIV., GUIDANCE TO FEDERAL AGENCIES ON COMPILING THE ADMINISTRATIVE RECORD 3-4 (Jan. 1999).

inadequate. [19] *See generally* Rule 56(d) Decl. ¶ 9(a)&(b).  For this reason alone, the Motion must

be denied.  *See, e.g., Greene v. Carson*, 256 F. Supp. 2d 411, 431-32 (S.D.N.Y. 2017) (where

administrative record is patently deficient, the government's Rule 12 and 56 motions must be

denied).

In any event, the proffered explanation is implausible and not supported by the Record

submitted.  Under the APA, an action is arbitrary and capricious if the agency "offered an

---

[19] By way of example only, the Record contains no documents:

- from Acting Secretary Duke's subordinates, despite sworn deposition testimony that at least fifteen DHS employees were involved in the decision to terminate DACA, and that Acting Secretary Duke based her decision in part on the work and recommendation of those employees.  Hamilton Dep. at 95; *see In re United States*, 2017 WL 5505730, at *3 ("it strains credulity to suggest that the Acting Secretary decided to terminate DACA without consulting one advisor or subordinate within DHS") (internal quotation omitted); *Otsuka Pharm. Co. v. Burwell*, No. 15-852, 2015 WL 1579127, at *2 (D. Md. Apr. 8, 2015) ("[i]f the agency decision maker based his decision on the work and recommendations of subordinates, those materials should be included as well") (citing *Amfac Resorts, LLC v. U.S. Dep't of Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (collecting cases));

- from the Department of Justice or the White House other than a one-page letter from Attorney General Sessions and a 2014 Office of Legal Counsel opinion concluding that DACA was legal.  The idea that no additional records exist defies credulity, given:  (1) sworn deposition testimony that the White House Chief of Staff, two Deputy Chiefs of Staff, four Presidential advisors, the Attorney General, and three other DOJ representatives participated in the decision to terminate DACA (Hamilton Dep. at 103); (2)  representations by the Government at a hearing that "the Attorney General and DHS both decided that this was an unlawful program" and "the Attorney General and DHS decided that . . . they're going to wind down this program," Sept. 14, 2017 Tr. *Battalla Vidal*, 16-cv-4756 at 13, 26 (Ex. 9); (3) a press release from the President taking credit for the decision (Ex. 10)         ; and (4) a press conference at which the Attorney General claimed that DACA led to an increase in unaccompanied minors entering the United States and resulted in American citizens losing job opportunities, and that termination of the program would "strengthen[] the constitutional order and the rule of law in America" (Ex. 11); or

- explaining why Defendants are allowing a program it claims is unconstitutional to remain in effect until March 2020, nor why DHS will continue to adjudicate applications filed by October 5, 2017.  Nor does it explain why President Trump tweeted, the same day Acting Secretary Duke issued the Rescission Policy, that if Congress could not "legalize DACA" within six months, he would "revisit this issue!" (Ex. 12) suggesting that the President believes the Executive Branch *does* have authority to continue the program.

explanation for its decision that runs counter to the evidence before the agency" or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). "[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute." *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970).

The Government purportedly based the rescission of DACA on "the imminent risk of a nationwide injunction." Gov. Br. 31. Among other things, this explanation ignores that the Government previously averred—both internally and before other courts—that DACA was a lawful exercise of the Executive Branch's immigration enforcement authority. Specifically, in 2014, the Department of Justice Office of Legal Counsel concluded that DACA was a lawful exercise of the Executive Branch's "discretion to enforce the immigration laws." AR000004-36. More recently, the Government represented that programs such as DACA are "lawful exercise[s]" of the Executive Branch's "broad statutory authority" to administer and enforce the INA.[20] And the current Administration determined in February and June that DACA should be maintained. Decl. Exs. 3 & 4. Reasoned agency decision-making "ordinarily demand[s] that [the agency] display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). As the Ninth Circuit found, "[t]he materials considered by Secretary Kelly in the course of deciding against ending DACA in February 2017 did not cease to be 'before the agency' for purposes of the administrative

---

[20] Brief for Petitioners at 42, *United States v. Texas*, 136 S. Ct. 2271 (2016) (No. 15-674), 2016 WL 836758 at *42.

record during that seven-month evolution in policy." *In re United States*, 2017 WL 5505730, at *4 (*quoting Thompson v. Dep't of Labor*, 885 F.2d 551, 556-56 (9th Cir. 1989)).   Nonetheless, Defendants have not provided any explanation, let alone a reasoned analysis, for this change in position.

There was nothing imminent about risk to DACA:  No litigation ever sought to enjoin DACA, no litigant has successfully challenged DACA, no litigant has filed a brief demonstrating imminent harm from DACA, and no Court ever enjoined DACA.   The Fifth Circuit's ruling in *Texas*, upon which Defendants almost exclusively rely for this assertion of "imminent risk," involved no such challenge.   Contrary to Defendants' erroneous suggestion that the Fifth Circuit found DACA "invalid[] . . . as it was actually implemented in practice,"  Gov. Br. 36, the Fifth Circuit never ruled on the validity of DACA—nor has any other court.   Rather the Fifth Circuit decision in the *Texas* litigation concerned the "Deferred Action for Parents of Americans," or "DAPA," an entirely different immigration program.

Indeed the Administrative Record confirms "the original DACA policy was not challenged in the [Texas] lawsuit."   AR00000253.   Additionally, as Defendants concede, DAPA "was *enjoined before its implementation*," Gov. Br. 35 (emphasis added), meaning the equities at issue in challenging DAPA are very different than those presented for DACA.   DACA has been in place for five years and has extended protected interests to more than 800,000 individuals; DAPA was never implemented and protected no one.   In light of these critical factual differences (discussed nowhere in the Administrative Record or the Government's brief), it is entirely speculative for the Government to conclude that the Court would enjoin DACA.[21]

---

[21] Press Release, Dep't of Homeland Security, *Statement from Acting Secretary Duke on the Rescission of DACA* (Sept. 5, 2017), https://go.usa.gov/xncuM.

By hailing the Fifth Circuit's DAPA decision, the Government is hoisted by its own petard. The Fifth Circuit explicitly concluded that DAPA was both justiciable and a substantive rule that should have gone through notice-and-comment.  *Texas,* 809 F.3d at 146-48.  It is implausible that the Government grounded its decision to rescind DACA on the alleged "litigation risk" created by the Fifth Circuit opinion if, as the Government now claims, its justiciability and notice-and-comment holdings were wrong.

The Government also avers (even more speculatively) that rescission of DACA would be more "orderly," and "less disruptive," or result in less "litigation risk" than defending another suit seeking an injunction.  Gov. Br. 2, 10, 20, 30, 33.  These assumptions are belied by the confusion, fear and disruption experienced by the more than 800,000 DACA recipients and their families as a result of Defendants' actions; indeed, the "orderly" termination of DACA—which involved renewal and application deadlines with no rationale—were so poorly executed that USCIS was forced to revise its procedures for the acceptance of renewal applications between the filing of the Complaint and the deadline for this response brief.[22]  The presumed reduced "litigation risk" is belied by the ten lawsuits filed across the country by individuals, states, universities, cities, counties, civil rights groups, non-profit organizations, major corporations, and others.  "[A]t, most, the Department deliberately traded one lawsuit for another." *Organized Vill. Of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 970 (9th Cir. 2015) (agency's desire to avoid litigation did not satisfy its obligation to provide a reasoned explanation for its change in policy); *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 34 (D.D.C. 2012) (rejecting the "litigation risk" explanation for an action and finding action to be arbitrary and capricious).

