**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**CASA DE MARYLAND, *et al.*** *

*Plaintiffs* *

v. * Civil No. RWT-17-2942

**U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*** *

*

*Defendants*

***

**MEMORANDUM OPINION**

On October 5, 2017, Plaintiffs filed a Complaint seeking to enjoin rescission of a program known as Deferred Action for Childhood Arrivals ("DACA"), asserting a variety of claims as to why the rescission was unlawful. *See* ECF No. 1. Plaintiffs are a number of individual participants in that program known as "Dreamers," as well as a series of special interest organizations that deal with immigration policy issues and work directly with immigrants in the community. *Id.* at 11–21. Defendants are President Donald Trump, Attorney General Jeff Sessions, and a series of government agencies—the Department of Homeland Security ("DHS"), U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP")—as well as each agency's acting leader (secretary, director, or commissioner). Defendants collectively will be referred to as the "Government." Each individual defendant is being sued in his or her official capacity. *Id.* at 21–22.

Plaintiffs' Complaint alleges a number of causes of action—both administrative and constitutional—which they believe are proper grounds for relief. Plaintiffs assert that rescission

of the DACA program was unlawful under the Administrative Procedure Act ("APA") both (1) as an arbitrary and capricious decision and (2) for failure to follow notice-and-comment procedures. *Id.* at 54–58. Plaintiffs further allege that the DACA rescission was a violation of the Fifth Amendment on the grounds of procedural due process, substantive due process, and equal protection. *Id.* at 49–54. Plaintiffs seek injunctive relief on the basis of equitable estoppel both as to the DACA rescission itself and its information sharing policy. *Id.* at 58–59. Lastly, Plaintiffs seek declaratory relief that the DACA program is lawful. *Id.* at 59–60.

On November 1, 2017, the Court held an in-person status conference in order to resolve the scheduling and logistical issues of this case. ECF No. 19. Thereafter on November 15, 2017, the Government filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. ECF No. 27. On November 28, 2017, Plaintiffs responded in opposition, ECF No. 29, and on December 5, 2017, the Government replied in support of its Motion, ECF No. 30. The Court issued an Order on December 11, 2017 giving notice to the parties in accordance with Rule 56(f) that it may grant summary judgment for the non-moving party. *See* ECF No. 31. On December 15, 2017, the Court held a hearing on the Motion. ECF No. 34.

## I. BACKGROUND

***"Can we all get along?" – Rodney King[1]***

In recent years, many Americans have found themselves sharing Mr. King's sentiment. This Court previously noted, albeit in the context of congressional gerrymandering, that "[n]ever before has the United States seen such deep political divisions as exist today, and while the courts are struggling in their efforts to find a standard [for the adjudication of gerrymandering claims], the fires of excessive partisanship are burning and our national government is

[1] *See* Richard A. Serrano, *Rodney King: 'Truth will come out'*, L.A. Times (May 2, 1992), http://www.latimes.com/local/california/la-me-king-case-aftermath-city-in-crisis-19920502-story.html.

encountering deadlock as never before." *Fletcher v. Lamone*, 831 F. Supp. 2d 887, 905 (D. Md. 2011) (Titus, J., concurring), *aff'd*, 567 U.S. 930 (2012). Unfortunately, that 2011 observation still holds true today—perhaps even more so.

This case is yet another example of the damaging fallout that results from excessive political partisanship. The highly politicized debate surrounding the DACA program has thus far produced only rancor and accusations. During the recent debate over the rescission of DACA, the program even turned into a bargaining chip that resulted in a brief shutdown of the entire federal government earlier this year.[2] In order to adequately resolve the legal issues of this case, it is important to step back from the heated rhetoric and understand the context under which DACA was promulgated and rescinded.

***The Dream Act—a Lengthy History of Failed Legislation***

The Constitution reserves the power to enact immigration policy to the legislative branch. U.S. Const. art. I, § 8 ("[T]o establish a uniform rule of naturalization"). However, the "supervision of the admission of aliens into the United States may be intrusted by [C]ongress" to the executive branch. *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). For over a decade at the start of the 21st century, Congress quarreled over policies regarding illegal aliens who entered the country as children, and who may have no memory or connection with their country of origin. Would the world's beacon of freedom—a nation founded by immigrants—cast out an immigrant population that was likely brought here without choice and who likely now knows no other home? While "no" would seem to be the obvious answer, ordinary logic has eluded our Congress.

---

[2] *See* Gregory Krieg, *The DACA shutdown is over. Now What?*, CNN (Jan. 22, 2018), https://www.cnn.com/2018/01/22/politics/shutdown-immigration-daca-outcomes/index.html.

"Dreamers" are neither constitutionally nor statutorily defined. Rather, the concept of protection for "Dreamers" arises from repeated congressional failures to act, and presidential action taken in their wake. A series of congressional sessions marked by bitter strife and inaction left the country without any protections for persons brought here illegally as children. The first attempt at a Development, Relief, and Education for Alien Minors ("DREAM") Act came in 2001, and although it took on many names in subsequent years, the repeated attempts to pass this legislation were filibustered, abandoned, or defeated on the floor.[3] As illustrated by the frequency of bills proposed, Dreamer legislation reached its zenith during late 2010 in the 111th Session of Congress. On December 8, 2010, the House of Representatives actually passed the DREAM Act.[4] However, like all other iterations of this controversial legislation, its fate was doomed—this time, less than two weeks later on the Senate floor.[5]

***DACA—an Act of Desperation Born of Frustration with a Paralyzed Congress***

President Obama's administration, faced with the reality that Congress could do little more than squabble regarding the Dreamers, decided to take action on its own. On June 15, 2012, then-Secretary of Homeland Security, Janet Napolitano, issued a memorandum promulgating by executive action what is now known as DACA ("DACA Memo").[6] DACA

---

[3] *See* Immigrant Children's Educational Advancement and Dropout Prevention Act of 2001, H.R. 1582, 107th Cong. (2001); Student Adjustment Act of 2001, H.R. 1918, 107th Cong. (2001); DREAM Act, S. 1291, 107th Cong. (2002); DREAM Act, S. 1545, 108th Cong. (2003); DREAM Act of 2005, S. 2075, 109th Cong. (2005); Comprehensive Immigration Reform Act of 2006, S. 2611, 109th Cong. (2006); American Dream Act, H.R. 5131, 109th Cong. (2006); DREAM Act, S. 2205, 110th Cong. (2007); Comprehensive Immigration Reform Act of 2007, S. 1348, 110th Cong. (2007); DREAM Act of 2009, S. 729, 111th Cong. (2009); DREAM Act of 2010, S. 3827, 111th Cong. (2010); DREAM Act of 2010, S. 3962, 111th Cong. (2010); DREAM Act of 2010, S. 3963, 111th Cong. (2010); DREAM Act of 2010, S. 3992, 111th Cong. (2010); DREAM Act of 2010, H.R. 6497, 111th Cong. (2010); DREAM Act of 2011, S. 952, 112th Cong. (2011).

