## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

<table>
<tr><td>

CASA DE MARYLAND, *et al.*,

      *Plaintiffs,*

        v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

      *Defendants.*

</td><td>

Civil No. PWG-17-2942

</td></tr>
</table>

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE

DAVID M. MORRELL
Deputy Assistant Attorney General

BRAD P. ROSENBERG
Assistant Branch Director

GALEN N. THORP (D. Md. 813831)
  Senior Trial Counsel
STEPHEN M. PEZZI (D. Md. 813691)
RACHAEL L. WESTMORELAND
  (D. Md. 807639)
  Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 305-8576
Fax: (202) 616-8470
Email: stephen.pezzi@usdoj.gov

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

BACKGROUND ............................................................................................................2

I.     The DACA Policy ..........................................................................................2

II.    The *Regents* Litigation ..................................................................................3

III.   This Litigation ...............................................................................................4

IV.   The Wolf Memorandum .................................................................................5

V.    Plaintiffs' Motion for an Order to Show Cause ............................................6

LEGAL STANDARD ....................................................................................................6

ARGUMENT ................................................................................................................7

I.     DEFENDANTS HAVE COMPLIED WITH ALL RELEVANT COURT
ORDERS. ......................................................................................................7

     A.    The Wolf Memorandum complies with all relevant court orders, none of
which forecloses future changes to the DACA policy, let alone explicitly. ..................7

     B.    The fact that the Wolf Memorandum is labeled an "interim" policy does not
mean that it violates any court orders. ..................9

     C.    Regardless of whether the Wolf Memorandum complies with the
Administrative Procedure Act—a question not presented here—it does not
violate any court orders. ..................11

     D.    The timing of the Wolf Memorandum did not violate any court orders. ..................13

II.    AN ORDER TO SHOW CAUSE IS UNWARRANTED. ......................... 16

     A.    Even if the Government misinterpreted this Court's order, any
misinterpretation caused no harm to any of the Plaintiffs. ...........16

     B.    Even if the Government misinterpreted this Court's order, any
misinterpretation was objectively reasonable. ...........18

     C.    Plaintiffs' remaining arguments lack merit. ...........19

III.   BECAUSE PLAINTIFFS HAVE NOT CHALLENGED THE WOLF
MEMORANDUM, THERE IS NO BASIS FOR AN ORDER RESTORING
DACA TO ITS PRE-SEPTEMBER 5, 2017 STATUS. .................................20

CONCLUSION .............................................................................................................20

# TABLE OF AUTHORITIES

**CASES**

*Arizona v. United States*,
   567 U.S. 387 (2012)................................................................................................................3

*Batalla Vidal v. Nielsen*,
   279 F. Supp. 3d 401 (E.D.N.Y. 2018) ........................................................................... 3, 8, 9

*Casa de Maryland v. DHS*,
   924 F.3d 684 (4th Cir. 2019), *cert. denied*, 2020 WL 3492650 (U.S. June 29, 2020) .................. 4, 5, 12

*Cole v. Burns Int'l Sec. Servs.*,
   105 F.3d 1465 (D.C. Cir. 1997) ............................................................................................13

*Davis v. Richmond, Fredericksburg & Potomac R. Co.*,
   803 F.2d 1322 (4th Cir. 1986)...............................................................................................13

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020)...................................................................................................1, 4, 9, 20

*Doe v. Chao*,
   511 F.3d 461 (4th Cir. 2007).................................................................................................12

*Hughey v. JMS Dev. Corp.*,
   78 F.3d 1523 (11th Cir. 1996)..............................................................................................12

*In re Gen. Motors Corp.*,
   61 F.3d 256 (4th Cir. 1995) ............................................................................................. 6, 8

*Int'l Longshoremen's Ass'n, Local 1291 v. Phil. Mar. Trade Ass'n*,
   389 U.S. 64 (1967) ...............................................................................................................12

*Jocks v. Tavernier*,
   316 F.3d 128 (2d Cir. 2003) ................................................................................................14

*MAKS, Inc. Gen. Trading & Contracting Co. v. Sterling Operations, Inc.*,
   2013 WL 5328419 (E.D. Tenn. 2013)...................................................................................13

*Martinez v. Menchaca*,
   2009 WL 37488 (S.D. Tex. 2009)........................................................................................14

*NAACP v. Bureau of the Census*,
   399 F. Supp. 3d 406 (D. Md.),
   *aff'd in part, rev'd in part and remanded*, 945 F.3d 183 (4th Cir. 2019)......................................12

*NAACP v. Trump*,
   298 F. Supp. 3d 209 (D.D.C. 2018) ......................................................................................3

*NAACP v. Trump*,
    315 F. Supp. 3d 457 (D.D.C. 2018) ........................................................................3

*NLRB v. Express Publishing Co.*,
    312 U.S. 426 (1941) ...............................................................................................13

*Rainbow Sch., Inc. v. Rainbow Early Educ. Holding LLC*,
    887 F.3d 610 (4th Cir. 2018) ................................................................... 6, 16, 18

*Regents of the Univ. of Cal. v. DHS*,
    279 F. Supp. 3d 1011 (N.D. Cal. 2018) ............................................................ 3, 8

*Reno v. Am. Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) .................................................................................................2

*Taggart v. Lorenzen*,
    139 S. Ct. 1795 (2019) .............................................................................6, 8, 13, 19

*United States v. Ali*,
    874 F.3d 825 (4th Cir. 2017) ..................................................................................6

## STATUTES

6 U.S.C. § 202 .....................................................................................................................7

8 U.S.C. § 1103 ...................................................................................................................7

## REGULATIONS

8 C.F.R. § 274a.12 ..............................................................................................................2

## OTHER AUTHORITIES

*Regents*, Judgment, No. 18-157 (U.S. July 20, 2020),
    https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/
    18-587.html ..............................................................................................................4

The White House, *Remarks by President Obama on Immigration* (June 15, 2012),
    https://go.usa.gov/xnZFY .....................................................................................10

USCIS, Check Case Processing Times,
    https://egov.uscis.gov/processing-times/ ...........................................................17