---

[22]USCIS, USCIS GUIDANCE ON DACA RENEWAL REQUESTS AFFECTED BY MAIL SERVICE ISSUES (last updated Nov. 17, 2017), ( Ex. 13).

In short, the Government's reasons for rescinding DACA are fundamentally permeated by speculation, unsupported by facts and undocumented in the Administrative Record. The APA, at a minimum, establishes that speculation cannot substitute for reasoned decision-making, nor can it justify jettisoning a policy on which over 800,000 people have relied. After all, "an agency changing its course must provide a reasoned analysis." *State Farm*, 463 U.S. at 57.

b. *In altering DHS's information-sharing prohibition, the Government "entirely failed to consider an important aspect of the problem" and therefore failed to support the revocation with a "reasoned analysis." State Farm*, 463 U.S. at 43. Nor does the Government attempt to provide such an explanation now. The only response is to deny that there has been a "substantive change in DHS's information-sharing policy." Gov. Br. 38. That response strains credulity, and is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43 (citation omitted).

In promoting the DACA program, the Government invited hundreds of thousands of highly vulnerable young people to offer their personal information, information that, if provided to immigration enforcement officials, could have severe consequences. The Government assured Plaintiffs and others like them that, in providing such personal information as part of their DACA applications, they had nothing to fear as long as they were honest in their applications, did not engage in subsequent criminal activity, and were not otherwise subject to deportation based on a previously obtained record. Specifically, the DACA application instructions stated unequivocally that:

> **Information provided in this request is protected from disclosure to ICE and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings** unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). The information may be shared with national security and law enforcement agencies, including ICE and CBP, for

purposes *other* than removal, including for assistance in the consideration of deferred action for childhood arrivals request itself, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense.  The above information sharing clause covers family members and guardians, in addition to the requestor.[23]

DHS made the same assurances in its Frequently Asked Questions regarding DACA:

> Information provided in [an application for DACA] is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA).  **Individuals whose cases are deferred pursuant to DACA will not be referred to ICE.**[24]

In the DHS notice of approval granting deferred action under DACA, the same message was conveyed:  the only grounds cited for violating the information sharing prohibition are "fraud or misrepresentation" and "[s]ubsequent criminal activity."[25]

Not only did the Government make these representations in outreach to DACA applicants; pursuant to its obligations under the e-Government Act, DHS also documented the information-sharing prohibition in its 2012 Privacy Impact Assessment for DACA (the "2012 PIA").[26]  In the 2012 PIA, DHS declared that "information provided in [a DACA request] is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings unless the individual meets the guidelines for the issuance of a Notice to Appear ("NTA") or a referral to ICE under [USCIS NTA guidance]."

This commitment to prohibit sharing DACA applicant information with enforcement authorities was essential to the successful implementation of the program.  DACA could work only if eligible young persons were willing to disclose the highly sensitive personal information needed

---

[23] *See* INSTRUCTIONS FOR CONSIDERATION OF DEFERRED ACTION FOR CHILDHOOD ARRIVALS, USCIS FORM I-821D 13 (Jan. 9, 2017 ed.) (emphasis added)) (Ex. 14).

[24] *See* USCIS DACA FAQS, RESPONSE TO QUESTION 19  (Ex. 15) (emphasis added)).

[25] *See* Ex. 16 (DACA APPROVAL SAMPLE).

[26] *See* Ex. 17 (DHS/USCIS/PIA-045 ).

to process their applications.  The Government had to engage in aggressive outreach to build the trust of such vulnerable persons, and doing so required making a promise of grave significance: they induced hundreds of thousands of young individuals to turn over information that could be used to destroy the futures for which those individuals hoped to attain through DACA.  Compl. ¶¶ 10-16, 79-81, 91.

While the Government contends there has been no "*substantive* change" to the information-sharing prohibition, Gov. Br. 37, 38 (emphasis added), that disingenuous factual averment is disputed, *see* Compl. ¶¶ 79-91, and is an area where discovery is appropriate.  *See* 56(d) Decl. ¶¶ 7, 8, 9(c) & 10.   Notably, the Government does not address the specific allegations in the Complaint including that (i) the April 27, 2017 memorandum purports to rescind all privacy commitments by declaring that "agencies may no longer extend the protections of the Privacy Act to those other than U.S. Citizens and Lawful Permanent Residents,"  Ex. 18, (ii) the Government changed the information policy when it issued the DACA rescission to say that "[g]enerally, information provided in DACA requests will not be *proactively* provided [by DHS] to other law enforcement entities [for purposes other than those permitted under the exceptions],"[27] or (iii) Acting Secretary Duke's publicly denied that there was any information sharing prohibition. Compl. ¶¶ 108-112.

Having denied that there has been a "substantive change," the Government does not attempt to explain or otherwise defend the change.  This omission is fatal: "Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, we

---

[27] DHS, FREQUENTLY ASKED QUESTIONS: RESCISSION OF DACA Q8 (Ex. 19).

must undo its action." *Petroleum Comm'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994);

*see also Am. Tel. & Tel. Co. v. FCC*, 974 F.2d 1351, 1354 (D.C. Cir. 1992) (same).[28]

  c. *The revocation of the information-sharing prohibition is contrary to law*. In issuing the

2012 PIA, DHS followed its longstanding policy to treat any personally identifiable information

collected, used, maintained and/or disseminated by DHS, *regardless of whether such information*

*pertains to U.S. citizen, legal permanent resident, visitor or alien*, as subject to the Privacy Act.[29]

Thus, even if the Privacy Act would not otherwise apply, as the Government now contends, Gov.

Br. 39, the Government expressly waived that statutory argument in the PIA. Compl. ¶¶ 83-89.[30]

  The Government's E-Government Act argument, Gov. Br. 39-41, is equally unavailing.

The E-Government Act requires agencies to update existing PIAs, or to conduct new PIAs, when

a change in practices regarding information collection and use, business processes, or other

information systems changes create privacy risks or otherwise effect individuals' privacy.[31] By

---

[28] Even if the Government had proffered an explanation, the revocation of the information-sharing prohibition would be impermissible by virtue of its retroactive, punishing impact. *See*, *e.g.*, *Velasquez-Garcia v. Holder*, 760 F.3d 571 (7th Cir. 2014) (holding rule to be impermissibly retroactive because the agency "'had established an explicit standard of conduct, and now attempts to punish conformity to that standard under a new standard subsequently adopted.'") (quoting *Retail, Wholesale & Dep't Store Union v. NLRB*, 466 F.2d 380, 391 (D.C. Cir.1972)).

[29] Guidance Memorandum from Hugo Teufel III, Chief Privacy Officer, U.*S. DHS, 2007-01: DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Information on Non-U.S. Persons* (Jan. 7, 2009) (Ex.20).

[30] The Government's citation of *Fares v. U.S. Immigration and Naturalization Service*, 50 F.3d 6 (4th Cir. 1995), Gov. Br. 40, is inapposite. The Government fails to note that *Fares* is an unpublished disposition, which means the decision has no precedential value. Moreover, *Fares* was decided almost 15 years before DHS declared its policy to treat all personally identifiable information the same under the Privacy Act, regardless of the immigration status of the individual to whom the information pertained. *See* DHS Guidance Memorandum of January 7, 2009 (cited in preceding footnote). And as relevant to DACA, *Fares* preceded DHS' decision to waive the Privacy Act limitation with respect to DACA applicants' personal information in the 2012 PIA. *See* 2012 PIA (Ex. 17) at 16, § 7.1.