[4] *See* John Brandt, *House Passes DREAM Act Immigration Measures*, Fox News (Dec. 8, 2010), http://www.foxnews.com/politics/2010/12/08/house-passes-dream-act-immigration-measures.html.

[5] *See DREAM Act Goes Down in Flames in Senate*, Fox News (Dec. 18, 2010), http://www.foxnews.com/politics/2010/12/18/senate-tries-pass-dream-act.html.

[6] Memorandum from U.S. Dep't of Homeland Sec., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012).

protections were afforded to the same class of immigrants foreseen by the various failed iterations of Dreamer legislation. The primary qualifications for DACA protections were that an individual must (1) have come to the U.S. before the age of sixteen, (2) meet various education or military service requirements, (3) not have a criminal record, and (4) register prior to the age of thirty.[7]

DACA was issued under a theory of "prosecutorial discretion" and "deferred action" and essentially permitted otherwise illegal aliens to remain in the United States without fear of deportation.[8] While some heralded DACA as a victory, others decried it as executive overreach—usurping the powers of Congress to promulgate immigration policy.[9] Over the course of the next five years, approximately 800,000 Dreamers registered for DACA protections.

***Phase II: DAPA***

Soon thereafter, the executive branch sought to expand its use of deferred action beyond the Dreamers. On November 20, 2014, then-Secretary of Homeland Security, Jeh Charles Johnson, issued a pair of memoranda in an attempt to promulgate what is now known as Deferred Action for Parents of Americans ("DAPA"), as well as a series of minor expansions for DACA.[10]

Less than a month later, DAPA was met with a legal challenge when Texas and twenty-five other states sued to enjoin implementation of the program. *See generally Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015). In that case, DAPA was struck down by the

---

[7] *See id.*

[8] *See id.*

[9] *See Obama suspends deportation for thousands of illegals, tells GOP to pass DREAM Act*, Fox News (June 15, 2012), http://www.foxnews.com/politics/2012/06/15/obama-administration-to-offer-immunity-to-younger-immigrants.html.

[10] Memorandum from U.S. Dep't of Homeland Sec., Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants (Nov. 20, 2014); Memorandum from U.S. Dep't of Homeland Sec., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents (Nov. 20, 2014).

district court, *see id.*, and a divided Fifth Circuit panel affirmed the decision, *see* 809 F.3d 134 (5th Cir. 2015). In June 2016, an equally divided Supreme Court affirmed the decision. *See United States v. Texas*, 136 S. Ct. 2271, 2272 (2016). In addition to finding DAPA and the expansions of DACA unlawful, the judicial decisions throughout the DAPA litigation illustrate two key realities: (1) challenges to DAPA or analogous immigration programs promulgated by DHS without approval by Congress are justiciable; and (2) reasonable legal minds may differ regarding their lawfulness.

Aside from the classes of immigrants to which each applies, DACA and DAPA are largely similar programs addressing different classes or subcategories of immigrants. While DACA affects a population of approximately 800,000 otherwise illegal aliens, DAPA would have affected nearly half of the 11,000,000 immigrants currently in the United States unlawfully. *See Texas v. United States*, 787 F.3d 733, 745 (5th Cir. 2015). DAPA was challenged and defeated before the program was ever successfully promulgated, while DACA has run for approximately half of a decade before the threat of any litigation.

***A Change in Administration and a Corresponding Change in Immigration Philosophy***

The 2016 presidential election brought a change in leadership of the executive branch and, with it, significant changes in immigration views and philosophies.[11] In June of 2017, and with the defeat of DAPA directly in the rear-view mirror, Texas and other state plaintiffs sent a letter threatening to challenge DACA if it were not rescinded by September 6, 2017.[12] Attorney General Jeff Sessions advised the Acting Secretary of Homeland Security, Elaine Duke, that

[11] *See, e.g.*, Tessa Berenson, *Middle Schoolers in Michigan Chant 'Build That Wall' After Trump Victory*, TIME (Nov. 11, 2016), http://time.com/4567812/donald-trump-middle-school-build-wall/.
[12] *See* Admin. R., ECF No. 26-1 at 238–40.

DACA was likely unlawful and headed for another legal battle.[13]  On September 5, 2017, Acting Secretary Duke issued a memorandum ("DACA Rescission Memo") outlining a six-month wind down of DACA to expire March 5, 2018.[14]

According to the Administrative Record, the basis for the decision to rescind DACA was its presumed unlawfulness in the wake of the DAPA litigation and the threat of imminent legal challenge.  The agency's reasoning is substantiated by the legal advice of the Attorney General and the fact that the memorandum was issued the day before the state parties had threatened to act.  A six-month wind down period was provided to avoid the potential for chaos if a court decision resulted in immediate termination, and the President urged Congress to pass Dreamer-protection legislation.[15]

Complicating the picture for some observers is the unfortunate and often inflammatory rhetoric used by President Trump during the campaign, as well as his Twitter pronouncements, both before and after his election.  Thoughtful and careful judicial review is not aided when the President lobs verbal hand grenades at the federal courts, the Department of Justice, and anyone else with whom he disagrees.