## INTRODUCTION

Plaintiffs' motion for an order to show cause is based on the indefensible theory that the Wolf Memorandum—a new agency action that modifies DACA in some respects—somehow violates court orders, even if it fully complies with the Administrative Procedure Act. Plaintiffs have misinterpreted the Supreme Court's opinion in *Regents*, the Fourth Circuit's mandate in this case, and this Court's July 17, 2020 Order implementing that mandate. This litigation has never been about "whether DHS may rescind DACA"—in fact, before the Supreme Court, "[a]ll parties agree[d] that it may," and the Supreme Court offered no reason to doubt that consensus. *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020). It had always been undisputed—at least, before Plaintiffs' motion—that the Department of Homeland Security (DHS) *may* rescind a discretionary non-enforcement policy like DACA, in whole or in part, at any time, as long as it provides a sufficient explanation. And although Plaintiffs purport to acknowledge this reality in the first sentence of their brief, *see* Pls.' Mot. For an Order to Show Cause, at 1 ECF No. 115 ("Mot."), it cannot be reconciled with their arguments that follow.

DHS has now exercised (some of) this long-undisputed authority. For the reasons explained in the Wolf Memorandum, until further notice, DHS has modified DACA, while retaining its core—including by allowing current DACA recipients to renew indefinitely. That new agency action alters the legal status quo, but it violates no court order. In fact, the Wolf Memorandum *effectuates* all relevant orders, by formally withdrawing the prior memoranda that had attempted to rescind DACA. And even before the Wolf Memorandum, DHS was complying with all relevant orders: It was no longer applying the rescission policy set forth in the prior, now-vacated rescission memoranda—as evidenced by its continued actions renewing DACA grants and, even more starkly, its decision to temporarily hold (rather than continue to reject) initial applications, pending then-imminent policy changes. No court order required the agency to announce its future plans with respect to DACA on the same days those orders issued, let alone prohibited the agency from taking a few weeks to deliberate, then to finalize and publish a formal memorandum explaining how DHS would be responding to the *Regents* opinion going forward. And while the Wolf Memorandum modifies DACA in certain respects, that

1

itself is an *application* of a critical aspect of the original Napolitano Memorandum: namely, that any policy like DACA is, by its nature, *always* subject to change.

Plaintiffs have not challenged the Wolf Memorandum under the APA. Instead, relying on newspaper editorials, internet commentary, and statements from legislators, Plaintiffs accuse the Government—without any valid basis—of an "intent to defy the clear mandate of the Supreme Court." Mot. at 2. That extraordinary accusation is meritless. The Wolf Memorandum fully complies with the APA, but even if a court were later to hold otherwise, that would not mean that the Government has violated any court order—let alone knowingly violated a clear provision in such an order, as is required to justify contempt proceedings. Moreover, the timing of the Wolf Memorandum, and the accompanying temporary hold on certain DACA-related processing in the days preceding its issuance, cannot have caused any harm to Plaintiffs, given that, regardless of what DHS had done in the interim, *all* first-time DACA requests submitted during that period would still have been pending on the day the Wolf Memorandum issued, and thus subject to the agency's eventual policy decision to largely preserve the status quo of the past few years by denying all first-time DACA requests, even as renewals continue.

An order to show cause is unwarranted. Plaintiffs' motion should be denied.

## BACKGROUND

### I.     THE DACA POLICY

On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano announced the policy known as DACA, or Deferred Action for Childhood Arrivals. *See* Admin. R. (AR) 1-3 (Napolitano Mem.), ECF No. 26-1. DACA made deferred action available to "certain young people who were brought to this country as children" in violation of the immigration laws. *Id.* at 1. Following completion of a background check, successful requestors would receive deferred action for a period of two years, subject to renewal. *Id.* at 2-3. The Napolitano Memo stated that deferred action pursuant to DACA was an "exercise of prosecutorial discretion." Napolitano Mem. at 1; *see also Reno v. Am. Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999); *see* 8 C.F.R. § 274a.12(c)(14) (describing

"deferred action" as "an act of administrative convenience to the government which gives some cases lower priority"). This "broad discretion" is a "principal feature of the removal system." *Arizona v. United States*, 567 U.S. 387, 396 (2012). To that end, the Napolitano Memo explained that DACA "confer[red] no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights." Napolitano Mem. at 3. The Napolitano Memorandum was issued without notice-and-comment rulemaking.

On September 5, 2017, then-Acting Secretary of Homeland Security Elaine Duke, exercising her authority to establish national immigration policies and priorities, rescinded the Napolitano Memorandum, and decided to wind down DACA in an orderly fashion. *See* AR 252-56 (Duke Mem.). This and numerous other lawsuits followed, challenging that agency decision on various grounds.

## II.   THE *REGENTS* LITIGATION

In five related cases challenging the Duke Memorandum, on January 9, 2018, the U.S. District Court for the Northern District of California granted a motion for a preliminary injunction, and ordered Defendants to "maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017, including allowing DACA enrollees to renew their enrollments." *Regents of the Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1048 (N.D. Cal. 2018). That injunction, however, specifically excluded (1) "new applications from applicants who have never before received deferred action" and (2) DACA-based requests for advance parole. *Id.* Shortly thereafter, a co-extensive preliminary injunction was issued by the U.S. District Court for the Eastern District of New York. *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018). And the U.S. District Court for the District of Columbia later issued a final judgment vacating the Duke Memorandum in its entirety, *NAACP v. Trump*, 298 F. Supp. 3d 209 (D.D.C. 2018), and also rejected a subsequent agency explanation (the Nielsen Memorandum) on similar grounds, 315 F. Supp. 3d 457 (D.D.C. 2018). With plaintiffs' consent, however, the D.C. court stayed its order in part pending appeal, so that the practical effect of the D.C. judgment was also coextensive with the California and New York preliminary injunctions.