[31] *See* DEPT. OF JUS., OFFICE OF PRIVACY AND CIVIL LIBERTIES, PRIVACY IMPACT ASSESSMENTS: OFFICIAL GUIDANCE (last revised Mar. 2012), https://www.justice.gov/opcl/docs/2012-doj-pia-

altering the information sharing prohibition, a policy change related to DACA that contradicts the findings and representations made in the 2012 PIA without updating or replacing the 2012 PIA, DHS has violated the E-Government Act.   Because DHS has not acted in accordance with applicable law, its challenged actions were arbitrary and capricious in violation of the APA.   5 U.S.C. §§ 702-706.

 

2. <u>The DACA Rescission Memo is a Substantive Rule Subject to Notice-and-Comment Rulemaking.</u>

Count V of the Complaint alleges that Defendants violated the APA because the rescission of DACA was a substantive rule and failed to go through notice-and-comment rulemaking.   In support of this claim, the Complaint contains detailed factual allegations concerning the substantive impact DACA and its rescission had on Dreamers, Compl. ¶¶ 7, 17, 20, 71-78, 92, 97-106, and the irregularities in the revocation of these programs.   Compl. ¶¶ 18, 21-25, 92-128, 162-166.

The DACA Rescission Memo is a substantive rule that prevents DHS from exercising discretion in a class of cases and substantively limits Dreamers' ability to work, live, attend school, and travel.   Therefore, DHS was required to comply with notice-and-comment procedures in promulgating the DACA Rescission Memo.   It undisputedly failed to do so.

a.   Under the § 553 of the APA, all substantive (or legislative) rules must go through the notice-and-comment rulemaking process before they become effective.   See *Chrysler Corp. v.*

---

manual.pdf; *see also* OFFICE OF MANAGEMENT AND BUDGET ("OMB") MEMORANDUM, M-03-22, OMB GUIDANCE FOR IMPLEMENTING THE PRIVACY PROVISIONS OF THE E-GOVERNMENT ACT OF 2002 (Sept. 26, 2003).

*Brown*, 441 U.S. 281, 314 (1979); *see also* 5 U.S.C. § 551(5) (the definition of "rule making" includes "the process of formulating, amending, or *repealing* a rule") (emphasis added).[32]

In determining whether a rule is substantive, a court must analyze whether the rule "has the force of law, and creates new law or imposes new rights or duties." *Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205, 207 (4th Cir. 1989); *see also U.S. v. Mitchell*, 39 F.3d 465, 470 (4th Cir. 1994). A rule is subject to notice and comment when it has a substantial impact on those it seeks to regulate.[33] *Brown Express, Inc. v. United States*, 607 F.2d 695, 702 (5th Cir. 1979). Conversely, general statements of policy are exempted from notice-and-comment procedures pursuant to § 553(b)(3)(A). *See* 5 U.S.C. § 553(b)(3)(A); *Chamber of Commerce of U.S. v. U.S. Dept. of Labor*, 174 F.3d 206, 213 (D.D.C. 1993). A rule or regulation is "a general statement of policy if it does not establish a binding norm and leaves agency officials free to exercise their discretion." *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341 (4th Cir. 1995); *Texas*, 86 F.Supp. 3d at 666 (A "general statement of policy," which is exempt from APA's notice-and-comment requirements for rulemaking, "is best characterized as announcing the agency's tentative intentions for the future.").

---

[32] When engaged in such rulemaking, the agency must: (1) publish a general notice of proposed rulemaking in the Federal Register that includes "the terms or substance of the proposed rule or a description of the subjects and issues involved;" (2) give "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments;" and (3) "[a]fter consideration of the relevant matter presented . . . incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(b)-(c).

[33] Defendants cherry-pick language from *National Association of Regulatory Utility Commissioners v. United States Department of Energy* indicating it would have been "cumbersome and time-consuming" to require the agency to comply with full notice-and-comment rulemaking procedures. 851 F.2d 1424, 1431 (D.C. Cir. 1988). Defendants decline, however, to mention that the Department of Energy had still solicited public comments, was in the process of responding to comments, and prepared a methodology for publication on the Federal Register. By contrast, Defendants solicited *no* outside input before rescinding DACA.

Although the agency may characterize a rule as a general statement of policy, the "agency's statement . . . does not preclude our finding that is something more." *Jerri's Ceramic Arts, Inc.*, 874 F.2d at 207. An "agency cannot apply or rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy." *Am. Bus Ass'n v. United States.*, 627 F.2d 525, 529 (D.C. Cir. 1980) (citation omitted). Exceptions to notice and comment requirements "are not to be used to escape the requirements of section 553." *See id.*; *see also Chamber of Commerce of U.S. v. U.S. Dept. of Labor*, 174 F.3d 206, 213 (D.D.C. 1999) (finding rule was not a general policy statement and required notice and comment rulemaking where the "effect of the rule is . . . not to announce the agency's tentative intentions for the future, but to inform employers of a decision already made").[34] Exceptions to notice-and-comment are narrowly construed and, if a rule is substantive, all "notice-and-comment requirements must be adhered to scrupulously."[35] *Texas*, 787 F.3d at 762.

b. Here, the Rescission Memo is a substantive rule that should have complied with the APA's notice-and-comment requirements because it binds DHS and substantially affects the rights of DACA recipients.

The "cabining of an agency's prosecutorial discretion can in fact rise to the level of a substantive, legislative rule." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987) ("CNI"); *see Municipality of Anchorage v. United States*, 980 F.2d 1320, 1324 (9th Cir. 1992) (The "critical factor" in evaluating the substantive nature of an agency action is "the extent to

---

[34] *Compare Am. Bus Ass'n v. United States.*, 627 F.2d 525, 532 (D.C. Cir. 1980) (use of "will" indicates statement is in fact a binding norm) *with Guardian Fed. Sav. and Loan Ass'n v. Fed.l Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666 (D.C. Cir. 1978) (use of "may" indicates statement is a "general statement of policy").

[35] As the Fourth Circuit has recognized, "[t]he important purposes of . . . notice and comment procedure cannot be overstated." *N. Carolina Growers' Ass'n v. United Farm Workers*, 702 F.3d 755, 763 (4th Cir. 2012).

which the challenged [rule or regulation] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case."); *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 441 (D.C. Cir. 1989) (holding that agency order with "mandatory language cabining DOT's enforcement discretion" was a substantive rule); *cf. Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (finding agency guidance was "meaningless" legally since it "imposes no obligations or prohibitions on regulated entities" and because authorities "are free to ignore it").[36]

Here, the DACA Rescission Memo creates a binding norm and categorically curtails DHS's discretion to grant Dreamers deferred action status—and accordingly, it is a "substantive" rule that should have complied with the requisite rulemaking procedures under § 553. Specifically, the DACA Rescission Memo mandates that (1) Defendants will immediately cease accepting applications under DACA; (2) Defendants will issue renewals only for recipients whose DACA permits expire between September 5, 2017 and March 5, 2018, *only if* they apply for renewal by October 5, 2017; (3) Defendants will not issue renewals for recipients whose permits expire after March 5, 2018; and (4) Defendants will not approve any new or pending applications for advance parole for DACA recipients. Defendants' assertion that DHS "does not categorically forbid the