As disheartening or inappropriate as the President's occasionally disparaging remarks may be, they are not relevant to the larger issues governing the DACA rescission.  The DACA Rescission Memo is clear as to its purpose and reasoning, and its decision is rationally supported by the Administrative Record.  *See generally Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972) ("[W]hen the Executive exercises [a congressionally delegated power of immigration policies

---

[13] *See* Admin. R., ECF No. 26-1 at 251.
[14] Memorandum from U.S. Dep't of Homeland Sec., Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017).
[15] *See* Michael D. Shear & Julie Hirschfeld Davis, *Trump Moves to End DACA and Calls on Congress to Act*, N.Y. Times (Sept. 5, 2017), https://www.nytimes.com/2017/09/05/us/politics/trump-daca-dreamers-immigration.html.

and rules for the exclusion of aliens] negatively on the basis of a facially legitimate and bona fide reason, the courts will [not] look behind the exercise of that discretion."); *Hamdan v. Rumsfeld*, 548 U.S. 557, 623–24 n.52 (2006) ("We have not heretofore, in evaluating the legality of executive action, deferred to comments made by such officials to the media.").[16]

The executive branch may have the authority to exercise or not exercise prosecutorial discretion as it sees fit, and an agency certainly may refrain from action it reasonably believes to be unlawful. Under the Constitution, it is the responsibility of Congress to determine immigration policy, and the executive branch must only act within its constitutional and delegated legislative authority. Although Congress has repeatedly failed to pass Dreamer legislation in the past, the ball is again in its court. And with 87 percent of Americans favoring some sort of DACA-esque protections, the elected members of Congress should understandably feel the pressure now that the President has deferred to them—in short, Congress needs to get the job done now that their authority has been recognized by court decisions and the President.[17]

***Other DACA Litigation***

Various plaintiffs have filed lawsuits seeking to enjoin the DACA rescission throughout the country—specifically in this Court, the Eastern District of New York, the Northern District of California, and the District of the District of Columbia. These cases are at various stages, but

---

[16] *See also Washington v. Trump*, 858 F.3d 1168, 1174 (9th Cir. 2017) (Kozinski, J., dissenting):

> Even if a politician's past statements were utterly clear and consistent, using them to yield a specific constitutional violation would suggest an absurd result—namely, that the policies of an elected official can be forever held hostage by the unguarded declarations of a candidate. If a court were to find that campaign skeletons prevented an official from pursuing otherwise constitutional policies, what could he do to cure the defect? Could he stand up and recant it all ("just kidding!") and try again? Or would we also need a court to police the sincerity of that mea culpa—piercing into the public official's "heart of hearts" to divine whether he really changed his mind, just as the Supreme Court has warned us not to? *See McCreary*, 545 U.S. at 862, 125 S. Ct. 2722.

[17] *See* Jennifer De Pinto, Fred Backus, Kabir Khanna & Anthony Salvanto, *Most Americans support DACA, but oppose border wall*, CBS News (Jan. 20, 2018), https://www.cbsnews.com/news/most-americans-support-daca-but-oppose-border-wall-cbs-news-poll/.

preliminary injunctions have already been granted by the Eastern District of New York and the Northern District of California.[18] With regard to the California case, the Government attempted to bypass the Ninth Circuit and directly petitioned the Supreme Court for a writ of certiorari before judgment.[19] On February 26, 2018, the Supreme Court denied the petition without prejudice, and noted that "[i]t is assumed that the Court of Appeals [for the Ninth Circuit] will proceed expeditiously to decide this case."[20]

All courts reviewing the DACA rescission would benefit from a prior generation's wisdom regarding the separation of powers: "A sturdy judiciary should not be swayed by the unpleasantness or unpopularity of necessary executive action, but must independently determine for itself whether the President was acting, as required by the Constitution, to 'take Care that the Laws be faithfully executed.'" *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 709 (1952).[21]

The decisions to date by courts in California and New York are premised on the legal conclusion that DACA is lawful, and therefore, a decision to rescind DACA on the basis of unlawfulness is necessarily arbitrary and capricious. Respectfully, this Court disagrees. Regardless of the lawfulness of DACA, the appropriate inquiry is whether or not DHS made a

---

[18] *See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. CV 17-05211 WHA, 2018 WL 339144 (N.D. Cal. Jan. 9, 2018); *Batalla Vidal v. Nielsen*, No. CV 16-4756 NGG JO, 2018 WL 834074 (E.D.N.Y. Feb. 13, 2018).

[19] *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, No. CV 17-05211 WHA, 2018 WL 339144 (N.D. Cal. Jan. 9, 2018), *petition for cert. before judgment filed*, 2018 WL 509822 (U.S. Jan 18, 2018) (No. 17-1003).

[20] Docket, *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, No. 17-1003, (U.S. Feb. 26, 2018).

[21] Or, more directly, as Judge Niemeyer notes in his recent dissent in the "travel ban" case.

> The public debate over the Administration's foreign policy and, in particular, its immigration policy, is indeed intense and thereby seductively tempts courts to effect a politically preferred result when confronted with such issues. But public respect for Article III courts calls for heightened discipline and sharpened focus on only the applicable legal principles to avoid substituting judicial judgment for that of elected representatives.

*Int'l Refugee Assistance Project v. Trump*, No. 17-2231, 2018 WL 894413, at *104 (4th Cir. Feb. 15, 2018) (Niemeyer, J., dissenting).

reasoned decision to rescind DACA based on the Administrative Record. Any alternative inquiry would impermissibly require a court to "substitute its judgment for that of the agency." *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Given the fate of DAPA, the legal advice provided by the Attorney General, and the threat of imminent litigation, it was reasonable for DHS to have concluded—right or wrong—that DACA was unlawful and should be wound down in an orderly manner. Therefore, its decision to rescind DACA cannot be arbitrary and capricious.

## II. STANDARD OF REVIEW

***Motion to Dismiss.*** The purpose of a motion to dismiss under Rule 12(b)(6) is "to test the sufficiency of a complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). The Supreme Court has further articulated the standard applicable to Rule 12(b)(6) motions. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Twombly*, 550 U.S. at 556 n.3. To survive a motion to dismiss, a complaint must put forth "plausible claim[s] for relief." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

***Motion for Summary Judgment.*** Summary judgment is proper under Fed. R. Civ. P. Rule 56(a) if there is no genuine dispute over any material facts, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*,

477 U.S. 242, 248 (1986). A dispute of material fact is genuine if the evidence would allow the trier of fact to return a verdict for the nonmoving party. *Id.* When considering a summary judgment motion, the court has "an affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Grave-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex*, 477 U.S. at 323-24). Thus, the court may only rely on facts supported in the record, not assertions made in the pleading. *Id.* Moreover, the court must view all facts and make all reasonable inferences in the light most favorable to the nonmoving party. *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party must present more than a "mere scintilla" of evidence to demonstrate a genuine issue of material fact that would preclude summary judgment. *Anderson*, 477 U.S. at 252.