The Supreme Court ultimately granted certiorari (or certiorari before judgment) in all of the California, New York, and District of Columbia DACA-rescission cases. On June 18, 2020, the Supreme Court issued a decision setting aside the Duke Memorandum as arbitrary and capricious under the APA, and declining to consider the Nielsen Memorandum. The Court acknowledged that DHS's authority to rescind DACA was undisputed. *Regents*, 140 S. Ct. at 1905. Indeed, it recognized that deciding the best way to move forward with "a program with the breadth of DACA" involves "important policy choices" that are left to DHS, *id.* at 1910, and that DHS has "considerable flexibility in carrying out" this policy-making responsibility, *id.* at 1914. Nonetheless, the Court held that the Duke Memorandum failed to consider alternatives to rescinding DACA in its entirety, and failed to adequately address the possibility of legitimate reliance interests related to DACA. *Id.* at 1912, 1913. Accordingly, the Court held that a remand to DHS was appropriate "so that it may consider the problem anew." *Id.* at 1916. The Supreme Court's judgment issued on July 20, 2020. *See Regents*, Judgment, No. 18-157 (U.S. July 20, 2020), https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/18-587.html. The Supreme Court also ordered vacatur of the New York and California injunctions, which had required maintaining portions of the DACA policy during the litigation. *See Regents*, 140 S. Ct. at 1916.

## III.   THIS LITIGATION

Plaintiffs filed this lawsuit on October 5, 2017, raising claims similar to those in *Regents*. On March 5, 2018, the late-Judge Titus granted summary judgment to Defendants in substantial part, holding that the Duke Memorandum did not violate the APA or the Constitution. *See* Order at 1-2 (Mar. 5, 2018), ECF No. 43. Judge Titus granted judgment in part to Plaintiffs, however, on their estoppel claim regarding the DACA information-sharing policy, and enjoined Defendants from modifying or rescinding that policy. *See id.*, *as amended by* Order (Mar. 15, 2018) at 1-2, ECF No. 49.

The Fourth Circuit reversed Judge Titus's arbitrary-and-capricious holding, vacated DACA's rescission in its entirety, and remanded the matter for "further proceedings consistent with this opinion." *Casa de Maryland v. DHS*, 924 F.3d 684, 706 (4th Cir. 2019). It also vacated the

information-sharing injunction, and reversed that portion of the judgment. *Id.* The Fourth Circuit, however, stayed the mandate pending appeal to the Supreme Court, a request that Plaintiffs did not oppose. *See* Stay of Mandate (May 31, 2019), ECF No. 86.

On June 29, 2020, after deciding *Regents*, the Supreme Court denied certiorari here. *See* ECF No. 92. The Fourth Circuit issued its mandate on June 30, 2020. ECF No. 93. On July 17, 2020, this Court issued an order implementing the Fourth Circuit's mandate, which read, in relevant part: "The rescission of the DACA policy is VACATED, and the policy is restored to its pre-September 5, 2017 status. . . . Defendants . . . are ENJOINED from implementing or enforcing the DACA rescission and from taking any other action to rescind DACA that is not in compliance with applicable law." Order (Jul. 17, 2020) at 3, ECF No. 97.

## IV.    THE WOLF MEMORANDUM

Eight days after the Supreme Court issued its judgment in *Regents*, on July 28, 2020, Acting Secretary of Homeland Security Chad F. Wolf formally rescinded the Duke Memorandum and the Nielsen Memorandum. *See* Defs.' Notice (July 28, 2020), ECF No. 102-1 ("Wolf Memorandum"). The Wolf Memorandum announced the Acting Secretary's determination, "[i]n accordance with the Supreme Court's decision," "to give careful consideration to whether the DACA policy should be maintained, rescinded, or modified." Wolf Mem. at 5. Given the Acting Secretary's serious enforcement policy concerns—for example, that policies like DACA "send[] mixed messages about DHS's intention to consistently enforce the immigration laws as Congress has written them," *id.* at 4-5—the Wolf Memorandum also made certain immediate changes to DACA. *Id.* The Wolf Memorandum explains that, until further notice, DHS (1) will not accept first-time DACA requests; (2) will continue to accept renewal requests from DACA recipients, though it will limit the period of any future grants of DACA to one year, rather than the two years provided under the Napolitano Memorandum; and (3) will allow DACA recipients to submit requests for advance parole, to be granted in "exceptional circumstances." *See id.* at 5. These changes apply to both pending and

prospective requests. *Id.* at 7. The Wolf Memorandum also reiterates that DHS will "[c]ontinue to comply with the information-sharing policy" announced in 2012. *Id.* at 8.

## V. PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE

On August 14, 2020, Plaintiffs filed a motion for an order to show cause why Defendants should not be held in contempt or, in the alternative, to compel compliance with the Fourth Circuit mandate. ECF No. 115. Plaintiffs argue that DHS is obligated by court orders to operate DACA exactly how it was operated before September 5, 2017—even after the issuance of the Wolf Memorandum, and whether or not the Wolf Memorandum satisfies the APA.

<u>LEGAL STANDARD</u>

"To ensure compliance with its orders, a district court has the inherent authority to hold parties in civil contempt." *Rainbow Sch., Inc. v. Rainbow Early Educ. Holding LLC*, 887 F.3d 610, 617 (4th Cir. 2018). In the Fourth Circuit, "[a] party can be held in civil contempt when there is clear and convincing evidence of four elements: '(1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's favor; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result.'" *Id.* (quoting *United States v. Ali*, 874 F.3d 825, 831 (4th Cir. 2017)). For civil contempt to be an "appropriate sanction," there must be a court order "which sets forth in specific detail an unequivocal command which a party has violated." *In re Gen. Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995) (citation and alteration omitted); *see also Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (explaining that "principles of 'basic fairness require that those enjoined receive explicit notice' of 'what conduct is outlawed' before being held in civil contempt," and that "civil contempt 'should not be resorted to where there is a *fair ground of doubt* as to the wrongfulness of the defendant's conduct'") (brackets and citations omitted).