---

[36] *CNI* is instructive: in that case, organizations and private citizens challenged the promulgation of a FDA statement that established "action levels" to notify food producers of the allowable levels of unavoidable contaminants in food. *See* 818 F.2d at 945. Although the *CNI* court gave some deference to the agency's characterization of the statement as a general statement of policy, it concluded the rule was substantive and vacated it for failure to comply with the requisite notice-and-comment procedures because (1) the language used in creating and describing "action levels" suggested a present effect and was binding; (2) the present, binding effect was confirmed by the fact that the FDA considered the "action levels" as necessary for food producers to secure exceptions to the action levels; and (3) the FDA had made statements indicating that the action levels established a binding norm. *See id.* at 947.

agency from continuing to defer enforcement action against DACA recipients," Gov. Br. 43, is contradicted by the clear terms of the DACA Rescission Memo.[37]

In addition, the DACA Rescission Memo also has the "force and effect of law" on Dreamers. *See Chrysler Corp.*, 441 U.S. at 282; *see also Elec. Privacy Info. Ctr. v. U.S. Dep't. of Homeland Sec.*, 653 F.3d 1, 6 (D.C. Cir. 2011) (finding that a rule which allowed the Transportation Security Administration to screen airline passengers by using advanced imaging technology could not be exempt from rulemaking requirements, since the change substantially changed the experience of airline passengers with regard to privacy and security "to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking").

The DACA Rescission Memo fundamentally and substantively changes the ability of Dreamers to work, live, attend school, obtain credit, and travel in the United States. For example, the DACA Rescission banned current DACA recipients from receiving advance parole based on their DACA eligibility. *See* AR 255 (DHS *"[w]ill not approve* any Form I-131 applications for advance parole under standards associated with the DACA program" and "*[w]ill administratively close all pending Form I-131 applications*" filed under the DACA program.) (emphasis added). This is more than a suggested policy—this is a mandated action preventing DACA recipients from traveling. Because DHS has failed to comply with the APA's procedures in promulgating this substantive rule, the Rescission must be set aside.

---

[37] The sole reference to DHS's discretion in the DACA Rescission Memo relates to the ability of DHS to continue early termination of deferred action. *See* AR 255 ("[DHS] will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.") Thus, it is clear that DHS has promulgated a substantive rule that eliminates discretion to grant deferred action status without complying with the APA's notice-and-comment requirements.

Finally, Defendants' assertion that the promulgation of the 2012 DACA Memorandum without notice-and-comment excuses the failure to conduct notice-and-comment for its rescission because the program was "void ab initio," Gov. Br. 41, is legally without merit.  It is well-established that the APA's notice-and-comment requirement attaches to the rescission of a substantive rule regardless of whether the rule initially went through this procedure.  *See State Farm*, 463 U.S. 29 at 41 (When an agency rescinds a substantive rule, it is "obligated to supply a reasoned analysis for the change beyond what may be required when the agency does not act in the first instance."); *Mada-Luna,* 813 F.2d at 1018 n.12 ("[W]hen the government seeks to repeal a regulation, it is generally not bound for [notice-and-comment] purposes by the way it classified that regulation at the time of its promulgation.").   The rescission of a substantive rule requires notice and comment even if the original process was defective.  *See Consumer Energy Council v. FERC*, 673 F.2d 425, 448 (D.C. Cir. 1982) ("The argument that repeal was required because the regulations were defective does not explain why notice and comment could not be provided."). This requirement is necessary to prevent Defendants from circumventing the APA.  *See id. at* 447 n.79 ("The Commission's argument that notice and comment requirements do not apply to 'defectively promulgated regulations' is untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation.").[38]   The requirement helps ensure that an agency like DHS is not able to

---

[38] Defendants' reliance on *Chen Zhou Chai*, 48 F.3d at 1341 n.9, for the proposition that the interim rule would have had been invalid from the date of issuance if it were substantive is unpersuasive. As an initial matter, the statement was merely dicta contained in a footnote that does not address the question of whether notice-and-comment rule making is needed for the rescission of a rule. Moreover, *Chen Zhou Chai* ignores the fact that a court can use its equitable powers to protect challenged rules from immediate invalidation.  *See, e.g.*, *U.S. Steel Corp. v. EPA*, 649 F.2d 572,

"undo all that it accomplished" through a program "without giving all parties an opportunity to comment on the wisdom" of that action. *Id.* at 446;[39] *see also United States ex rel. Parco v. Morris*, 426 F. Supp. 976 (E.D. Pa. 1977) (holding the rescission of voluntary departure status required notice-and-comment procedures even though the program itself was adopted without such procedures).

Because the DACA Rescission Memo is a substantive rule revoking existing discretion of immigration officials, DHS is obligated to follow notice-and-comment procedures, regardless of whether DACA should have gone through such procedures.

### B.       The Complaint States a Claim for Violations of the Equal Protection Clause

Count III of the Complaint alleges that the Government violated the Equal Protection Clause.  In support of this Count, the Complaint contains detailed factual allegations concerning the Government's disparate treatment of allowing non-predominantly Latino deferred action programs to continue, the discriminatory impact of ending DACA (*i.e.,* that over ninety percent of DACA recipients were Mexican, Central American, or Latino), and considerable evidence of senior Government officials exhibiting their animus towards Mexicans, Central Americans, and Latinos, including eighteen distinct, detailed examples of statements exhibiting discriminatory animus.  Compl. ¶¶ 24-25, 68, 94-96.

---

575-77 (8th Cir. 1981) (leaving rule in effect pending completion of further administrative proceedings); *W. Oil & Gas Ass'n*, 633 F.2d at 812-13 (same).

[39] Moreover, a court considering a petition for review on an agency action "may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action." *Ford Motor Co. v. NLRB*, 305 U.S. 364, 373 (1939).

In an equal protection case, disparate impact evidence may be considered alongside the following non-exhaustive list of "subjects of proper inquiry in determining whether racially discriminatory intent existed":

[1] The historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes.

[2] The sequence of events leading up [to] the challenged decision . . . .

[3] Departures from the normal procedural sequence . . . . [and]

[4] The legislative or administrative history . . . especially where there are contemporary statements by members of the decision making body, minutes of its meetings, or reports.  In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action . . . .

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266-67 (1977); *see also Washington v. Davis*, 426 U.S. 229, 241-242 (1976) ("Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact that the law bears more heavily on one race than another").  The Supreme Court has repeatedly recognized that the Fifth Amendment's "equal protection component," *see Harris v. McRae*, 448 U.S. 297, 321 (1980), applies to non-citizens like DACA recipients.  *See Plyler v. Doe*, 457 U.S. 202, 210 (1982).