## III. ANALYSIS

### ***a. Justiciability***

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). Congress has the authority to expand or limit federal district court jurisdiction by statute. However, federal courts possess an inherent jurisdiction (under Article III and the fundamental principles of due process) over certain cases relating to the enforcement of the Constitution that cannot be limited by Congress. *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 603 (1988) (permitting federal district court jurisdiction when necessary "to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim.").

The Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. However, federal courts may only review "cases and controversies" if

they are justiciable. *See generally Flast v. Cohen*, 392 U.S. 83, 94–99 (1968) (discussing the doctrine of justiciability as "a blend of constitutional requirements and policy considerations"). A case may lack justiciability when it involves a political question and implicates concerns regarding the separation of powers between the judiciary and one of the other branches of government. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 210–11 (1962) ("Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed . . . is a responsibility of this Court as ultimate interpreter of the Constitution."). While executive actions may often involve otherwise unreviewable political questions, federal courts always retain the power to review matters of constitutional violations. *See id.* Accordingly, the Court need not reach back to *Marbury v. Madison*, 5 U.S. 137 (1803), to support the conclusion that Plaintiffs' constitutional claims are justiciable.

Turning to Plaintiffs' remaining claims, the Court is required to determine if judicial review has been limited by Congress under the APA. The plain language of the APA—specifically, 5 U.S.C. §§ 701, 702—indicates a presumption for judicial review, at least to the procedures surrounding agency decision-making (but not necessarily to the substance of those decisions). *See generally Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967) (restating "the basic presumption of judicial review" for APA claims "so long as no statute precludes such relief or the action is not one committed by law to agency discretion").[22] Under 5 U.S.C. § 701(a), the only two exceptions are when: "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."

[22] *abrogated on other grounds by statute*, Pub. L. 94-574, 90 Stat. 2721, *as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977) (finding the statutory amendment to "eliminate the requirement of a specified amount in controversy as a prerequisite to the maintenance of any (§ 1331) action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity").

The Government argues both exceptions—that 8 U.S.C. § 1252(g) precludes judicial review, and that the DACA rescission is "committed to agency discretion" because it is a matter of prosecutorial discretion, *see United States v. Armstrong*, 517 U.S. 456, 464 (1996), immigration enforcement, *see Arizona v. United States*, 567 U.S. 387, 396–97 (2012), and deferred action generally, *see Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*, 525 U.S. 471, 485 (1999). *See* ECF No. 27-1 at 29–30.

However, the notion that 8 U.S.C. § 1252(g) precludes judicial review has been rejected repeatedly. *See, e.g.*, *AADC*, 525 U.S. at 482 (explicitly rejecting that § 1252(g) serves as a zipper clause that functions to prohibit all judicial review). Furthermore, while DHS possesses specified delegated authority over immigration enforcement, Congress never explicitly granted DHS a blanket authority to disparately enforce policies.

Plaintiffs' APA claims are justiciable because they relate to *the procedures* followed by DHS—not to *the substance* of its policy or its decision of a specific case. The Court may review whether the repeal of DACA followed the correct APA procedures. Furthermore, it is important to note that the Government's explanation for rescinding DACA was the Secretary's belief that the program was unlawful and would face lengthy legal challenges. The similarities between DACA and DAPA support justiciability in this case because review of DAPA was also found to be justiciable. *See Texas v. United States*, 809 F.3d 134, 155–64 (5th Cir. 2015) ("Congress has expressly limited or precluded judicial review of many immigration decisions . . . but DAPA is not one of them."), *aff'd*, 136 S. Ct. 2271 (2016).[23]

[23] *See also Texas v. United States*, 809 F.3d 134, 165–170 (5th Cir. 2015), *aff'd*, 136 S. Ct. 906 (2016).

> Congress did not intend to make immune from judicial review an agency action that reclassifies millions of illegal aliens in a way that imposes substantial costs on states that have relied on the protections conferred by § 1621. . . .

Accordingly, the Court finds all claims in Plaintiffs' Complaint are justiciable.

***b. Standing***

Direct standing exists for plaintiffs who have an injury-in-fact that is traceable to the defendants and which is redressable through adjudication. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 590 (1992). The injury must be more than a generalized grievance, which is an ideological objection or an injury widely shared by all members of the public. *See id.* at 575. Organizations have direct standing when government action has impaired the organization's own legal rights. *See, e.g., Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (U.S. 1977). However, association standing also exists for organizational plaintiffs when (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the purpose of the organization, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See id.* at 343.

The Government does not contest the standing of the individual plaintiffs. However, it argues that the organizational plaintiffs lack direct standing because they are not "the object of any government policy" and are merely seeking to "vindicate their own value preferences." *See* ECF No. 27-1 at 38–39 (equating the organizational plaintiffs' injury to a mere "generalized

---

*(continued from previous page)*

> *Chaney*'s presumption against judicial review of agency inaction [exists] because there are no meaningful standards against which to judge the agency's exercise of discretion. But where there is affirmative agency action—as with DAPA's issuance of lawful presence and employment authorization—and in light of the INA's intricate regulatory scheme for changing immigration classifications and issuing employment authorization, the action at least can be reviewed to determine whether the agency exceeded its statutory powers. . . .
>
> At its core, this case is about the Secretary's decision to change the immigration classification of millions of illegal aliens on a class-wide basis. The states properly maintain that DAPA's grant of lawful presence and accompanying eligibility for benefits is a substantive rule that must go through notice and comment, before it imposes substantial costs on them, and that DAPA is substantively contrary to law. The federal courts are fully capable of adjudicating those disputes. Because the interests that Texas seeks to protect are within the INA's zone of interests, and judicial review is available, we address whether Texas has established a substantial likelihood of success on its claim that DAPA must be submitted for notice and comment.

grievance"). The Government also argues that the organizational plaintiffs lack representational standing for failing to identify members of their organizations who are directly harmed by the repeal of DACA, *see id*. at 41–42, or reside within DACA's zone-of-interests, *see id.* at 42 (citing *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395–96 (1987)).