# ARGUMENT

## I. DEFENDANTS HAVE COMPLIED WITH ALL RELEVANT COURT ORDERS.

Plaintiffs' argument is misguided. While expressly disavowing any challenge to the legality of the Wolf Memorandum under the APA, they nevertheless contend that it violates some combination of the Supreme Court's judgment, the Fourth Circuit's mandate, and this Court's July 17, 2020 Order implementing that mandate. Plaintiffs have materially misinterpreted the relevant orders, none of which purport to prohibit DHS from making future changes to DACA, or even rescinding it entirely. Both before and after the Wolf Memorandum, Defendants have complied with all relevant orders.

### A. The Wolf Memorandum complies with all relevant court orders, none of which forecloses future changes to the DACA policy, let alone explicitly.

The central premise of Plaintiffs' motion is that this Court's July 17, 2020 Order, ECF No. 97, which sought to implement the Fourth Circuit's mandate, *prohibited* DHS from making any change to DACA, and instead *required* DACA to be preserved, untouched, on the terms that were in effect before September 5, 2017. *See, e.g.*, Mot. at 8 ("The Wolf Memorandum confirmed that Defendants had not been complying with the Courts' Orders to return DACA 'to its pre-September 5, 2017 status.'"). But that premise is wrong, and that basic misunderstanding dooms Plaintiffs' motion.

**1.** The key passage of this Court's July 17, 2020 Order is as follows: "The rescission of the DACA policy is VACATED, and the policy is restored to its pre-September 5, 2017 status." July 17, 2020 Order at 3. Unquestionably, that order requires that the prior DACA-rescission memoranda be "VACATED"—hence the all-caps decretal language. That was no surprise: the Fourth Circuit (and the Supreme Court) held that the Duke Memorandum was arbitrary and capricious. Accordingly, the Wolf Memorandum formally and explicitly effectuates that command. *See* Wolf Mem. at 4 ("[I]n the exercise of my authority and discretion in establishing national immigration policies and priorities, *see* 8 U.S.C. § 1103(a)(1); 6 U.S.C. § 202(5), I am rescinding the Nielsen Memorandum and the Duke Memorandum.").

What follows that decretal language is another independent clause, set off by a comma: ". . . and the policy is restored to its pre-September 5, 2017 status." July 17, 2020 Order at 3. Neither

that language's text, nor its formatting, nor the relevant context give any indication that this Court intended the second half of that sentence to operate as a separate, mandatory command that the DACA policy *must* be governed *indefinitely* by the Napolitano Memorandum—even in the face of future policy changes by the agency. *See In re Gen. Motors Corp.*, 61 F.3d at 258 (requiring violation of "an unequivocal command" for civil contempt); *see also Taggart*, 139 S. Ct. at 1801. To the contrary, the "pre-September 5, 2017 status" of the DACA policy was the Napolitano Memorandum—including, of course, the critical aspect of that Memorandum that the DACA policy was subject to change, as a discretionary non-enforcement policy that conferred no substantive rights and that had been adopted without any notice-and-comment procedures. *See* Napolitano Mem. at 3 ("This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights.").

In other words, had DHS taken no further action following the prior rounds of litigation and this Court's order, the Napolitano Memorandum *would have* been the last memo standing, and DACA *would have* continued pursuant to its terms. But there is no language in the Court's July 17, 2020 Order implementing the Fourth Circuit's mandate that *requires* the Napolitano Memorandum to be applied in perpetuity—nor would there have been any legal basis for such an order. The only relevant court-ordered *requirement* was vacatur of the *prior* DACA-rescission memoranda. That requirement has been carried out by the agency, via the Wolf Memorandum. And indeed, even after the Supreme Court ruled but before the Wolf Memorandum had issued, DHS was not enforcing the prior DACA-rescission memoranda, as reflected by the fact that during that period it both *continued* to grant DACA renewals and *stopped* rejecting all initial DACA requests from first-time requestors. *See* Wolf Mem. at 7.

To be sure, during the prior litigation, two district courts *had* issued preliminary injunctions, which *did* require preserving (part of) the status quo with respect to DACA. *Regents*, 279 F. Supp. 3d at 1048; *Batalla Vidal*, 279 F. Supp. 3d at 401. DHS complied fully with those orders for the two-plus years that they were in effect (and no plaintiff ever argued to the contrary). But those orders are no

longer in effect. *See Regents*, 140 S. Ct. at 1916. If DHS were prohibited from changing its policy, then the Supreme Court would have affirmed, rather than ordered vacatur of those orders.

**2.** Although the text and structure of the Court's July 17, 2020 Order are sufficient to dispose of Plaintiffs' argument that this Court (without any briefing on the question) ordered DACA to continue indefinitely under the terms of the Napolitano Memorandum, the relevant litigation history—including the Supreme Court's opinion in *Regents*—further confirms the Government's reading. In nearly three years of litigation in multiple jurisdictions over the rescission of DACA, to the Government's recollection, *nobody* ever suggested that it would *ever* be appropriate to issue an order that would require DACA to continue indefinitely, even in the face of additional agency action seeking to modify or rescind it. Instead, this litigation has always been about whether DHS has *adequately explained* its previous attempts to rescind DACA. As the Supreme Court put it: "The dispute before the Court is not whether DHS may rescind DACA. All parties agree that it may. The dispute is instead primarily about the procedure the agency followed in doing so." *Regents*, 140 S. Ct. at 1905; *see also Batalla Vidal*, 279 F. Supp. 3d at 408 ("Defendants indisputably can end the DACA program."). Plaintiffs' core allegation—that the Wolf Memorandum violates court orders, *whether or not* it satisfies the APA—is necessarily inconsistent with that previously undisputed consensus, and with the Supreme Court's opinion in *Regents*.

**B.** **The fact that the Wolf Memorandum is labeled an "interim" policy does not mean that it violates any court orders.**

At times, Plaintiffs appear to place significant weight on the fact that the Wolf Memorandum is explicitly couched as an "interim" policy, vaguely implying that this somehow nullifies DHS's authority to rescind or modify DACA. *See, e.g.*, Mot. at 3 ("The mandate and order require Defendants to restore the DACA program in full to its pre-rescission operation until such time as Defendants complete their DACA reconsideration process."). Plaintiffs are wrong. As discussed at the July 31, 2020 status conference, interim or not, the Wolf Memorandum is a significant new agency action, which materially alters the legal status quo.