Under this standard, Count III more than adequately states a claim.  Plaintiffs allege the Government's rescission of DACA is based on discrimination based on race, national origin, and ethnicity, as demonstrated by all of the non-exhaustive factors listed by the Court in *Arlington Heights*.  Specifically, the complaint identifies the discriminatory impact of the decision on Mexicans, Central Americans, and Latinos (Compl. ¶¶ 24, 157, 159), and it sets forth the historical background of DACA Rescission and the sequence of events leading up to it (*id*. ¶¶ 2-17, 93), the many ways in which the DACA Rescission was a departure from normal procedures (*id*. ¶¶ 18, 21-22, 118-128), and the ongoing pattern of statements revealing a discriminatory intent.  The latter includes:

- Candidate Trump's discriminatory statements about immigrants of Mexican, Central American, and Latin American descent in February 2015 ("criminals"), June 2015 ("rapists"), August 2015 ("the bad ones"), May 2016 ("criminals" and "thugs"), June 2016 (Judge Gonzalo Curiel was "Hispanic," "pro-Mexican," and "a very hostile judge to me"), August 2016 ("illegal workers draw much more out from the system than they can ever possibly pay back … no one will be immune or exempt from enforcement"), and October 2016 ("bad hombres" and "we're going to get them out"). Compl. ¶¶ 25, 94;

- President-elect Trump's discriminatory statements about immigrants of Mexican, Central American, and Latin American descent in December 2016 (people from Central America are "killing and raping everybody out there. They're illegal. And they are finished."). Compl. ¶ 94; and

- President Trump's discriminatory statements about immigrants of Mexican, Central American, and Latin American descent in 2017 (January: "We are going to get the bad ones out. . . The criminals and the drug deals, and gangs. . ." and "tough hombres"), (February: "They're rough and they're tough…. So we're getting them out"), (June: "true animals" and "bad people"). *Id.*

The Complaint also identifies statements reflective of discriminatory intent from other officials, including the Attorney General and White House Senior Policy Advisor Stephen Miller. *Id.*

Only by ignoring the actual factual allegations of the Complaint and misstating the law does the Government challenge Plaintiffs' Equal Protection claims on three flawed grounds. *First*, the Government erroneously contends that an Equal Protection challenge is non-reviewable under *AADC* and *Armstrong*, Gov. Br. at 45-47; for the reasons described above, that is incorrect. *AADC*, which concerns the right of individuals to challenge interim decisions under 8 U.S.C. §1252(g), says nothing to suggest the Government has unreviewable authority to intentionally discriminate in the administration of immigration laws in violation of the Equal Protection Clause; rather the Supreme Court has consistently held that the Equal Protection Clause extends "to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary or permanent." *Zadvydas*, 533 U.S. at 694-95; *see also Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 597 n.19 (4th Cir. June 15, 2017) (rejecting argument that *AADC* insulates

"the President and other executive officials from judicial scrutiny" when their "official acts violate the Constitution.") (*IRAP II*), *vacated as moot*, *Trump v. Int'l Refugee Assistance Project*, No. 16-1436, 2017 WL 4518553 (U.S. Oct. 10, 2017).[40]   Similarly *Armstrong*, which concerns an individual criminal defendant's assertion that their prosecution was "selective," says nothing to suggest the Government's conduct is unreviewable.  Rather, *Armstrong* states unequivocally that the government decision "may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification."  517 U.S. at 464 (internal quotations and citation omitted).  Here, the challenged decision is a discriminatory policy decision (not a challenge to a particular prosecution) that has a discriminatory impact and was motivated by discriminatory animus.[41]

Second, the Government contends that the strong "disparate impact"—which the Government concedes, Gov. Br. at 46 (acknowledging that 93 percent of affected individuals are Mexican, Central American, or Latino)—is insufficient to allege an Equal Protection violation under *Davis*, 426 U.S. at 242.  *See* Gov. Br. 46-47.  Again, the Government ignores the allegations in the Complaint about discriminatory motive.  The Complaint pleads in great detail an actual and specific discriminatory intent on the basis of race, national origin, and ethnicity, as established by numerous statements of the individuals who influenced, designed, and implemented the Rescission decision.  *See* Compl. ¶¶ 24-25, 94-96, 154-161.  And this is an area where additional discovery is warranted.  *See* Rule 56(d) Decl. ¶¶ 5 & 9(d).

---

[40] Indeed, even for individuals contesting removal proceedings, the *AADC* court noted that its holding did not address cases which contested deportation "in which the alleged basis of discrimination is . . . outrageous." 525 U.S. at 492.

[41] For example, the Complaint identifies 18 separate statements by senior Government officials exhibiting animus towards Mexicans, Central Americans, and Latinos leading up to the rescission decision. Compl. ¶¶ 94-96. There were no equivalent statements presented in *Armstrong*.

Third, the Government dismissively mischaracterizes the statements of animus by suggesting that "most were before the [President] took the oath of office" and did not come out of the mouth of the "decisionmaker ultimately responsible for the Rescission Policy." Gov. Br. 47. Again, the Government ignores the allegations of the Government's animus against Mexicans, Central Americans, and Latinos (i) continuing after the President assumed office and has been exhibited in at least nine separate statements, *see* Compl. ¶¶ 25, 94, 96, and (ii) demonstrated by other senior Government officials. *See id.* ¶ 96 (alleging statements made by officials in March and July 2017). It also ignores the allegations that the decision to rescind DACA was collectively made by numerous government officials, including the President, the Attorney General, and the Acting DHS Secretary. Compl. ¶¶ 60-66, 157-161. To the extent the Government contends that Acting Secretary Duke is solely responsible for the decision, that is a contested issue of fact that should not be resolved on a Rule 12(b) motion. *See* Exs. 2, 5, 8, 9. *See also* Rule 56(d) Decl. ¶¶ 9(a)(iii)&(iv) (discussing evidence of the other individuals involved in the decision to rescind DACA). Moreover, the Government's argument that the President's expressions of racial animus prior to assuming office are irrelevant is legally wrong: the "historical background of the decision. . . particularly if it reveals a series of official actions taken for invidious purposes" is the "subject[ ] of proper inquiry in determining whether racially discriminatory intent existed." *Arlington Heights*, 429 U.S. at 266-67; *see also McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 866 (2005) ("[T]he world is not made brand new every morning," and courts should not "turn a blind eye to the context in which [the] policy arose"). It is for this reason that both the Fourth Circuit and Judge Chuang held in the Travel Ban litigation that President Trump's campaign statements are unmistakably relevant in evaluating whether the government's actions

are motivated by impermissible considerations.  *See IRAP*, 2017 WL 4674314, at *5-6; *IRAP II*, 857 F.3d at 598-601.

There are sufficient allegations of discriminatory animus that the burden shifts to the Government to show that the Rescission was in service of a compelling governmental interest and narrowly tailored.  That issue cannot be resolved in favor of the Government on a motion to dismiss, and the Government makes no attempt to argue otherwise.  Indeed, the Administrative Record here shows the Government likely will never be able to sufficiently justify the policy, with virtually no consideration of the human and economic costs and no consideration at all of alternatives to the deportation of 800,000 individuals, and that the Rescission was motivated by racial and national origin animus.  The Government's request to dismiss the Third Count of the complaint should be denied.

### C.     The Complaint States Claims for Violations of the Due Process Clause

Counts I and II of the Complaint allege that Defendants violated Plaintiffs' procedural and substantive due process rights when it stripped Plaintiffs of their ability to work, raise a family, maintain family integrity, and pursue their educations (Count I), and disregarded the protections afforded the critically sensitive personal information they shared when they applied for DACA (Count II).  Compl. ¶¶ 129-153.  In support of these Counts, the Complaint contains detailed factual allegations concerning the various interests and commitments the Government made to DACA applicants to induce them to participate in the program, Compl. ¶¶ 10-16, 19-20, 71-91, the irregular process the Government has used to strip these interests from DACA recipients, Compl. ¶¶ 97-128, and the actions taken by the Government to strip these interests from DACA recipients because of the discriminatory animus of the individuals who influenced, designed, and implemented the rescission decision.  *See* Compl. ¶¶ 24-25, 94-96.

Defendants contend Plaintiffs fail to state either a procedural or substantive due process claim.  Gov. Br. 48-54.  This remarkable contention is premised on a complete disregard for bedrock constitutional principles and wholesale revision of Plaintiffs' Complaint.  Under the actual law and actual well-pled allegations, these claims are more than adequately stated.