The Government's challenges to the standing of the organizational plaintiffs miss the mark. Casa De Maryland and the rest of the organizational plaintiffs are special interest groups directly focused on aiding immigrants and their communities. The fact that one of their primary functions has been assisting their members with "tens of thousands of DACA initial and renewal applications" is sufficient for standing in and of itself. *See* ECF No. 29 at 33. In addition to direct standing, the organizational plaintiffs possess association standing. Each organization has identified a number of its members who are Dreamers, and who unquestionably would have standing in this case. Furthermore, the purpose of these organizations is to aid and represent immigrants in their communities, including compliance with immigration procedures. Therefore, the rescission of DACA has an absolute nexus to the organizations' purpose. Additionally, the relief sought is injunctive and declaratory relief—not damages or any other remedy requiring the individual Dreamers. Hence, these organizational plaintiffs are the prototypical examples of possessing association standing.

Accordingly, the Court finds all Plaintiffs have standing in the instant case.

***c. APA Claims***

Rulemaking is a common method federal agencies use to promulgate decisions. *See generally Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445–46 (1915); *Londoner v. City & Cty. of Denver*, 210 U.S. 373, 385 (1908). Informal rulemaking is standardized under the APA and requires notice-and-comment procedures. *See* 5 U.S.C. § 553;

*e.g.*, *United States v. Nova Scotia Food Prod. Corp.*, 568 F.2d 240, 253 (2d Cir. 1977). Informal rulemaking does not include non-legislative rulemaking, such as procedural rules, interpretive rules, or policy statements. *See* 5 U.S.C. § 553(b); *e.g.*, *McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1324–25 (D.C. Cir. 1988).

After the notice-and-comment requirements, if applicable, have been met, courts must take a hard look at whether the decision to promulgate or repeal a rule is "arbitrary or capricious"—which is to say that there must be a rational correlation between the facts reviewed and the decision made. *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–44 (1983) (explaining that an agency must examine relevant data, articulate a satisfactory explanation contemporaneously with its decision, using rationale that comes from the agency (and not from a court inferring after the fact logic that is not explicitly stated in the record)). *See id.* However, even when notice-and-comment requirements do not apply, agency decisions are subject to judicial review under 5 U.S.C. § 706. By statute, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

The DACA program is a deferral of action, which by definition is an exercise of discretion rather than a rule with the force of law. Furthermore, the DACA Rescission Memo was not immediately binding, but rather a statement of intended policy beginning March 5, 2018. To the extent that Plaintiffs aver that, in practice, immigration reviews absent DACA protections lack individualized discretion, their dispute is merely with how the agency applies its policy, and

not with the policy itself.[24] Although a substantial paradigm shift, the DACA Rescission Memo neither curtails DHS's discretion regarding individual immigration reviews, nor does it prevent the agency from granting Dreamers deferred action status again in the future. Hence, DACA and its rescission are more akin to non-binding policy statements, and thus not subject to notice-and-comment requirements.

Plaintiffs argue that the decision to rescind DACA must be arbitrary and capricious because the Administrative Record is "insufficient" to make a decision of such magnitude. *See* ECF No. 29 at 35–39 (noting that the Administrative Record is only 256 pages long—192 of which are court opinions related to DAPA); *see also In re United States*, No. 17-72917, 2017 WL 5505730, at *2 (9th Cir. Nov. 16, 2017) ("The notion that the head of a United States agency would decide to terminate a program giving legal protection to roughly 800,000 people based on 256 pages of publicly available documents is not credible.").

However, based on the historical and political context outlined in the introductory pages of this Opinion, the decision to rescind DACA was neither arbitrary nor capricious, but rather was a carefully crafted decision supported by the Administrative Record. It is well established that "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. 29, 43 (1983). Therefore, it is irrelevant whether this Court, a judge in California or New York, or even a justice on the Supreme Court might have made a different decision while standing in the shoes of DHS on September 5, 2017. Rather, the relevant inquiry is whether the decision was made with a

[24] Plaintiffs' APA claim regarding DACA's information sharing policy also lacks merit. Nothing in the DACA Rescission Memo outlines any change—let alone implements a substantive rule—with regard to the use of any individual's information gathered during DACA's implementation.

"satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal quotations omitted).

DHS's rationale provided in the DACA Rescission Memo was a belief, based on recent court decisions and the advice of the Attorney General, that DACA was unlawful. Assuming that a reasonable basis for that belief exists in the Administrative Record, how could trying to avoid unlawful action possibly be arbitrary and capricious? Quite simply, it cannot. Regardless of whether DACA is, in fact, lawful or unlawful, the belief that it was unlawful and subject to serious legal challenge is completely rational.

DAPA—an analogous program, promulgated by analogous means—had been defeated less than a year prior. The litigation that stopped DAPA included expansions of DACA itself. The same plaintiffs who defeated DAPA threatened to challenge DACA imminently. The Attorney General of the United States—the nation's chief legal officer—provided legal advice that DACA was likewise unlawful and likely ill-fated against a legal challenge. All of this is in the Administrative Record—the remnants of the DAPA litigation,[25] the threatened legal challenge,[26] and the Attorney General's advisory letter.[27]

Therefore, what did the Acting Secretary of DHS do? She opted for a six-month wind-down period instead of the chaotic possibility of an immediate termination, which would come at a time known only to the judge resolving a future challenge to the DACA program. This decision took control of a pell-mell situation and provided Congress—the branch of government charged with determining immigration policy—an opportunity to remedy it. Given the

---

[25] *See* Admin. R., ECF No. 26-1 at 42–228.
[26] *See* Admin. R., ECF No. 26-1 at 238–40.
[27] *See* Admin. R., ECF No. 26-1 at 251.

reasonable belief that DACA was unlawful, the decision to wind down DACA in an orderly manner was rational.

Accordingly, the Court finds Plaintiffs' APA claims to lack merit; the rescission of DACA neither required notice-and-comment procedures, nor was it decided arbitrarily or capriciously.