Plaintiffs are correct that the Wolf Memorandum is an "interim" policy, in the sense that it contemplates the possibility of *additional* changes to DACA in the future. But that should be unsurprising, given the nature of the policy at issue—absent a new Act of Congress, no policy like DACA will ever (or could ever) be permanent. That is why, even when DACA was first announced in 2012, Secretary Napolitano made clear that it "confers no substantive right, immigration status or pathway to citizenship," Napolitano Memo. at 3, and why President Obama described it as "not a permanent fix," but a "temporary stopgap measure." The White House, *Remarks by President Obama on Immigration* (June 15, 2012), https://go.usa.gov/xnZFY. Accordingly, neither Acting Secretary Wolf's acknowledgment of the undeniable fact that either he or some future Secretary of Homeland Security may make additional changes—in either direction—nor his acknowledgment that he is actively considering such further changes, has any bearing on the propriety of a show-cause order.

In any case, it is indisputable that the Wolf Memorandum is an immediately effective policy change—"interim" label notwithstanding. *See* Wolf Mem. at 5 ("[G]iven my serious concerns about the policy, I have determined that some changes should immediately be made to the policy to limit its scope in the interim."); *id.* at 1 ("By this memorandum, I am rescinding the 2017 and 2018 memoranda, and making certain immediate changes to the DACA policy . . . ."); *id.* at 4 ("Below, I address each of my enforcement policy concerns and then explain the immediate interim changes."); *id.* at 7 ("Accordingly, effective immediately, DHS shall . . ."). And, of course, that is why these Plaintiffs (and others) have expressed disagreements with the Wolf Memorandum—because it has an immediate effect on how DACA is operated, and they are dissatisfied with those changes. That is also why it is clear and undisputed that the interim nature of the Wolf Memorandum does not immunize it from *challenge* under the APA, as various parties have already taken steps to do in other cases.

In sum, it is neither surprising nor significant to the question of a show-cause order that the Wolf Memorandum acknowledges explicitly that it remains subject to further changes in the agency's future discretion. That unremarkable fact—which was also true of the Napolitano, Johnson, Duke, and Nielsen memoranda, whether or not they said so explicitly, implicitly, or not at all—cannot justify

Plaintiffs' remarkable position that the Court, without any briefing, permanently foreclosed any agency action like the Wolf Memorandum in its order implementing the Fourth Circuit's mandate.

### C. Regardless of whether the Wolf Memorandum complies with the Administrative Procedure Act—a question not presented here—it does not violate any court orders.

**1.** Plaintiffs expressly disclaim any interest in arguing that the Wolf Memorandum is arbitrary and capricious, stating that "the legality of the Wolf Memorandum under the APA is an issue for another day." Mot. at 2. But despite that disclaimer, many of Plaintiffs' arguments, in fact, have nothing to do with contempt, and everything to do with a future arbitrary-and-capricious challenge. *See, e.g., id.* at 13-14 ("[I]f Defendants seek to rescind or modify DACA, they must *first* complete a lawful, thorough consideration of the DACA program pursuant to the procedures outlined by the Court.") *id.* at 14 ("This Court's July 17 Order . . . *enjoin[ed]* Defendants from taking any action to rescind DACA that is not compliant with the law."); *id.* ("These 'immediate changes' cannot be squared with 'careful consideration' 'in accordance with the Supreme Court's decision.'"). These arguments are meritless, but the more important point for present purposes is that they belong (if anywhere) in an amended complaint challenging the Wolf Memorandum directly; they do nothing to advance Plaintiffs' accusation that Defendants are violating court orders.

**2.** The only arguable connection between these otherwise distinct concepts—that is, the legality of the Wolf Memorandum under the APA, and Plaintiffs' motion for a show-cause order—is the following language from this Court's July 17, 2020 Order: "Defendants . . . are ENJOINED from implementing or enforcing the DACA rescission and from taking any other action to rescind DACA that is not in compliance with applicable law." July 17, 2020 Order at 3 (footnote omitted). But Plaintiffs' reliance on this language is unavailing, for several reasons.

First, Defendants have fully complied: that reference to "the DACA rescission" can only reasonably be interpreted as a reference to the Duke Memorandum (and perhaps the Nielsen Memorandum)—the subject of the prior litigation. And as discussed above, the Wolf Memorandum formally rescinds both of those "DACA rescission" memoranda, and DHS has not been rejecting

DACA requests pursuant to those rescission memoranda since the Supreme Court issued its decision. Accordingly, the Wolf Memorandum has done nothing to "enforce[e] the DACA rescission" memoranda that have now been vacated, and thus does not violate any order.

Second, Defendants have not taken any "action to rescind DACA that is not in compliance with applicable law." July 17, 2020 Order at 3. Not only does the Wolf Memorandum fully comply with the APA (including as interpreted by *Regents* and *Casa de Maryland*), but, as noted above, Plaintiffs have disclaimed any current intent to argue otherwise. *See* Mot. at 2.

Third, even if some court (or this Court) were to hold, in the future, that the Wolf Memorandum *does* violate the APA, that alone would not violate this Court's Order, much less justify contempt proceedings. Defendants do not interpret the Court's July 17, 2020 Order as requiring that extraordinary result—nor would such an interpretation be permissible. Among other reasons, the mandate rule would have foreclosed any effort by this Court to require more of Defendants than the Fourth Circuit required. *See, e.g.*, *Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007) ("In its earliest days, the Supreme Court consistently held that an inferior court has no power or authority to deviate from the mandate issued by an appellate court.") (citation and alterations omitted). And the Fourth Circuit never suggested that the Napolitano Memorandum needed to persist in perpetuity; instead, it vacated the Duke Memorandum, and remanded to the agency. *See Casa de Maryland*, 924 F.3d at 706 ("DACA's rescission is vacated as arbitrary and capricious, and the matter is remanded for further proceedings consistent with this opinion."), *cert. denied*, 2020 WL 3492650 (U.S. June 29, 2020). This Court's July 17, 2020 order quoted that very language. July 17, 2020 Order at 3 n.3.