       1.    <u>The Complaint Alleges Violations of Procedural Due Process</u>

To state a claim of a violation of procedural due process, Plaintiffs must demonstrate that: (1) they had a constitutionally protected interest; (2) of which the government deprived them by its sudden and arbitrary action; (3) without due process of law.  *See*, *e.g.*, *Tri-County Paving, Inc. v. Ashe County*, 281 F.3d 430, 436 (4th Cir. 2002).  The Government makes two arguments against Plaintiffs' procedural due process claims.  Neither has merit.

       a.  It is axiomatic that "the Due Process Clause applies to all persons within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *United States v. Lopez-Collazo*, 824 F.3d 453, 460–61 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 628 (2017) (quoting *Zadvydas*, 533 U.S. at 693 (2001)) (internal quotations omitted).  Yet, the Government argues that plaintiffs have no "protected interests."  Gov. Br. at 48-50, 52.  Plaintiffs specifically allege a host of property and liberty interests impugned by the DACA rescission:  the ability, among others, to obtain employment authorization (Compl. ¶ 72), travel outside of the United States (*id*. ¶ 73), attend educational institutions (*id*. ¶ 74), to pay into and be eligible for certain benefit programs such as Social Security and disability (*id*. ¶ 75); to secure access to other opportunities on which Americans depend, such as opening bank accounts and obtaining credit cards (*id*. ¶ 77); and to be considered "lawfully present" by DHS (*id*. ¶ 78).  It is undisputed that the panoply of work, travel, educational and family benefits that flowed from DACA are protected interests.  *See*, *e.g.*, *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972) (protected interests include, "without doubt, . . . the right of the individual to contract, to engage in any of the

common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men").

Instead of addressing these protected interests, the Government contorts the Complaint to portray the interest at issue as limited to "deferred action" status. Gov. Br. 49-50. This is nonsense. The Government's abrupt decision to terminate DACA deprived Plaintiffs not only of an immigration status, but more fundamentally the panoply of attendant interests identified in the Complaint that Dreamers have relied on to build their lives in this country.

Without this fundamental misconstruction of the Complaint, the Government's argument that Plaintiffs fail to allege a protected interest unravels. All of the Government's arguments and authority rely on a need to create a source for protected interests. *See* Gov. Br. at 48 (averring that only "statutes or regulations" can bestow protected interests), 49-50 (no protected interest where "government officials may grant or deny it in their discretion"). In any event, they are wrong. Property and liberty interests "are not limited by a few rigid, technical forms," and are "secured by 'existing rules or understandings.'" *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (quoting *Roth*, 408 U.S. at 577). The Fourth Circuit has repeatedly recognized that "rules or understandings" encompasses a wide variety of governmental actions that provide specific benefits to particular individuals, including everything from statutes, regulations, city charters, contracts, and permits.[42] Such is the case here:  with promises that DACA recipients would enjoy interests

---

[42] *See, e.g.*, *Gardner v. City of Balt. Mayor & City Council*, 969 F.2d 63, 68 (4th Cir. 1992) (property interests created by a city's charter and its planning commission's subsequent regulations); *Royster v. Bd. of Tr's of Anderson Cty. Sch. Dist. No. Five*, 774 F.2d 618, 620 (4th Cir. 1985) (contracts are "the independent source for the property interest"); *Ruttenberg v. Jones*, No. 07-1037, 2008 WL 2436157, at *6 n.2 (4th Cir. June 17, 2008) (property interest created by a conditional use permit).

enjoyed by legal residents of the United States, the government enticed hundreds of thousands of vulnerable young people to step forward; in short, it was precisely the type of "mutual understanding" that the Supreme Court held creates interests protectable by the Due Process clause. *Perry*, 408 U.S. at 601.

For the same reason, the Government's contention that Plaintiffs have no protected interest in having their application data protected from disclosure to enforcement officials fails. Gov. Br. 51-52. The Government ignores Plaintiffs' allegations of the Government's (i) unequivocal assurances not to share applicant data with immigration enforcement authorities, and (ii) express recognition of this commitment for purposes of the Privacy Act. *See* Compl. ¶¶ 79-91. It was precisely these assurances that created a protected interest in Plaintiffs' sensitive personal information.

Instead, the Government makes a contested factual averment that DACA applicants were "consistently advised" that this protection could be "modified, superseded, or rescinded" at any time. Gov. Br. 52. This averment is improper in a Rule 12(b) motion, dooms the Government's alternative Rule 56 motion, and is inaccurate. For example, the following image is taken from the DHS PowerPoint described in paragraph 81 of the Complaint:



Protecting Your Information

We will not share any information about you with ICE or U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings unless you meet the criteria for:
- the issuance of an NTA; or
- a referral to ICE under the criteria set forth in our NTA guidance.

Contrary to the Government's averment, this slide (Ex. 21) contains no representation that the information sharing policy could be changed.  Similarly, the general guidance on the USCIS website similarly reassured applicants that their applications would be submitted to a "lockbox" and would not be shared with immigration enforcement, and contained no warning that the policy could be modified or rescinded.  Likewise, when the DHS Secretary wrote to Congress on December 30, 2016 that DHS had "consistently made clear that information provided by applicants . . . will not later be used for immigration enforcement," Compl. ¶ 89, it contained no suggestion that the information sharing policy could be changed (Ex. 22).[43]  There are undoubtedly further instances of unqualified commitments in the Government's files, and this is an area where further discovery is appropriate.  *See* Rule 56(d) Decl. ¶¶ 7, 8, 9(b)&(c) & 10.

The well-pled facts alleged in the Complaint, which the Court must accept as true, demonstrate that the Defendants created and guaranteed (and then improperly deprived) protected interests for Plaintiffs in their ability to work, travel, attend school, maintain family integrity, and that their sensitive information would not be shared with ICE or CBP.  *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015).

---

[43] In an apparent attempt to argue that no right has been deprived, the Government repeats its false claim that DHS has not substantively changed its sensitive information protection policy.  Gov. Br. 51-52. As discussed *supra* at Argument II.A.1.b, it has.  The Government also submits that no personal information "has in fact been impermissibly shared" to date since no Plaintiff or Dreamer has lost their status yet.  *Id.* at 51.  This ignores that the Complaint identifies six specific instances where the Government has commenced enforcement proceedings against Dreamers.  Compl. ¶ 111. Moreover, courts have roundly rejected the "mechanical and simplistic" distinction between those whose benefits have already been deprived and those whose benefits are expected to be deprived in the future.  *See Mallette v. Arlington Cty. Emp's Supplemental Ret. Sys. II*, 91 F.3d 630, 639-640 (4th Cir. 1996) (collecting cases).  As *Batalla Vidal* found, changes in DHS's information use-policy "will likely result in more undocumented immigrants' removal from the United States."  2017 WL 5201116, at *18.  To do so, the government will necessarily need to rely on the sensitive information shared by the DACA recipients—their name, address, family members—to locate, detain and deport them.

b.  The Government's contention that the deprivation of these protected interests does "not require individualized process" is specious.  Gov. Br. 50-51.  Due process, at a minimum, requires that a person be given notice of impending action and afforded a hearing.  *Richardson v. Town of Eastover*, 922 F.2d 1152, 1159 (4th Cir. 1991).  DACA's internal procedures established that there would be both notice and an opportunity to be heard.  Compl. ¶ 78.  Plaintiffs were afforded no such notice or opportunity to be heard.  Compl. ¶¶ 118, 138, 151.