#### ***d. Equal Protection***

Equal protection is the legal mechanism by which the law prevents disparate treatment between groups. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). A violative statute or action may provide for disparate treatment facially or in its application. *See id.* at 447–48. In reviewing legislation, which creates disparate impacts 'as applied,' courts review whether the action is covertly based on a suspect classification or if it can be plausibly explained on neutral grounds. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Probative considerations include a history of hostility towards the group, the sequence of events leading to the government action, departures from previous policies, and the legislative history. *See id.* at 265–67. The level of judicial scrutiny depends on the nature of the class targeted for disparate treatment.

The Complaint asserts that strict scrutiny should apply because the disparate treatment allegedly involves suspect classes—race, alienage, and national origin. *See, e.g.*, *Ambach v. Norwick*, 441 U.S. 68, 84 (1979) (finding alienage as a suspect class). When strict scrutiny applies, the government has the burden to demonstrate a compelling state interest, for which the governmental action is narrowly tailored and the least restrictive means. *See, e.g.*, *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 308 (2013).

The Government's equal protection argument analogizes the rescission of DACA to "selective prosecution"—which is afforded a presumption of non-discriminatory motives absent "clear evidence to the contrary." *See* ECF No. 27-1 at 58–61 (citing *United States v. Armstrong*, 517 U.S. 456, 463–68 (1996) where the court denied discovery on a selective prosecution claim regarding 24 drug-trafficking offenses (all of which were against African-American defendants)). Plaintiffs correctly note that the *Armstrong* court accepted the proposition that "the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Armstrong*, 517 U.S. at 464 (1996). Plaintiffs aver that the DACA rescission was "a discriminatory policy decision (not a challenge to a particular prosecution) that has a discriminatory impact and was motivated by discriminatory animus." *See* ECF No. 29 at 55 (noting that Hispanics comprise 93 percent of the 800,000 immigrants affected by DACA). To substantiate their claim, Plaintiffs cite to some of President Trump's unfortunate, less-than-politically-correct, statements. *See* ECF No. 29 at 54.

Both sides miss the mark. While DACA was promulgated under a theory of prosecutorial discretion, its rescission was not based on an exercise of that discretion. Rather, its rescission was premised on a legitimate belief that DACA was unlawful and should be wound down in an orderly manner, while giving Congress a window to act and adopt an appropriate legislative solution. The Administrative Record—the basis from which the Court must make its judicial review—does not support the notion that it was targeting a subset of the immigrant population, and it does not support any supposition that the decision was derived on a racial animus. That is where the judicial inquiry should end.

The Court rejects Plaintiffs' reliance on the President's misguided, inconsistent, and occasionally irrational comments made to the media to establish an ulterior motive. *See*

*generally Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972) (finding that courts should defer to any "facially legitimate and bona fide reason" for executive action and not "look behind the exercise of that discretion"); *Hamdan v. Rumsfeld*, 548 U.S. 557, 623–24 n.52 (2006) (noting that courts have never, "in evaluating the legality of executive action, deferred to comments made by such officials to the media"); *County of McCreary v. ACLU of Kentucky*, 545 U.S. 844, 845 (2005) (warning courts, albeit in the context of the First Amendment, to refrain from "scrutinizing purpose" when it requires "judicial psychoanalysis of a drafter's heart of hearts").[28]

Although the DACA Rescission Memo is facially clear as to its purpose and reasoning, Plaintiffs urge the Court to look behind it and find an allegedly discriminatory motivation—one that Plaintiffs attempt to establish with some of the President's remarks and statements. However, Plaintiffs here fail to make the necessary factual showing to permit this Court to do so. Albeit in the context of an Establishment Clause challenge, the Fourth Circuit recently explained in the "travel ban" case that there is "a heavy burden on Plaintiffs, but not an insurmountable one [in seeking to introduce such statements]. [Precedent] clearly affords the political branches substantial deference," but "also accounts for those very rare instances in which a challenger plausibly alleges that a government action runs so contrary to the basic premises of our Constitution as to warrant more probing review." *Int'l Refugee Assistance Project v. Trump*, No. 17-2231, 2018 WL 894413, at *12 (4th Cir. Feb. 15, 2018) (reviewing the standard set forth

[28] *See also Int'l Refugee Assistance Project v. Trump*, No. 17-2231, 2018 WL 894413, at *102 (4th Cir. Feb. 15, 2018) (Niemeyer, J., dissenting):

> Because of their nature, campaign statements and other similar statements, including Tweets, are unbounded resources by which to find intent of various kinds. They are often short-hand for larger ideas; they are explained, modified, retracted, and amplified as they are repeated and as new circumstances and arguments arise. And they are often susceptible to multiple interpretations, depending on the outlook of the recipient. . . .
>
> At bottom, the danger of this new rule is that it will enable a court to justify its decision to strike down any executive action with which it disagrees. It need only find one statement that contradicts the official reasons given for a subsequent executive action and thereby pronounce that the official reasons were a pretext.

in *Kleindienst v. Mandel*, 408 U.S. 753 (1972) "through the lens of Justice Kennedy's [concurring] opinion in" *Kerry v. Din*, 135 S. Ct. 2128 (2015)).

In that case, Chief Judge Gregory, writing for the majority, explained that *Mandel* requires courts to "first ask whether the proffered reason for the Proclamation is 'facially legitimate and bona fide.'" *Id.* (citing *Mandel*, 408 U.S. at 770). Under *Din*, however, a district court "may 'look behind' the Government's proffered justification for its action" upon "an 'affirmative showing of bad faith,' which [plaintiffs] must 'plausibly allege with sufficient particularity.'" *Id.* (citing *Din*, 135 S. Ct. at 2139–41 (Kennedy, J., concurring)). However, while the plaintiffs in the "travel ban" case offered "undisputed evidence" of an "anti-Muslim bias," *see id.* at *13, the Plaintiffs cannot here make a similarly substantial showing. The Fourth Circuit found that then-candidate Trump regularly disparaged Islam as a religion and repeatedly proposed banning Muslims from the United States. *See id.* at *13–*16. Implicit to the issue was a direct nexus between the discriminatory statements and the executive action in question in that case—a travel ban targeting predominantly Muslim nations.