More fundamentally, even setting aside the mandate rule, "appellate courts will not countenance injunctions that merely require someone to 'obey the law.'" *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1531 (11th Cir. 1996); *accord NAACP v. Bureau of the Census*, 399 F. Supp. 3d 406, 419 (D. Md.) (Grimm, J.) (noting in an APA case that an "'obey the law' injunction" is "disfavored") (citation omitted), *aff'd in part, rev'd in part and remanded*, 945 F.3d 183 (4th Cir. 2019); *see also Int'l Longshoremen's Ass'n, Local 1291 v. Phil. Mar. Trade Ass'n*, 389 U.S. 64, 76 (1967) ("The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly

one."). Otherwise, a vague obey-the-law injunction after a *first* agency action would convert any routine APA challenge to a *second* agency action into a high-stakes question of contempt. The Court's order should not be construed to have that improper scope. *See, e.g.*, *Davis v. Richmond, Fredericksburg & Potomac R. Co.*, 803 F.2d 1322, 1328 (4th Cir. 1986) (vacating an "obey the statute" injunction) (citing *NLRB v. Express Publishing Co.*, 312 U.S. 426 (1941)); *cf. Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1485 (D.C. Cir. 1997) ("'[A]n interpretation that makes the contract lawful is preferred to one that renders it unlawful.").

Instead, the Government reasonably understood the Court's July 17, 2020 Order to have been consistent with the mandate rule, and with precedent disfavoring obey-the-law injunctions: as a routine, largely ministerial order implementing the mandate, which required rescission of the Duke Memorandum and the Nielsen Memorandum. Plaintiffs' contrary interpretation—that, without any briefing, this Court went farther than the Supreme Court and the Fourth Circuit did, and exposed DHS to contempt proceedings to accompany *any* future allegation of an APA violation arising out of *any* future changes to the DACA policy, no matter how different from the particular APA questions litigated previously in this case and in *Regents*—is meritless. At a minimum, such a remarkable interpretation of this Court's order cannot support contempt. *See Taggart*, 139 S. Ct. at 1801-1802.

## D.     The timing of the Wolf Memorandum did not violate any court orders.

The Fourth Circuit's mandate issued on June 30, 2020. ECF No. 93. This Court's order implementing that mandate was issued on July 17, 2020. ECF No. 97. And the Supreme Court's judgment was issued on July 20, 2020. *See Regents, supra* at 4. Whatever those orders required, none specified any particular time for compliance, and Plaintiffs have not argued otherwise. At a minimum, therefore, the Government had a "reasonable time" to come into compliance. *See, e.g.*, *MAKS, Inc. Gen. Trading & Contracting Co. v. Sterling Operations, Inc.*, 2013 WL 5328419, at *2 (E.D. Tenn. 2013) (denying request for sanctions, because the order in question "did not specify a time for compliance," meaning that the court "expected that [compliance] would be completed within a reasonable time," and concluding that the party seeking sanctions "has not demonstrated that [the opposing party] has

taken an unreasonable amount of time to comply with the Court's Order"); *Martinez v. Menchaca*, 2009 WL 37488, at *1 (S.D. Tex. 2009) ("Plaintiff therefore cannot have given the defendants a reasonable amount of time to comply with the Court's order before filing his motion. He provides no reason to believe that defendants have unduly delayed in complying with the Court's orders, and thus he fails to state a basis for imposing sanctions."); *see also Jocks v. Tavernier*, 316 F.3d 128, 139 (2d Cir. 2003) (failure to comply on time was "insufficient for a finding of contempt" because government counsel "was reasonably diligent in carrying out the court's instructions"). Accordingly, even if the Government *were* out of compliance in the short period leading up to the issuance of the Wolf Memorandum— whether it be for a period of eight days (if measuring from the Supreme Court's judgment), eleven days (if measuring from this Court's July 17, 2020 order), or 28 days (if measuring from the Fourth Circuit's mandate)—Defendants were well within the "reasonable time" that was available to evaluate their options and come into compliance with the relevant orders.

To be sure, the length of a "reasonable time" will vary from case to case. But here, the future of DACA represents a "significant administration decision," Wolf Mem. at 4, made in the aftermath of a major APA ruling from the Supreme Court, which held that a prior agency action on the same subject was unlawful. That the agency took a few extra days to ensure that its *next* DACA-related action appropriately accounted for all of the factors that the Supreme Court identified in ruling against the Government is commendable, not contemptuous. And to the extent Plaintiffs nonetheless believe that DHS *failed* to consider all the relevant factors, or failed to consider them carefully enough, that is (once again) an argument for a new APA challenge—not an argument for contempt.

In all events, Defendants were *not* out of compliance—not even during the brief intervening period between the effective dates of the relevant court orders and the issuance of the Wolf Memorandum. Instead, as counsel explained at the July 24, 2020 status conference, and as the final paragraph of the Wolf Memorandum later confirmed in writing, during that time DHS "generally held properly submitted initial requests for DACA in anticipation of potential policy changes." *Id.* at 7. If anything, that demonstrates an intent to *comply* with court orders, because under the prior DACA-rescission memoranda, DHS had been *rejecting* all initial requests, and it immediately stopped

doing so once the Supreme Court held that the rescission was unlawful—even before the Supreme Court's judgment issued on July 20. Nor is there any court order that required DHS immediately to start processing new DACA requests for the first time in nearly three years, rather than temporarily pausing processing while the agency assessed its options in light of a significant Supreme Court decision. Again, once the Duke Memorandum was vacated by the Supreme Court's judgment and the Fourth Circuit's mandate, the governing document became *the Napolitano Memorandum itself*, rather than any court order—which did not constrain a future Secretary of Homeland Security even from rescinding DACA entirely. The Napolitano Memorandum, *a fortiori*, certainly did not (and could not) foreclose a future Secretary of Homeland Security from either *modifying* the policy, or *temporarily* accepting and holding (instead of accepting and processing) a subset of requests. The availability of that discretion is even clearer given that the subset of requests at issue—initial DACA requests from first-time requestors—had not been accepted *at all* for the previous two-and-a-half years, and because this temporary interim hold was designed to accommodate a very brief period of deliberation, while the agency finalized and published a significant, then-imminent policy change (*i.e.*, the Wolf Memorandum).