Individualized process *is* required where, as here, there is no process that would provide a group of individuals an opportunity to be heard.  *See Kapps v. Wing*, 404 F.3d 105, 118 (2d Cir. 2005) (where an administrator's rules arbitrarily denied a group of applicants an opportunity to appeal, those applicants *were* entitled to individualized notice and an opportunity to be heard because there was no other outlet for review).  The Government's cases are inapt.  *Bi-Metallic Inv. Co. v. State Bd. of Equalization,* 239 U.S. 441 (1915) (Gov. Br. 50), examined whether a state tax commission was authorized to increase the tax rates of a group without providing individualized notice or an opportunity to be heard;  the Court found that individualized notice was not required because the affected individuals were "protected" by the political process."  *Id*.  *Yassini v. Crosland*, 618 F.2d 1356 (9th Cir. 1980) (Gov. Br. 51), emphasized that no hearing was constitutionally required especially where, *inter alia*, "*there [was] a post-decision review*." *Id. at 1363* (citations omitted and emphasis added).  Neither process is available to Plaintiffs.

In short, the law is clear—it remains unconstitutional to deprive individuals of protected interests without due process of law.  *Kerr v. Marshall Univ. Bd. of Gov.*, 824 F.3d 62, 80 (4th Cir. 2016).  As alleged, Plaintiffs were not afforded such notice and are entitled to challenge that deprivation.  Because the Government disputes this, this an area where further discovery is appropriate.  *See* Rule 56(d) Decl. ¶ 6.

2. <u>The Complaint Alleges Violations of Substantive Due Process</u>

To state a claim for a violation of substantive due process, Plaintiffs must allege that: (1) the interest at issue is protected by the substantive due process clause and (2) the government's deprivation of that protected interest "shocks the conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845, 848 (1988). The "touchstone of due process" is "protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Id.* at 845–46 (citations omitted).

Although the Government concedes that a denial of fundamental fairness constitutes a violation of substantive due process rights, Gov. Br. 53, they contend that the substantive due process claims should be dismissed because Plaintiffs do not provide a sufficiently detailed description of their fundamental rights, and do not allege actions by the Defendants that "shock the conscience." Gov. Br. 52-53. Again, the Government ignores the core of Plaintiffs' allegations—that they have been targeted for deprivation of protected interests based on the shocking discriminatory animus of senior Government officials against Mexicans, Central Americans, and Latinos. Compl. ¶¶ 94-96.

The discriminatory motivation underlying the DACA rescission is the definition of conduct that shocks the conscience. To shock the conscience "the conduct must be 'intended to injure in some way *unjustifiable by any government interest.*'" *Hawkins v. Freeman*, 195 F.3d 732, 738,742 (4th Cir. 1999) (quoting *Lewis*, 523 U.S. at 849). Conduct is unjustifiable by any "government interest" and can be fairly said to shock the conscience if it "involves abusing executive power, or employing it as an instrument of oppression." *Int'l Ass'n of Machinists & Aerospace Workers v. Haley*, 482 F. App'x 759, 766 (4th Cir. 2012) (quoting *Martin v. Saint Mary's Dep't of Social Serv's*, 346 F.3d 502, 511 (4th Cir. 2000)); *Hawkins*, 195 F.3d at 741–42. Defendants' actions and

statements were loaded with shocking generalizations of all Mexicans and Latin Americans as "criminals," "thugs," "rapists," and "bad hombres." Complaint ¶ 94. It was on the heels of those statements about the national origin of 93% of DACA recipients that the program was rescinded, creating the strong conclusion that the policy change was based on race or national origin. Taken as true, the facts alleged point clearly to an "abuse of executive power" that is "unjustifiable by any government interest." *Cf. Romer v. Evans*, 517 U.S. 620, 634–35 (1996) ("[A] bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.") (emphasis added).

Similarly, the Government's breaking of their unequivocal promise to DACA applicants that their most personal information would not be used for enforcement purposes is shocking. This unconstitutional bait-and-switch violates Plaintiffs' right to due process. *See*, *e.g.*, *Cox v. Louisiana*, 379 U.S. 559, 571 (1965); *Raley v. Ohio*, 360 U.S. 423, 438-39 (1959).

Plaintiffs are entitled to a subjective assessment of these factual allegations. Courts have continually noted the "shocks-the-conscience" test is "no calibrated yard stick" and is "laden with subjective assessments." *Hawkins*, 195 F.3d at 741–42 (quoting *Lewis*, 523 U.S. at 847, 857). "[B]ecause specific conduct that in one context would meet the test might not in another, application of this standard demands an exact analysis of circumstances." *Hawkins*, 195 F.3d at 742 (citations omitted). Plaintiffs are entitled to such a review of these factual allegations to determine whether the termination of a program relied on by 800,000 people constitutes an action "fatally arbitrary in the constitutional sense" or "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id*. at 738, 742. To the extent that Defendants disagree with those factual allegations, their disagreement is unavailing on a motion to dismiss. Accordingly, Defendants' motion to dismiss these claims must fail.

### D.      The Complaint States a Claim for Equitable Estoppel

Count VI of the Complaint alleges that the Government should be estopped from abandoning its commitment not to share DACA applicant information with immigration enforcement authorities.  In support of this Count, the Complaint alleges that since the DACA program was announced in 2012, the Government—in numerous publications and statements by officials at the highest levels—repeatedly and affirmatively assured DACA applicants that the Government would not use the personal information provided in the DACA application process for enforcement purposes.  Compl. ¶¶ 79-91.  Because the Government intended to (and did) induce participants to apply to DACA based on these commitments, and because DACA applicants did indeed rely on these commitments to protect their personal information, the Government is estopped from now using this information for enforcement purposes.

The Government again misstates the law and allegations of the Complaint to oppose Plaintiffs' estoppel claim.  Contrary to the Government's argument, Gov. Br. 54-55, a cause of action in estoppel may lie against the Government where, as here, the Government acts in a manner that violates the "interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government," *Heckler v. Cmty Health Serv's of Crawford Cty., Inc.,* 467 U.S. 51, 60-61 (1984), or where "justice and fair play require it." *Watkins v. U.S. Army,* 875 F.2d 699, 706 (9th Cir. 1989); *see also Office of Pers. Mgt. v. Richmond,* 496 U.S. 414, 423 (1990) (rejecting a "sweeping rule" establishing that "no estoppel claim could ever succeed against the Government.").

It is well-established that the Government may be estopped when it engages in "affirmative misconduct going beyond mere negligence." *Angeles v. Dist. Dir., INS,* 729 F. Supp. 479, 485 (D. Md. 1990).  The Complaint alleges well-pled facts that the Government's action here goes beyond

mere negligence: the Government has intentionally abandoned its commitment that it would not take enforcement actions against individuals who relied upon assurances by the Government that their personal information would not be used in furtherance of enforcement proceedings. Compl. ¶¶ 108, 111, 112.

The Government's conduct here satisfies all of the elements of estoppel.[44] The Government affirmatively intended DACA recipients to rely on the promise not to use personal information for enforcement purposes. *See* Compl. ¶¶ 9-16, 79-81. The Government itself has publicly acknowledged that this information was "most assuredly relied" upon by DACA applicants to their detriment. Compl. ¶¶ 84-89. The Government, and not the DACA participants, are aware of the true nature of the Government's bait-and-switch policy regarding personal information. Compl. ¶¶ 21-22, 84-88, 107-112. This is an area where further discovery is appropriate. *See* Rule 56(d) Decl. ¶¶ 7, 8, 9(b)&(c) & 10.