The instant case is factually very different. The President certainly made statements of his strong views on immigration policy, including advocacy for the rescission of the DACA program.[29] However, his statements have frequently shifted but have moderated since his election. He has referred to the Dreamers as "terrific people;" he has pledged to "show great heart;" and he has referred to Dreamers as "incredible kids."[30] He referred to the "DACA

[29] *See* Gregory Krieg, *Trump's many shifting positions on DACA, from the campaign to right now*, CNN (Jan. 25, 2018), https://www.cnn.com/2018/01/25/politics/donald-trump-positions-daca/index.html.
[30] *See id.*

situation" as a "very difficult thing for me. Because, you know, I love these kids."[31] He added that "the existing law is very rough. It's very, very rough."[32]

The rescission of the DACA program merely fulfills the duty of the executive branch to faithfully enforce the laws passed by Congress. Accordingly, no affirmative showing of bad faith can follow. In fact, the President actually urged Congress to pass Dreamer-protection legislation during DACA's wind down period[33]—simply put, this case is wholly dissimilar to the "extraordinary case" regarding the recent "travel ban."[34] As a result, the Court need not go further than the facially legitimate motivation offered in the DACA Rescission Memo and supported by the Administrative Record.

Accordingly, the Court finds Plaintiffs' equal protection claims to lack merit

***e. Procedural Due Process***

Procedural due process ensures that the government must satisfy certain procedures prior to depriving a person of his or her rights. *See Mathews v. Eldridge*, 424 U.S. 319, 332–33 (1976). Procedural due process applies whenever the government seeks to deprive a person of a liberty or property interest. *See id.* Liberty interests include physical restraint, a substantial infringement of a fundamental right, harm to one's reputation affecting another tangible interest, or the unjustified intrusion of one's personal security. *See, e.g., Vitek v. Jones*, 445 U.S. 480, 488 (1980). Property interests include real property, personal property, intellectual property, or any legitimate claim of entitlement. *See, e.g., Logan v. Zimmerman Brush Co.*, 455 U.S. 422,

---

[31] *See id.*
[32] *See id.*
[33] *See supra* Note 15.
[34] *Accord Int'l Refugee Assistance Project v. Trump*, No. 17-2231, 2018 WL 894413, at *13 (4th Cir. Feb. 15, 2018) ("In the extraordinary case before us, resolution of that question [regarding pretext] presents little difficulty. Unlike *Din* and *Mandel*, in which the Government had a "bona fide factual basis" for its actions, *Din*, 135 S. Ct. at 2140 (Kennedy, J., concurring in the judgment), here the Government's proffered rationale for the Proclamation lies at odds with the statements of the President himself.").

429 (1982). Entitlements—rights to things like education, public employment, and welfare—are grounded in the law and cannot be removed except for cause. *See id.* In determining the amount of process owed, courts balance (1) the importance of the right the individual is trying to preserve, (2) the risk of erroneous deprivation of that right given the existing level of due process, and (3) the level of governmental burden for the additional levels of due process sought. *See Eldridge*, 424 U.S. at 334–35.

Plaintiffs allege that under DACA, Dreamers were afforded, and are now being deprived of, a number of protected interests, including the ability to (1) obtain employment authorization, (2) travel internationally, (3) attend schools, (4) pay into and receive payment from Social Security and disability, (5) secure other opportunities like obtaining bank accounts or credit cards, and (6) otherwise be considered "lawfully present." *See* ECF No. 29 at 58.

First, Plaintiffs' claim fails because procedural due process only applies to individualized deprivations, not policy-based deprivations for an entire class. *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) (holding that individualized hearings are unnecessary when impractical and when the challenged policy affects a large number of people; in these instances, the political process serves as an effective alternative).

Second, even assuming *arguendo* that due process did attach to class-wide policy deprivations, Plaintiffs' due process claim would fail because DACA did not create an entitlement. Facially, the June 15, 2012 DACA Memo explicitly denied the creation of any such rights:

> This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Memorandum from U.S. Dep't of Homeland Sec., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012).

While entitlements are not always self-labeled or created with bright flashing lights, the exercise or restraint of prosecutorial discretion is not traditionally the sort of governmental action that creates substantive rights. The DACA Memo did not guarantee any individual immigrant particular benefits, and the DACA Rescission Memo did not curtail DHS's discretion regarding individual immigration reviews. Therefore, even if due process could attach to DACA, no *de facto* entitlements were created by the program itself.

Accordingly, the Court finds Plaintiffs' procedural due process claim to lack merit.

***f. Substantive Due Process***

While procedural due process outlines the manner by which the government may deprive a person of his or her rights, substantive due process bars the government from depriving a person of a right altogether. *See, e.g.*, *Roe v. Wade*, 410 U.S. 113, 167–68 (1973) (Stewart, J., concurring). If the right being deprived is a "fundamental right," courts apply strict scrutiny; if the right being deprived is not fundamental, courts apply rational basis.

Certain rights have been adjudicated formally as fundamental (right to associate, right to educate one's children, right to procreate, right to marry, etc.). *E.g.*, *Griswold v. Connecticut*, 381 U.S. 479, 482–86 (1965). In determining whether a non-previously-adjudicated right is fundamental, courts have applied different approaches—whether the absence of the right would make other fundamental rights "less secure," *see id.* at 482–83, whether the right is "deeply rooted in this Nation's history and tradition," *see Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (quoting *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977)), and whether the

right is a basic value "implicit in the concept of ordered liberty," *see Glucksberg*, 521 U.S. at 720–21 (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)).

In the instant case, Plaintiffs claim a "denial of fundamental fairness." *See* ECF No. 29 at 63–64. However, for the "denial of fundamental fairness" to rise to the level of a substantive due process violation, it must be "so egregious" and "so outrageous" as "to shock the contemporary conscience." *See Manion v. N. Carolina Med. Bd.*, 693 F. App'x 178, 181 (4th Cir. 2017) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 850 (1998), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001)). Plaintiffs believe they have met this burden by alleging a discriminatory intent in DACA's rescission—an allegation unsupported by the record before this Court.