To be sure, as counsel acknowledged at the July 24, 2020 status conference, the agency could have updated its websites more quickly in the aftermath of the Supreme Court's decision, and while the policy deliberations described above were taking place. But none of the relevant orders purported to impose deadlines for updates to agency websites, and Plaintiffs do not contend otherwise. So that acknowledged lack of communication does not have any bearing on whether an order to show cause is appropriate—what matters is what the agency was *actually doing*. And the agency's *actions* do not (and did not) conflict with any court order. By the same token, contrary to Plaintiffs' repeated suggestions, Mot. at 9, 17, the agency's prompt updates to the relevant websites upon the issuance of the Wolf Memorandum (and counsel's immediate notice to this Court, *see* ECF No. 102), show good faith, not bad faith—the agency took seriously the concerns raised by Plaintiffs, the Court, and the public about how its websites were maintained in July.

In short, there should be little doubt that, had the Wolf Memorandum issued the day after the Supreme Court's opinion, there could be no reasonable argument that the agency had violated any court order—setting aside the separate question of whether the Wolf Memorandum complies with the APA. The fact that a brief period of time elapsed before that significant decision was finalized and published—either 8, 11, or 28 days, depending on which order is considered the starting point— also does not establish the violation of any court order, much less warrant an order to show cause. In fact, Plaintiffs have hardly argued to the contrary—instead, they press in earnest only the untenable argument that the *Wolf Memorandum itself* violates this Court's July 17, 2020 Order, even to this day.

## II. AN ORDER TO SHOW CAUSE IS UNWARRANTED.

For the reasons set forth above, an order to show cause is unwarranted because Defendants are (and always have been) in full compliance with all relevant orders. But even if the Court decides that Defendants have misinterpreted those orders, contempt proceedings would *still* be unwarranted, for at least two reasons: (1) Plaintiffs have not demonstrated, by clear and convincing evidence, that they suffered any actual harm from the agency's reasonable decision to temporarily accept and hold certain DACA requests pending then-imminent policy changes, announced in the Wolf Memorandum shortly thereafter, which ultimately required rejection of *all* such requests; and (2) any misinterpretation of the relevant orders was reasonable in light of the lack of any explicit text in any court order foreclosing the agency's actions.

### A. Even if the Government misinterpreted this Court's order, any misinterpretation caused no harm to any of the Plaintiffs.

Even if there is clear and convincing evidence that a party has knowingly violated a clear and unambiguous court order, civil contempt is still inappropriate unless "the movant suffered harm as a result" of the violation. *Rainbow Sch.*, 887 F.3d at 617. The motion can be denied on that basis alone.

**1.** Even assuming that any of the relevant court orders explicitly foreclosed a temporary pause on the processing of initial DACA requests while the agency finalized next steps (or, perhaps allowed for a shorter period than taken by the Government), any such violation caused no harm to Plaintiffs. That is because, even when DHS was regularly processing initial DACA requests from first-time

requestors—something it has not done in nearly three years—that process (which requires a background check, among other things) typically took approximately 6-8 *months*. *See* USCIS, Check Case Processing Times, https://egov.uscis.gov/processing-times/. DHS issued the Wolf Memorandum on July 28—that is, just 8, 11, or 28 days after any relevant court order—a date on which *all* of the applications in question (*i.e.*, those submitted after the Supreme Court's opinion but before the Wolf Memorandum) would necessarily still have been pending. And the Wolf Memorandum confirms that *all* pending DACA requests from first-time requestors are to be denied:

> [T]o further mitigate my concerns, I have determined that these changes should apply both to DACA and advance parole requests submitted after the issuance of this memorandum and requests that are currently pending before the agency. Since the issuance of the Supreme Court's decision, DHS has, on an interim basis, generally held properly submitted initial requests for DACA in anticipation of potential policy changes. Since July 24, DHS has likewise, on an interim basis, held all requests for advanced parole from current DACA recipients.[1] Consistent with the Court's express remand for the agency's reconsideration and the Napolitano Memorandum's clear statement that it conferred no substantive rights, DHS did not expand beyond the status quo of the past several years for a few weeks while it was determining next steps. I now conclude that all pending and future requests should be treated in the same manner, rather than be subject to differential treatment depending on the fortuity of when DHS received the request within a short period of uncertainty. Nothing in the Napolitano Memo purports to preclude me from exercising my enforcement discretion to make these changes on an interim basis while I consider whether to make more substantial changes on a permanent basis. Even under the Napolitano Memo, no aliens had a legal entitlement to receive DACA—much less a legal entitlement to a particular renewal period. Nor can aliens with pending requests assert any meaningfully greater reliance interests in their initial or continued enjoyment of the policy and the attendant benefits than aliens who submit such requests after the issuance of this memorandum.

---

[1] "Prior to July 24, DHS's treatment of advance parole requests from DACA recipients varied. Many were rejected, while some were accepted and receipted. To the extent any rejected requestor believes exceptional circumstances support his or her request, he or she may now renew the request for advance parole, and it will be adjudicated on the terms set forth in this memorandum." Wolf Mem. at 7 n.1.

Wolf Mem. at 7 (footnote in original). Plaintiffs do not question the agency's authority to adopt this approach, nor the legality of this policy decision under the APA.

As a result of the agency's policy choice, *none* of the first-time requests that had been submitted after the *Regents* opinion but before the Wolf Memorandum would have actually been *approved*—even if DHS had been accepting and processing those requests (instead of accepting and holding those requests) during that brief period. The only difference to Plaintiffs would have been a few days or weeks of false hope. Accordingly, as of July 28, *none* of the individuals in question (let alone any of the actual Plaintiffs in this case) would have been in any different position, even if some processing of those requests had begun in the preceding days or weeks. That alone forecloses Plaintiffs' motion, for failure to make a clear and convincing showing of actual harm. *Rainbow Sch.*, 887 F.3d at 617.