Contrary to the Government's suggestion, Gov. Br. 54, estoppel is available where individuals have relied to their detriment on government policy. Indeed, the Government's violation of its commitment to DACA applicants is similar in kind to other instances where the Government has been estopped from taking action against individuals who relied, to their detriment, on prior official policies by the Government. For example, in *United States v. Penn. Indus. Chem. Corp. ("PICCO"),* the Supreme Court found that a plaintiff charged with violating pollution laws must have the opportunity to bring evidence that it reasonably relied on the regulations in force at the time of its action as a defense to prosecution. 411 U.S. 655, 675 (1973).

---

[44] These elements are: "(1) the party to be estopped knew the true acts; (2) the party to be estopped intended for his conduct to be acted upon or acted in such a way that the party asserting estoppel had a right to believe that it was intended; (3) the party claiming estoppel was ignorant of the true facts; and (4) the misconduct was relied upon to the detriment of the parties seeking estoppel." *Dawkins v. Witt,* 318 F.3d 606, 611, n. 6 (4th Cir. 2003).

Similarly, in *Watkins v. U.S. Army,* the court found that the Army was estopped from discharging a homosexual officer on the basis of a regulation barring homosexuals from serving in the military after allowing him to reenlist numerous times with full awareness of his sexual orientation. 875 F. 2d at 710-11; *see also United States. v. Cox,* 964 F.2d 1431, 1434-35 (4th Cir. 1992) (finding that Government was estopped from refusing to pay court-appointed psychiatrist after agreeing to do so).

Finally, the Government contends it would not constitute a "serious injustice" if DACA applicant information was used for immigration enforcement proceedings because the Government has made the factual averment that "nothing" about the commitment "could be construed to represent to DACA recipients that DACA policy was permanent and not subject to change." Gov. Br. 56. This factual averment is disputed and belied by the well-pled factual allegations in the Complaint. *See* Compl. ¶¶ 21-22, 84-88, 107-112 & Section II.C.

## III. DEFENDANTS' ARGUMENTS REGARDING A NATIONWIDE INJUNCTION ARE PREMATURE AND LEGALLY INCORRECT

The Government's arguments that declaratory relief and a nationwide injunction are not available remedies to Plaintiffs, Gov. Br.57-59, are premature and more appropriately addressed in conjunction with Plaintiffs' motion for injunctive relief. Moreover, they are predicated on incorrect statements of the law. Declaratory relief is available under the APA, *see Bowen v. Mass.,* 487 U.S. 879 (1988), and under the Declaratory Judgment Act, 28 U.S.C. § 2201. Plaintiffs claim that the Government's decision to rescind DACA is, among other things, unconstitutional. Compl. ¶¶ 129-161. The APA provides relief for government decisions that are, among other reasons, contrary to law and "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(A). The Government based its rescission of DACA on its belief that the program is unlawful. Gov. Br. 20. Accordingly, a declaratory judgment that DACA is lawful is entirely within

the scope of the Court's authority.  The Government also asserts that any injunctive relief ordered by the court should be limited to the individual Plaintiffs and should not be nationwide in scope. Gov. Br. 58-59.  Plaintiffs here include both national organizations and organizations from across the country.  Moreover, the Government's position is not consistent with prevailing Fourth Circuit principles.  District Courts "have broad discretion when fashioning injunctive relief."  *Ostergren v. Cuccinelli,* 615 F.3d 263, 288 (4th Cir. 2010); *see also Richmond Tenants Org., Inc. v. Kemp,* 956 F.2d 1300, 1308 (4th Cir. 1992) (discretion of district court to issue injunction extends to litigation in other federal courts); *Texas,* 809 F.3d at 187-88 (asserting that the power of the district court "is not limited to the district wherein the court sits but extends across the country.")

Approving a nationwide injunction under the facts here is consistent with the broad principles justifying national injunctions.  First, Plaintiffs reside throughout the United States; the actions by the Government challenged here would violate the rights of DACA recipients in jurisdictions throughout the country.  *See Richmond Tenants Org.,* 956 F.2d at 1308-09 (upholding nationwide injunction against evictions of tenants in public housing without due process due to national scope of eviction issue).  Second, the need for national uniformity and consistency in the application of the law is particularly important in addressing immigration policy.  *See Texas,* 809 F.3d at 187-88 (upholding a nationwide injunction on the DAPA program due to the need for the immigration laws of the U.S. to be "enforced vigorously and uniformly").  A more limited injunction would necessarily mean that the fate of DACA recipients would be tied to the accident of their geography, rather than to the merits of their case.  Finally, enjoining the rescission of DACA only as to Plaintiffs would not address the underlying Constitutional issue facing the Government's action; only a nationwide injunction can provide "complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 765 (1994) (internal citations omitted).

## CONCLUSION

For the reasons set forth in the accompanying memorandum of law, Plaintiffs respectfully move

the Court to deny Defendants' Motion to Dismiss or, in the Alternative for Summary Judgment.

Dated:  November 28, 2017                          Respectfully submitted,


\_\_/s/ Dennis A. Corkery_____

| | |
|---|---|
| Matthew K. Handley (D. Md. 18636) | John A. Freedman[†] |
| Dennis A. Corkery (D. Md. 19076) | Gaela Gehring Flores (D. Md.14559) |
| WASHINGTON LAWYERS' | Ronald A. Schechter (pro hac vice |
|   COMMITTEE FOR CIVIL RIGHTS | forthcoming) |
| AND | Nancy L. Perkins[†] |
|   URBAN AFFAIRS | Jeremy Karpatkin (pro hac vice forthcoming) |
| 11 Dupont Circle, Suite 400 | ARNOLD & PORTER KAYE SCHOLER LLP |
| Washington, DC 20036 | 601 Massachusetts Ave., NW |
| (202) 319-1000 | Washington, DC  20001-3743 |
| matthew_handley@washlaw.org | (202) 942-5000 |
| dennis_corkery@washlaw.org | John.Freedman@apks.com |
| | |
| Elizabeth J. Bower[†] | Steven L. Mayer (pro hac vice forthcoming) |
| Kevin B. Clark (D. Md. Bar No. 04771) | ARNOLD & PORTER KAYE SCHOLER LLP |
| Priya Aiyar[†] | 10th Floor |
| WILLKIE FARR & GALLAGHER LLP | Three Embarcadero Center |
| 1875 K Street, NW | San Francisco, CA 94111-4024 |
| Washington, DC  20006-1238 | +1 415.471.3100 |
| EBower@willkie.com | |
| | Ajmel Quereshi (D. Md. 28882) |
| Nicholas Katz (pro hac vice forthcoming) | HOWARD UNIVERSITY SCHOOL OF |
| CASA DE MARYLAND |   LAW CIVIL RIGHS CLINIC |
| 8151 15th Ave. | 2900 Van Ness Street, NW |
| Hyattsville, MD 20783 | Washington, DC 20008 |
| (240) 491-5743 | (202) 806-8000 |
| NKatz@wearecasa.org | aquereshi@law.howard.edu |
| | |
| [†]*Appearing* pro hac vice | *Attorneys for Plaintiffs* |

CERTIFICATE OF SERIVCE

I hereby certify that on November 28, 2017, a copy of the foregoing was served on all counsel of record via the Court's CM/ECF system.

/s/ Dennis A. Corkery
Dennis A. Corkery
(D. Md. Bar. No. 19076)