The rescission of a policy relating to prosecutorial discretion does not shock the conscience of this Court. Absent congressional action, the benefits given to Dreamers by DACA were in potential violation of congressional immigration laws; the only thing that has changed is that deferred status will expire, and enforcement of immigration laws may recommence in the absence of action by Congress, which the President has requested. There is nothing surprising or unfair about policies, laws, or enforcement thereof changing with an election cycle. Furthermore, the election process, and not federal litigation, is the appropriate method for resolving any fairness implicated in DACA's rescission.

Accordingly, the Court finds Plaintiffs' substantive due process claim to lack merit.

***g. Estoppel***

The doctrine of estoppel is traditionally founded in the principles of fraud as applied in contract law, but the doctrine may be applied elsewhere in the law as well. *See generally W. Augusta Dev. Corp. v. Giuffrida*, 717 F.2d 139, 141 (4th Cir. 1983) (discussing the outgrowth of

the doctrine of estoppel as a claim against the government). In general, "equitable estoppel is comprised of three basic elements: (1) a voluntary misrepresentation of one party, (2) that is relied on by the other party, (3) to the other party's detriment." *Chawla v. Transamerica Occidental Life Ins. Co.*, 440 F.3d 639, 646 (4th Cir. 2006). In this Circuit, when raising such a claim against the government, there is a heightened standard for the first element, and an additional showing of "affirmative misconduct" by the government actors. *See Dawkins v. Witt*, 318 F.3d 606, 611 (4th Cir. 2003).

As with Plaintiffs' substantive due process claim, estoppel cannot apply to DACA's rescission. The rescission of a policy relating to prosecutorial discretion does not amount to a misrepresentation by the government. DACA was promulgated with an express disclaimer that it was not conferring any rights. Nothing in the DACA Memo or in DACA's implementation suggested to Dreamers that the program was permanent, and individuals in the program were aware that their protections were subject to renewal every two years. DACA's rescission lacks any serious injustice—let alone, affirmative misconduct by any of the defendants.

However, while estoppel does not apply to DACA's rescission, it potentially would apply to any use for immigration enforcement of the information collected from Dreamers during DACA registrations. With regard to this narrow issue, and based on the evidence before it, the Court finds that the Government promised not to transfer or use the information gathered from Dreamers for immigration enforcement. *See* ECF No. 29 at 42–44, 60–61; ECF No. 29-3 at 15–27, 32–41, 52–76, 96–98, 109–13. And now that the government is in possession of this information, the potential for use or sharing of it is theoretically possible.

On the one hand, the Government claims that no changes have been made to the information-sharing policy. However, at oral argument, counsel for the Government was unable to provide any assurance that the Government would not make changes.

> [*Mr. Shumate:*] The rescission policy that is being challenged here says nothing about the sharing of information for enforcement purposes. There's nothing more that the plaintiffs have raised other than a speculative fear that this might happen in the future. But DHS has been quite clear and they said on the FAQ section –
>
> *The Court:* Are you prepared to say that from representing the defendants that there is no intention of changing the information-sharing assurances that were given in connection with DACA?
>
> *Mr. Shumate:* No. I'm not making that representation, Your Honor. Even from the beginning, DHS has been quite clear that this policy on information-sharing can change. . . . But they also I think take liberties with what that policy is. There has never been a promise or assurance that that information would never be changed. FAQ 19 quite clearly says that the information is generally protected and will not be shared for enforcement purposes, but there may be circumstances where it will be to adjudicate a DACA application or for law enforcement purposes if the individual meets the status of the test for notice to appear. But also quite clearly, DHS has said from the start that the information policy – sharing policy can change, but it has not. So that really should be the end of the debate about the information-sharing.

Tr. of Mot. Hr'g (Dec. 15, 2017) at 16–17.

The Court disagrees that this "should be the end of the debate about the information-sharing." *Id.* Logic would dictate that it is possible that the government, having induced these immigrants to share their personal information under the guise of immigration protections, could now use that same information to track and remove them. This potentially would be "affirmative misconduct" by the government, and the Dreamers' detrimental reliance would be self-evident in the information-sharing itself.

Therefore, while the Government will not be enjoined from rescinding DACA, given the substantial risk for irreparable harm in using Dreamers' DACA-provided information, the Court

will enjoin the Government from using information provided by Dreamers through the DACA program for enforcement purposes. In the event that the Government needs to make use of an individual Dreamer's information for national security or some purpose implicating public safety or public interest, the Government may petition the Court for permission to do so on a case-by-case basis with *in camera* review.

## IV.    CONCLUSION

In concluding this Opinion, the Court notes the recent opinion of Judge Gonzalo P. Curiel, of the Southern District of California, in which he made observations that aptly apply to this case. In a case involving a challenge to President Trump's proposed "border wall," he noted that the case was "currently the subject of heated political debate," but that in its review of the case, "the Court cannot and does not consider whether underlying decisions . . . are politically wise or prudent." *In re Border Infrastructure Envtl. Litig.*, No. CV 17-1215 GPC (WVG), 2018 WL 1071702, at *1 (S.D. Cal. Feb. 27, 2018). For this proposition, he cited the opinion of his fellow Indiana native, Chief Justice Roberts, in *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012): "Court[s] are vested with the authority to interpret the law; we possess neither the expertise nor the prerogative to make policy judgments. Those decisions are entrusted to our Nation's elected leaders, who can be thrown out of office if the people disagree with them. It is not our job to protect the people from the consequences of their political choices."

The result of this case is not one that this Court would choose if it were a member of a different branch of our government. An overwhelming percentage of Americans support protections for "Dreamers," yet it is not the province of the judiciary to provide legislative or executive actions when those entrusted with those responsibilities fail to act. As Justice Gorsuch noted during his confirmation hearing, "a judge who likes every outcome he reaches is probably

a pretty bad judge, stretching for the policy results he prefers rather than those the law compels."[35]

This Court does not like the outcome of this case, but is constrained by its constitutionally limited role to the result that it has reached. Hopefully, the Congress and the President will finally get their job done.

Date: March 5, 2018

/s/
ROGER W. TITUS
UNITED STATES DISTRICT JUDGE

[35] Neil Gorsuch, Transcript of Opening Remarks at Confirmation Hearing, Comm. on the Judiciary (Mar. 20, 2017), https://www.judiciary.senate.gov/imo/media/doc/03-20-17%20Gorsuch%20Testimony.pdf.