**2.** As for advance parole, Plaintiffs do not even assert that any of them (or even their members) submitted an application between June 18, 2020 and July 28, 2020—let alone that they have now resubmitted that application pursuant to the terms of the Wolf Memorandum and had it denied. So the agency's interim treatment of advance parole applications from DACA recipients—while subject to some unfortunate confusion and inconsistency, disclosed by counsel for Defendants at the July 24, 2020 status conference and later confirmed by the Wolf Memorandum (at 7 n.1)—also cannot have caused any "harm" to the "movant." *Rainbow Sch.*, 887 F.3d at 617.

**3.** Finally, Plaintiffs argue vaguely that "Plaintiffs and the public have been further injured by Defendants' refusal to abide by the rule of law." Mot. at 18. But federal-court litigation is about vindicating the legal rights of the parties—not the generalized interests of "the public," which is why the Fourth Circuit requires that "*the movant* suffered harm" in order to justify civil contempt. *Rainbow Sch.*, 887 F.3d at 617 (emphasis added). In any case, as for Plaintiffs' generalized interest in "the rule of law," it is fully shared by the Government.

### B. Even if the Government misinterpreted this Court's order, any misinterpretation was objectively reasonable.

As explained above, the Government interpreted the Court's July 17, 2020 Order as having implemented the Fourth Circuit's mandate, which (as relevant here) required vacatur of the

DACA-rescission memoranda—nothing more, nothing less. Even if the Government's interpretation was incorrect—for example, if, without any briefing, the Court intended to go beyond the Fourth Circuit's mandate to require the Napolitano Memorandum to persist indefinitely, even in the face of new agency action (notwithstanding the mandate rule); or if the Court intended to issue a binding "obey-the-law" injunction that requires contempt proceedings for any future allegation of an APA violation (notwithstanding that such injunctions are inappropriate)—at a minimum, the Government had an "objectively reasonable basis" for its interpretation. *Taggart*, 139 S. Ct. at 1801. That alone is enough to reject Plaintiffs' motion, even if the Court disagrees with the Government's interpretation.

### C. Plaintiffs' remaining arguments lack merit.

Plaintiffs quote from a hodgepodge of legal and non-legal secondary sources to suggest that the Government has some intent to defy court orders, or is otherwise operating in bad faith. *See* Mot. at 8-11. Although many of those editorials, internet opinion pieces, and statements from legislators are factually or legally inaccurate (sometimes egregiously so), two warrant a brief response here.

**1.** Plaintiffs quote remarks from an unidentified "Senior Administration Official," which, although ambiguous, appear to reference this Court's orders. Mot. at 8 (quoting a "Senior Administration Official" who reportedly told journalists in a background briefing that "one judge's orders are not a penultimate here" in response to a question about this Court's July 17, 2020 Order). Whatever was meant by those remarks, to be clear, the Government fully recognizes that it must comply with any order issued by this (or any other) Court, as long as it remains in effect. It has done so, and it will continue to do so.

**2.** Plaintiffs claim that "Defendants deliberately misinformed the public to deter individuals from applying for relief under the judicially-restored DACA program." Mot. at 17. That accusation is baseless. To be sure, as Defendants have acknowledged in this brief and in open court, certain agency websites could have been updated more quickly between the Supreme Court's opinion and the issuance of the Wolf Memorandum. But Plaintiffs' claims of an intent to misinform are entirely unsupported. If anything, *Plaintiffs'* suggestion that this Court's Order of July 17, 2020 (or any other

order) somehow immunizes the Napolitano Memorandum from future policy changes, or that there is currently a "judicially-restored DACA program" to which they should apply, risks misinforming the public. In fact, the preliminary injunctions that previously required parts of DACA to continue—though *not* first-time requests, or applications for DACA-based advance parole—are no longer in effect. *See Regents*, 140 S. Ct. at 1916. And, as Secretary Napolitano recognized in 2012, the original DACA memorandum "confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer those rights." Napolitano Mem. at 3.

## III. BECAUSE PLAINTIFFS HAVE NOT CHALLENGED THE WOLF MEMORANDUM, THERE IS NO BASIS FOR AN ORDER RESTORING DACA TO ITS PRE-SEPTEMBER 5, 2017 STATUS.

In the alternative, Plaintiffs request an order "to compel compliance with the Fourth Circuit mandate to restore DACA to its pre-September 5, 2017, status." Mot. at 20. That alternative request fails largely for the same reasons as above. It also fails for an additional reason: Plaintiffs have not challenged the Wolf Memorandum. And the Wolf Memorandum is the reason *why* the DACA policy currently differs, at least in certain respects, from its "pre-September 5, 2017, status," when DACA was still governed by the Napolitano Memorandum. Plaintiffs explicitly disclaimed any interest in "the legality of the Wolf Memorandum under the APA," claiming that "is an issue for another day." *Id.* at 2. Moreover, *even if* the Wolf Memorandum violated the APA, the proper relief would be an order setting it aside—*not* an order permanently depriving DHS of any future ability to revise the DACA policy in a manner consistent with the APA. Indeed, under Plaintiffs' remarkable theory that the Napolitano Memorandum is to be preserved in amber, DHS would be indefinitely enjoined even from expanding DACA. For these reasons, Plaintiffs' alternative request for relief should also be denied.

## CONCLUSION

For these reasons, Plaintiffs' motion for an order to show cause or, in the alternative, to compel compliance with the Fourth Circuit's mandate should be denied.

Dated: August 28, 2020

Respectfully submitted,

DAVID M. MORRELL
Deputy Assistant Attorney General

BRAD P. ROSENBERG
Assistant Branch Director

 /s/   *Stephen M. Pezzi*
GALEN N. THORP (D. Md. 813831)
  Senior Trial Counsel
STEPHEN M. PEZZI (D. Md. 813691)
RACHAEL L. WESTMORELAND
    (D. Md. 807639)
  Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 305-8576
Fax: (202) 616-8470
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*