# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| CASA DE MARYLAND, *et al.*,<br><br>    *Plaintiffs,*<br><br>    v.<br><br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY, *et al.*,<br><br>    *Defendants.* | Civil No. PWG-17-2942 |

## DEFENDANTS' SUR-REPLY IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE

Plaintiffs' reply brief largely ignores Defendants' arguments, mischaracterizes Defendants' brief, and continues to make material errors of both fact and law. In particular, Plaintiffs have lobbed a completely unsupported and inappropriate accusation that Defendants have not been candid with the Court:

> The Wolf Memorandum cannot cure Defendants' contempt for the additional reason that we now know that "Acting Secretary" Wolf had no authority to issue the Memorandum because he issued it while he was illegally appointed under Federal Vacancies Reform Act. This fact was known to the Defendants in late 2019, but in another remarkable measure of Defendants' lack of candor, was not disclosed to Plaintiffs or the Court during the hearings on July 24 or July 31, and only became public on August 14.

Pls.' Reply Mem., ECF No. 117, at 2. That accusation—made in the context of an argument presented for the very first time in Plaintiffs' reply—warrants a brief response.

At the outset, the legality of Acting Secretary Wolf's service as Acting Secretary of Homeland Security is not a "fact" to be disclosed; it is a disputed question of law. And it is not even a question of law that is before this Court—while plaintiffs in other DACA-related lawsuits have chosen to litigate the legality of the Wolf Memorandum, including by presenting arguments under the Federal Vacancies Reform Act, Plaintiffs here chose instead to focus on Defendants' compliance with the Fourth Circuit's mandate and this Court's July 17, 2020 Order implementing that mandate.

Accordingly, other litigation regarding Acting Secretary Wolf's appointment was not relevant to this Court's July hearings. In that regard, Plaintiffs' accusations are not only unfounded, but gratuitous.[1]

In any event, nothing "became public on August 14" except a non-binding opinion from the Government Accountability Office, with which Defendants respectfully disagree. Questions have been raised—publicly—regarding the validity of Acting Secretary Wolf's appointment since November 2019, immediately upon his appointment. *See, e.g.*, Ex. A, Nov. 15, 2019 Ltr. from House of Representatives Committee on Homeland Security (*available at* https://homeland.house.gov/news/correspondence/thompson-and-maloney-ask-for-emergency-review-of-wolf-and-cuccinelli-appointments). Although those arguments are meritless, there is nothing secret about them. And they were certainly known to Plaintiffs: Although they do not mention it, Plaintiff Casa de Maryland on July 21 filed a Federal Vacancies Reform Act lawsuit in this district challenging the appointment of Acting Secretary Wolf. Ex. B, Compl., *Casa de Maryland v. DHS*, No. 8:20-cv-02118-PX (D. Md., July 21, 2020), ECF No. 1, ¶ 12 (alleging that asylum regulations should be vacated because DHS "acted through Defendant Chad Wolf, who has no valid claim to the Office of Acting DHS Secretary and therefore lacked the authority to issue the rules").

Plaintiffs' motion should be denied.

---

[1] Plaintiffs' belated injection of an argument about the validity of Acting Secretary Wolf's appointment is particularly surprising and inappropriate given that their reply brief otherwise largely retreats from any challenge to the validity of the Wolf Memorandum itself, and instead focuses on the agency's interim actions before that memorandum issued—which it falsely asserts that the Government has not defended. *Compare* Pls.' Reply at 1 ("Defendants' Opposition is entirely silent on their failure to comply with the Courts' Orders prior to July 28, 2020"), *with* Defs.' Opp'n, ECF No. 116, at 13-16 (explaining, among other things, why "Defendants were *not* out of compliance—not even during the brief intervening period between the effective dates of the relevant court orders and the issuance of the Wolf Memorandum").

Dated: September 9, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

BRAD P. ROSENBERG
Assistant Branch Director

/s/  *Stephen M. Pezzi*
GALEN N. THORP (D. Md. 813831)
  Senior Trial Counsel
STEPHEN M. PEZZI (D. Md. 813691)
RACHAEL L. WESTMORELAND
  (D. Md. 807639)
  Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 305-8576
Fax: (202) 616-8470
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*

# EXHIBIT A



November 15, 2019

The Honorable Gene Dodaro
Comptroller General of the United States
U.S. Government Accountability Office
441 G. Street, NW
Washington, DC 20548

Dear Comptroller General Dodaro:

We are writing to express serious concerns with the legality of the appointment of Chad Wolf as Acting Secretary of Homeland Security and Ken Cuccinelli as Senior Official Performing the Duties of Deputy Secretary.

On Wednesday, Mr. Wolf was appointed Acting Secretary pursuant to an "Amendment to the Order of Succession for the Secretary of Homeland Security" issued by then-Acting Secretary Kevin McAleenan on November 8, 2019.[1] This Amendment sought to elevate the position of Under Secretary for Strategy, Policy, and Plans—the position to which Mr. Wolf has recently been confirmed by the Senate—within the order of the succession. However, recently released documents suggest that the installation of Mr. Wolf as the Acting Secretary may violate the law, as Mr. McAleenan may not have been lawfully serving as Acting Secretary.

If so, numerous actions taken by both Mr. McAleenan and Mr. Wolf may be invalid, including Mr. Wolf's designation on Wednesday of Ken Cuccinelli as Senior Official Performing the Duties of Deputy Secretary. This designation is the latest attempt to install Mr. Cuccinelli in a senior leadership position at the Department of Homeland Security when the Administration knows that the Senate would not confirm him to that—or any other—position.

---

[1] Department of Homeland Security, *Amendment to the Order of Succession for the Secretary of Homeland Security* (Nov. 8, 2019) (attached to this letter as Enclosure A).

On April 10, 2019, prior to her departure, then-Secretary Kirstjen M. Nielsen updated the internal Department policy for "DHS Orders of Succession and Delegations of Authorities for Named Positions."[2] In that update, Secretary Nielsen changed the order of delegation of authority for the position of Secretary "in the event I am unable to act during a disaster or catastrophic emergency." However, Secretary Nielsen did <u>not</u> change the order of succession "[i]n case of the Secretary's death, resignation, or inability to perform." Instead, she left in place the line of succession under Executive Order 13753. At the time, Mr. McAleenan was <u>not</u> next in the order of succession under that Executive Order.[3] In fact, the Department appears to have skipped over two Senate-confirmed officials, the Under Secretary for National Protection and Programs (since renamed by law as the Director of Cybersecurity and Infrastructure Agency) and the Under Secretary for Intelligence and Analysis.

This act may have rendered Mr. McAleenan's appointment unlawful from the start. That would place many of Mr. McAleenan's decisions in legal jeopardy, including the November 8, 2019, Amendment that was the basis for Mr. Wolf's appointment.

The authority for Secretary Nielsen's order falls under the Homeland Security Act, which by its terms supersedes the Federal Vacancies Reform Act (FVRA).[4] The Homeland Security Act is the only statutory authority for appointing an Acting Secretary of Homeland Security, and it appears that it was not followed in this instance for Mr. McAleenan or, by extension, Mr. Wolf.

Even if Mr. McAleenan's appointment was somehow valid under the FVRA, however, his November 8 Amendment to the DHS line of succession may still be invalid. Mr. McAleenan issued that Amendment after exceeding the 210-day FVRA statutory limit for Acting officials— meaning that his own appointment may have already expired.[5]

These maneuvers are part of a troubling pattern of legal contortions, as well as an end-run around the Senate's constitutional Advice and Consent power. This Administration has hollowed out Department leadership, with frequent leadership turnover and abuse of the authority to appoint temporary acting officials. These actions place our nation's security at risk.

For all these reasons and given GAO's statutory role in evaluating federal agency vacancies and FVRA issues, we request that you conduct an expedited review to resolve whether Mr. Wolf and Mr. Cuccinelli—who are now engaged in decision-making that impact the security of every American—are legally serving in the position.

---

[2] Department of Homeland Security, *DHS Orders of Succession and Delegations of Authorities for Named Positions* (Apr. 10, 2019) (attached to this letter as Enclosure B).

[3] Exec. Order No. 13753, 81 Fed. Reg. 90667 (Dec. 9, 2016).

[4] 6 U.S.C. § 113(g).

[5] 5 U.S.C. § 3346(a)(1).

Thank you in advance for your timely consideration of our request.

Sincerely,

Bennie G. Thompson
Chairman
Committee on Homeland Security

Carolyn B. Maloney
Acting Chairwoman
Committee on Oversight and Reform

cc: Chad F. Wolf, Acting Secretary of Homeland Security



**Enclosure A**

# Amendment to the Order of Succession for the Secretary of Homeland Security

Section II.A of DHS Delegation No. 00106, *DHS Orders of Succession and Delegations of Authorities for Named Positions*, is amended hereby to state as follows: "In case of the Secretary's death, resignation, or inability to perform the functions of the Office, the order of succession of officials is governed by Annex A."

By the authority vested in me as Secretary of Homeland Security, including the Homeland Security Act of 2002, 6 U.S.C. § 113(g)(2), I hereby designate the order of succession for the Secretary of Homeland Security by amending Annex A of DHS *Orders of Succession and Delegations of Authorities for Named Positions*, Delegation No. 00106.  Annex A is hereby amended by striking the text of such Annex in its entirety and inserting the following in lieu thereof:

Annex A, Order for Delegation of Authority by the Secretary of the Department of Homeland Security
*Pursuant to Title 6, United States Code, Section 113(g)(2)*

1. Deputy Secretary of Homeland Security;

2. Under Secretary for Management;

3. Commissioner of the U.S. Customs and Border Protection;

4. Under Secretary for Strategy, Policy, and Plans;

5. Administrator and Assistant Secretary of the Transportation Security Administration;

6. Administrator of the Federal Emergency Management Agency;

No individual who is serving in an office herein listed in an acting capacity, by virtue of so serving, shall act as Secretary pursuant to this designation.

Dated: 11/08/19

Kevin K. McAleenan
Acting Secretary of Homeland Security



**Enclosure B**

# DHS ORDERS OF SUCCESSION AND DELEGATIONS OF AUTHORITIES FOR NAMED POSITIONS

## I.   Purpose

This is a succession order for named positions and a delegation of authority for the continuity of essential functions of officials at the Department of Homeland Security (DHS) in case of absence, the inability of the incumbent to act during disasters or catastrophic emergencies, or vacancies in offices.

## II.   Succession Order/Delegation

A.     In case of the Secretary's death, resignation, or inability to perform the functions of the Office, the orderly succession of officials is governed by Executive Order 13753, amended on December 9, 2016.

B.     I hereby delegate to the officials occupying the identified positions in the order listed (Annex A), my authority to exercise the powers and perform the functions and duties of my office, to the extent not otherwise prohibited by law, in the event I am unavailable to act during a disaster or catastrophic emergency.

C.     The order of succession for the named positions, other than the Office of the Secretary, are provided in Annexes B through AC.

D.     I hereby delegate authority to the officials occupying the identified positions in the orders listed in Annexes B through AC to exercise the powers and perform the functions and duties of the named positions in case of death, resignation, inability to perform, absence, or inability to act during a disaster or catastrophic emergency until that condition ceases.

1

E.     In terms of named positions in which appointment is required to be made by the President, by and with the advice and consent of the Senate (PAS), if positions are vacant as that term is used in the Federal Vacancies Reform Act of 1998, the First Assistant shall act as the incumbent until a successor is appointed, unless otherwise designated by the President.  The individual serving in the position identified as the first to succeed is designated the "First Assistant" for the purposes of the Federal Vacancies Reform Act of 1998.  If the First Assistant position is vacant, the next designated official in the order of succession may exercise all the powers, duties, authorities, rights, and functions authorized by law to be exercised by the incumbent, but may not perform any function or duty required by law to be performed exclusively by the office holder.

F.     For all other positions that are not subject to the Federal Vacancies Reform Act of 1998, any official in the order provided for in the succession order may exercise all the powers, duties, authorities, rights, and functions authorized to be performed by the incumbent, to the extent not otherwise limited by law.

G.     Only officials specifically designated in the order of succession for each of the named positions in Annexes B through AC are eligible, subject to modification in accordance with Section II.I.  Unless formally appointed by the Secretary, persons appointed on an acting basis, or on some other temporary basis, are ineligible to serve as a successor; therefore, the order of succession would fall to the next designated official in the approved order of succession.

H.     The prohibition on any re-delegation of powers, authorities, functions, and duties contained in Departmental Delegations, Directives, Management Directives, Instructions, Manuals, or similar internal documents is not applicable to restrict the authority of any individual who is exercising the authority of a vacant position under this Delegation.  Such an individual shall, however, be bound by such Departmental Delegations, Directives, Management Directives, Instructions, Manuals, or similar internal documents, and shall not further re-delegate powers to any individual.

I.     Each Annex may be updated separately.  A Component Head seeks modification of his/her order of succession by forwarding a proposed updated Annex to the Office of Operations Coordination (OPS), Continuity Division and the Office of the Under Secretary for Management (MGMT), Program Manager, Delegations and Directives; Annexes are processed by MGMT, in consultation with the Office of the General Counsel (OGC), for approval of the Secretary.  At a minimum, the Annex is coordinated with OGC and the White House Liaison.  Where possible, Component orders of succession should be at least three positions deep and geographically dispersed.

J.     The Office of the Executive Secretary, MGMT, and OPS are responsible for maintaining a current list of incumbents holding all positions identified in Annexes B through AC.

2

K. Nothing in this delegation is intended to limit my discretion as Secretary to depart from this delegation.

# III. Authorities

A. Title 5, United States Code (U.S.C.) §§ 3345-49 (Federal Vacancies Reform Act of 1998, as amended)

B. Title 6, U.S.C., § 112 (Secretary; functions)

# IV. Office of Primary Interest

OPS and MGMT is the office of primary interest for maintaining and updating the Annexes to this Delegation.

Jeh Charles Johnson
Secretary of Homeland Security

Dec 15 2016
Date

**Legend**

| | |
|---|---|
| Career | C |
| Limited Term Appointment | L |
| Military Officer | M |
| Non-Career in the Senior Executive Service or Schedule C | N |
| Presidential Appointee | P |
| Presidential Appointee with Senate Confirmation | S |
| Scientific Professional | T |
| First Assistant pursuant to the Federal Vacancies Reform Act | * |

# DHS ORDERS OF SUCCESSION AND ORDERS FOR DELEGATIONS OF AUTHORITIES

| Annex | Title | Issue Date |
|---|---|---|
| Annex A | Order For Delegation of Authority by the Secretary of the Department of Homeland Security | Revision 08.5, 04/10/2019 |
| Annex B | Deputy Secretary, Office of the | Revision 08.5, 04/10/2019 |
| Annex C | Citizenship and Immigration Service Ombudsman | Revision 06, 09/14/2016 |
| Annex D | Citizenship and Immigration Services, United States | Revision 06, 09/14/2016 |
| Annex E | Civil Rights and Civil Liberties, Office for | Revision 06, 09/14/2016 |
| Annex F | Coast Guard, United States | Revision 06, 09/14/2016 |
| Annex G | Countering Weapons of Mass Destruction Office | Revision 08.2, 05/21/2018 |
| Annex H | Customs and Border Protection, United States | Revision 06, 09/14/2016 |
| Annex I | Executive Secretariat | Revision 06, 09/14/2016 |
| Annex J | Federal Emergency Management Agency | Revision 06, 09/14/2016 |
| Annex K | Federal Law Enforcement Training Center | Revision 06, 09/14/2016 |
| Annex L | General Counsel, Office of the | Revision 06, 09/14/2016 |
| Annex M | Immigration and Customs Enforcement, United States | Revision 06, 09/14/2016 |
| Annex N | Inspector General, Office of | Revision 06, 09/14/2016 |
| Annex O | Intelligence and Analysis, Office of | Revision 06, 09/14/2016 |
| Annex P | Legislative Affairs, Office of | Revision 06, 09/14/2016 |
| Annex Q | Management Directorate | Revision 06, 09/14/2016 |
| Annex R | National Protection and Programs Directorate | Revision 08, 07/11/2017 |
| Annex S | Operations Coordination, Office of | Revision 06, 09/14/2016 |
| Annex T | Partnership and Engagement, Office of | Revision 06, 09/14/2016 |
| Annex U | Strategy, Policy, and Plans, Office of | Revision 08.4, 02/15/2019 |
| Annex V | Privacy Office, Chief | Revision 06, 09/14/2016 |
| Annex W | Public Affairs, Office of | Revision 06, 09/14/2016 |
| Annex X | Science and Technology | Revision 07, 01/19/2017 |
| Annex Y | Secret Service, United States | Revision 06, 09/14/2016 |
| Annex Z | Transportation Security Administration | Revision 08.3, 10/23/2018 |
| Annex AA | Chief Financial Officer (DHS) | Revision 06, 09/14/2016 |
| Annex AB | Deputy Administrator, Federal Emergency Management Agency (FEMA) | Revision 06, 09/14/2016 |
| Annex AC | Protection and National Preparedness (FEMA) | Revision 06, 09/14/2016 |

# ORDER FOR DELEGATION OF AUTHORITY BY THE SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY

*Pursuant to Title 6, United States Code, Section 113(g)(2)*

1. Deputy Secretary of Homeland Security
2. Under Secretary for Management
3. Commissioner of U.S. Customs and Border Protection
4. Administrator of the Federal Emergency Management Agency
5. Director of the Cybersecurity and Infrastructure Security Agency
6. Under Secretary for Science and Technology
7. Under Secretary for Intelligence and Analysis
8. Administrator of the Transportation Security Administration
9. Director of U.S. Immigration and Customs Enforcement
10. Director of U.S. Citizenship and Immigration Services
11. Under Secretary for Strategy, Policy, and Plans
12. General Counsel
13. Deputy Under Secretary for Management
14. Deputy Commissioner of U.S. Customs and Border Protection
15. Deputy Administrator of the Transportation Security Administration
16. Deputy Director of U.S. Immigration and Customs Enforcement
17. Deputy Director of U.S. Citizenship and Immigration Services
18. Director of the Federal Law Enforcement Training Centers

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

CASA DE MARYLAND, INC.,
*on behalf of itself and its members*,
8151 15th Avenue
Hyattsville, MD 20528
Prince George's County;

ASYLUM SEEKER ADVOCACY PROJECT, INC.,
*on behalf of itself and its members*,
228 Park Ave. S #84810
New York, NY 10003-1502;

CENTRO LEGAL DE LA RAZA
3022 International Blvd., 4th floor
Oakland, CA 94601;

OASIS LEGAL SERVICES
1900 Addison St., Suite 100
Berkeley, CA 94704; *and*

PANGEA LEGAL SERVICES
350 Sansome St., Suite 650
San Francisco, CA 94104;

        Plaintiffs,

– *versus* –

CHAD F. WOLF, *in his official capacity as the purported Acting Secretary of Homeland Security*,
c/o Office of the General Counsel
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528-0485; *and*

U.S. DEPARTMENT OF HOMELAND SECURITY
c/o Office of the General Counsel
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528-0485;

        Defendants.

**Case No. 8:20-cv-2118**

**COMPLAINT**

## INTRODUCTION

1.      This case challenges two interrelated final rules issued by the Department of Homeland Security in June 2020 ("Asylum EAD Rules") in utter disregard of the requirements of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. If permitted to take effect as scheduled starting August 21, these rules would place a crushing and unlawful burden on asylum applicants by upending the well-established system by which they have been able to obtain work authorization in the form of employment authorization documents ("EADs").

2.      The Asylum EAD Rules are part and parcel of the Trump Administration's broader agenda to dismantle the U.S. commitment to assisting migrants fleeing persecution that was codified into law through the Refugee Act of 1980.

3.      Congress has enshrined in law the right to apply for asylum in the United States, but the federal government does not offer any economic support or legal representation to applicants during the process. Thus, EADs are essential for asylum applicants so that they can earn income to secure housing, food, medical care, legal counsel, and other basic needs for themselves and their families as they pursue a safe, permanent life in this country.

4.      The Asylum EAD Rules will eviscerate the current system that asylum applicants rely on to obtain work authorization by complicating and delaying the adjudication of EAD applications, depriving applicants of the predictability that they need about when and whether they might obtain their EADs, and denying EADs even to applicants who will win their cases at the end of the asylum process.

5.      By DHS's own estimate, the Asylum EAD Rules will deprive hundreds of thousands of asylum applicants of income in the magnitude exceeding $ 2.3 billion annually, even while recognizing that other harms of restricting applicants' ability to work are unquantifiable.

2

6.     The asylum applicants who will be harmed by these rules will be vulnerable to homelessness, hunger, inadequate healthcare, and exploitation. They will not be able to afford an attorney to assist with their asylum process, even though legal representation significantly increases their chance of obtaining asylum. Some may have no choice but to abandon their asylum claims and return home to danger even when they would have ultimately won asylum.

7.     For example, W.L., a member of Plaintiff Asylum Seeker Advocacy Project, Inc., is a single mother with an 8-year-old son and an 8-month-old U.S. citizen daughter who fled Guatemala after being raped repeatedly, forced to have an abortion, and threatened with death by a prominent man who used his connections to government officials to evade arrest. She is currently staying in a family member's home where she shares a single room with her children.

8.     W.L. filed her asylum application on April 3, 2020, and had been hoping to take one of the jobs that had been offered through her contacts at her local church, or another stable job, once she receives an EAD. Under the current system, she would be eligible to apply for an EAD on August 31 and would receive a determination on her application at most 30 days later, or by the end of September.

9.     If the Asylum EAD Rules are permitted to take effect, however, W.L will be forced to wait an additional 7 months before she can even apply for an EAD and an indeterminate length of time for the government to process her application. During this time, she will not be able to provide a better housing situation for her children, sustainably pay for adequate basic necessities, or hire an immigration attorney to pursue her asylum claim.

10.     Delay in obtaining EADs will not be the only problem for asylum applicants if the Asylum EAD Rules are permitted to take effect, as many will be denied EADs altogether. Plaintiff Oasis Legal Services, which serves LGBTQ+ asylum seekers who  have endured horrific violence

3

because of their sexual orientation, gender identity, and/or HIV+ status, has a 99% success rate in helping its clients obtain asylum but estimates that 80% of its clients will be denied EADs while they await the adjudication of their asylum claims because of the new ineligibility grounds in the Asylum EAD Rules.

11.     The Asylum EAD Rules will also harm—and in fact have already begun to irreparably harm—plaintiff organizations, which offer legal and other services to asylum applicants. The Asylum EAD Rules have already required these organizations to divert resources to properly advise their asylum-seeking members and clients on their asylum and EAD applications. If the rules take effect, Plaintiffs will have to devote significantly more resources to assist these members and clients with the more burdensome EAD application process and to connect them to social and financial services during their extended period of unemployment.  Some Plaintiffs face the prospect of financial loss that will threaten their programming and operations. These harms will frustrate the organizations' missions to serve their clients and members, including but not limited to asylum applicants.

12.     The Asylum EAD Rules violate the Administrative Procedure Act and are otherwise unlawful in multiple ways, including because DHS failed to consider the impact of the rules on asylum applicants and the humanitarian purposes of the Refugee Act; prevented the public from commenting on the interplay among multiple proposed rules and refused to consider the interrelated impact of the pending rules and other recent changes that affect the asylum process; failed to reasonably explain the need for the new rules and the changes from its prior positions; and acted through Defendant Chad Wolf, who has no valid claim to the Office of Acting DHS Secretary and therefore lacked the authority to issue the rules.

13.     Plaintiffs ask that this Court ensure that the Asylum EAD Rules do not take effect, vacate the rules, and hold DHS to its obligation to follow the law.

## THE PARTIES

14.     **Plaintiff CASA de Maryland, Inc. ("CASA")** is a nonprofit organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, and Pennsylvania. CASA's mission is to create a more just society by building power and improving the quality of life in low-income immigrant communities, including for those seeking asylum.

15.     CASA is the largest membership-based immigrants' rights organization in the mid-Atlantic region, with more than 100,000 dues-paying members, including asylum seekers who have applied for or anticipate applying for an EAD. CASA's members drive the organization's priorities and agenda, participate in campaigns and programs, and benefit from the social, health, job training, employment, and legal services offered by the organization. Some members of CASA have seats on the organization's board, participate in the organization's Leadership Council, and serve on other programming committees. In these roles, members provide ongoing input on, establish, and approve the organization's long-term strategic priorities and policies.

16.     **Plaintiff the Asylum Seeker Advocacy Project, Inc. ("ASAP")** is a nonprofit organization headquartered in New York, New York. ASAP's mission is to provide individuals who came to the Mexico-U.S. border seeking asylum with community support and legal services regardless of where they are located. ASAP implements its mission by providing emergency legal aid and other support to its members and other asylum seekers and by engaging in nationwide systemic reform.

17.     ASAP has over 4,000 members, the majority of whom are mothers who sought asylum at the Mexico-U.S. border and now live throughout the United States in more than 40 U.S.

5

states and the District of Columbia. ASAP adds an average of 70 new members per month by screening individuals who have been referred by nonprofit organizations at the border or by existing members. Many of ASAP's members are asylum applicants who have applied for or anticipate applying for an EAD. The members receive daily informational support from ASAP, have the opportunity to access ASAP's emergency pro bono legal aid, and set the priorities and goals for the organization's systemic reform and advocacy work.

18. **Plaintiff Centro Legal de la Raza ("Centro Legal")** is a nonprofit organization headquartered in Oakland, California. Centro Legal is a legal services agency that protects and advances the rights of low-income individuals through bilingual legal representation, education, and advocacy. Centro Legal's mission is to combine quality legal services with know-your-rights education and youth development programming in order to ensure access to justice for thousands of individuals throughout Northern and Central California. Centro Legal has over 2,000 open asylum cases and helps asylum seekers file for work authorization as part of their representation.

19. **Plaintiff Oasis Legal Services ("Oasis")** is a nonprofit organization headquartered in Berkeley, California. Oasis's mission is to provide direct legal services and holistic case management to LGBTQ+ asylum seekers living within the jurisdiction of the U.S. Citizenship and Immigration Services San Francisco Asylum Office. Oasis's clients are undocumented immigrants, low-income people of color, and victims of hate crimes. All of Oasis's clients have endured horrific violence in their countries of origin because of their sexual orientation, gender identity, and/or HIV+ status. Oasis supports asylum applicants through the application process, including by assisting them in applying for EADs, and connecting them to job training and available benefits.

20.     **Plaintiff Pangea Legal Services ("Pangea")** is a nonprofit organization headquartered in San Francisco, California. Pangea's mission is to stand with immigrant communities and to provide services through legal representation, especially in the area of deportation defense. In addition to direct legal services, Pangea advocates on behalf of noncitizens through policy advocacy, education, and legal empowerment efforts. Pangea provides direct legal assistance with asylum applications and EADs to asylum seekers, including those arrested or convicted of crimes.

21.     **Defendant U.S. Department of Homeland Security ("DHS")** is a cabinet agency of the United States Government. DHS is the agency that proposed and issued both of the Asylum EAD Rules and is charged with implementing them should they go into effect. Within DHS, the U.S. Citizenship and Immigration Services ("USCIS") is responsible for adjudicating asylum applications and EADs for asylum applicants.

22.     **Defendant Chad F. Wolf** has purportedly held the title of Acting Secretary of the U.S. Department of Homeland Security since November 13, 2019. He issued both of the Asylum EAD Rules under that purported authority. He is sued in that official capacity.

**JURISDICTION AND VENUE**

23.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this action arises under the laws of the United States, including the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*

24.     Venue is proper in this district under 28 U.S.C. § 1391(e) and in this division because Defendants are agencies and officers of the United States, the action does not involve real property, and Plaintiff CASA resides in this district and division.

## ALLEGATIONS

I.  **WORK AUTHORIZATION BOLSTERS U.S. COMMITMENT TO PROVIDING REFUGE TO THOSE FLEEING PERSECUTION.**

A.  **The Refugee Act Reflects U.S. Commitment to Asylum Applicants.**

25.  Congress enshrined the U.S. commitment to providing refuge to those fleeing violence and persecution by passing the Refugee Act of 1980, § 101(a), Pub. L. No. 96-212, 94 Stat. 102, and signing on to the 1967 Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577 (1968).

26.  The Refugee Act declared it to be "the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands." § 101(a), Pub. L. No. 96-212, 94 Stat. 102.

27.  Under the Refugee Act, asylum in the United States is available to those who meet the definition of a "refugee"—that is, they are unable or unwilling to return to their home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1158(b)(1)(A); *id.* § 1101(a)(42).

28.  The asylum laws guarantee the right to apply for asylum to all non-citizens arriving at the U.S. border or within the United States. *Id.* § 1158(a)(1).

29.  A person may apply for asylum when they arrive at the U.S. border or soon thereafter. In such instances, individuals may generally apply for asylum defensively in removal proceedings if an asylum officer or immigration judge determines in an initial screening process (called a "credible fear interview") that there is a significant possibility that they could establish eligibility for asylum. *Id.* § 1225(b)(1)(A)(ii) & (B)(ii).

30.     A person in the United States may also become an asylum applicant by submitting an affirmative application to an asylum office of USCIS, 6 U.S.C. § 271, or as a defense to deportation in removal proceedings, 8 U.S.C. § 1229a(c)(4)(A).

31.     Regardless of how a person applies for asylum, an asylum applicant cannot be deported to their home country before they receive a decision on their asylum claim after a full hearing in a removal proceeding. *See id.* § 1229a(b)(4), (c)(4); § 1231(a)(1).

32.     An asylum applicant who is found ineligible for asylum in a removal proceeding before an immigration judge has the right to appeal that determination, including to the federal court of appeals. *See id.* § 1252(b).

33.     The asylum laws urge prompt processing of asylum applications.

34.     For applications made directly to DHS, the agency must grant an asylum applicant an initial interview within 45 days of the filing of the application and reach a decision on the application within 180 days absent exceptional circumstances. *Id.* § 1158(d)(5)(A)(ii), (iii).

35.     For asylum requests made to an immigration court, the judge must grant a hearing within 45 days of the application and issue a decision within 180 days absent exceptional circumstances. *Id.*

36.     A grant of asylum allows the person to continue to live in the United States and automatically gives work authorization as part of the status.

37.     A grant of asylum creates a pathway to lawful permanent resident status in the United States (*i.e.*, a "green card"), and, ultimately, U.S. citizenship.

38.     Each year, tens of thousands of asylum applicants are granted asylum in the United States. Most of them eventually become U.S. citizens.

**B.    Work Authorization Permits Asylum Applicants to Fully Exercise Their Right to Seek Asylum.**

39.    The asylum process is complicated, expensive, and difficult to navigate, particularly for those who are not trained in U.S. law or fluent in English.

40.    To substantiate their application, asylum applicants must often collect documentary evidence from their home countries, contact people who can testify in support of their applications, translate documents if necessary, retain experts, prepare written materials in accordance with changing laws and rules, and travel to interviews or hearings to present their cases.

41.    In the affirmative asylum process, an asylum applicant must submit evidence to USCIS and testify before an asylum officer, who can grant asylum or recommend the case be heard in immigration court by an immigration judge.

42.    In immigration court, an asylum applicant faces an adversarial system and must respond to arguments made by attorneys representing the government.

43.    The asylum process can be lengthy.

44.    The government routinely fails to meet the statutory time limits for processing asylum applications for reasons directly attributable to its decisions about staffing, case processing, and case management.

45.    For affirmative asylum applications, applications for which the agency does not promptly arrange an interview languish because of DHS's "last-in, first-out" system by which newer applications are decided first.

46.    For defensive asylum applications, applicants wait on average three years for their cases to be decided in immigration court, with a quarter of the applicants waiting nearly four years.

47.    The federal government does not provide any economic support or legal representation to asylum applicants during the asylum application process.

48.     Many asylum applicants lack independent financial resources and require a source of income to support themselves and their families during the pendency of their asylum applications.

49.     For many asylum applicants, the only viable source of income is through employment, which requires an EAD.

50.     Many asylum applicants rely on income received from employment made possible by their EAD to be able to afford housing, medical care, food, and other basic provisions for themselves and their families during the asylum process.

51.     Additionally, for many asylum applicants, an EAD is the only government-issued photo identification document that proves that the individual is lawfully in the country as an asylum applicant.

52.     Many asylum applicants rely on their EAD for identification in potential interactions with government authorities, or for securing apartment leases, bank accounts, utilities, health care, and other necessities of life.

53.     Many asylum applicants rely on their income from employment to retain attorneys and to help them fully exercise their right to seek asylum.

54.     Legal representation in the asylum application process significantly increases an applicant's chance of obtaining asylum.

55.     In a defensive asylum proceeding, legal representation increases the chance of obtaining asylum five-fold.

II.   **THE ASYLUM EAD RULES DRAMATICALLY CHANGE THE EXISTING SYSTEM BY WHICH ASYLUM APPLICANTS HAVE BEEN ABLE TO OBTAIN WORK AUTHORIZATION.**

A.   **The Existing Work Authorization System Generally Allows Asylum Applicants to Obtain Work Authorization 180 Days after Filing Their Asylum Applications.**

56.   The Refugee Act authorized the federal government to establish a regulatory system to grant work authorization to asylum applicants.

57.   Work authorization has long been available to asylum applicants under this regulatory system.

58.   In the 1990s, the Immigration and Naturalization Service, a predecessor agency to the DHS, engaged in notice and comment rulemaking to create the current EAD regulatory system.

59.   The current EAD regulatory system attempts to balance the need of asylum applicants to begin working promptly with the agency's desire to impose a waiting period for an EAD in order to discourage fraudulent asylum filings made solely for the purpose of obtaining immediate work authorization.

60.   Under the current EAD system, *see* 8 C.F.R. § 208.7,[1] an asylum applicant may submit an EAD application after a waiting period of 150 days after filing for asylum, discounting any applicant-caused delays to the asylum process. The EAD application and adjudication process are relatively simple: DHS must grant the EAD application within 30 days to any asylum applicants without an aggravated felony conviction whose asylum applications have been pending for over 180 days. The initial EAD is renewable so that work authorization will continue to last through the end of the asylum process, including any federal appeals.

---

[1] Citations to the regulations are to the version in effect as of the filing of the Complaint, except where otherwise indicated.

61.     When Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act in 1996 with the goal of restricting immigration, it amended the asylum laws to adopt the aspect of the regulatory system that requires asylum applicants to wait at least 180 days after filing their asylum application to receive an EAD. *See* 8 U.S.C. § 1158(d)(2). Congress otherwise continued DHS's authority to implement an EAD system for asylum applicants through regulations. *See id.*

### B.     The Asylum EAD Rules Will Introduce Delays, Uncertainties, and Unfair Obstacles in the Existing System.

62.     The Asylum EAD Rules published during the week of June 22, 2020 will dramatically change the regulatory system that DHS has been operating for over two decades.

63.     On June 22, 2020, DHS issued one final rule ("Timeline Repeal Rule"), which, in relevant part, repeals the requirement that DHS rule on an EAD application within 30 days of its filing.[2] *See* Final Rule, Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applicants, 85 Fed. Reg. 37,502, *et seq*.

64.     The Timeline Repeal Rule is scheduled to become effective on August 21, 2020.

65.     On June 26, 2020, DHS issued a second final rule ("Broader EAD Rule"), which destroys the current system for making EADs available to asylum applicants by delaying, burdening, and in some instances eliminating asylum applicants' access to work authorization. *See* Final Rule, Asylum Application, Interview, and Employment Authorization for Applicants, 85 Fed. Reg. 38,532, *et seq*.

66.     The Broader EAD Rule is scheduled to become effective on August 25, 2020.

---

[2] References to the "Timeline Repeal Rule" and "Asylum EAD Rules" do not include the rule change requiring that EAD renewal applications be received 90 days prior to the expiration of the EAD. This reflected a technical change to align the regulation with a final rule issued in 2017 and has no relationship to or impact on the Timeline Repeal Rule or the Broader EAD Rule.

67.     Together, the two Asylum EAD Rules will introduce new delays, uncertainties, and unfair obstacles in the system that many asylum applicants, and the organizations that assist and provide services to them, rely upon to ensure that they can safely remain in the United States and support themselves and their families during the pendency of their asylum applications.

68.     **First,** the Asylum EAD Rules will eliminate the regulatory provision that generally allows asylum applicants to obtain work authorization 180 days after applying for asylum.

69.     Under the current system, the 180-day window is created through two components of one regulatory provision, *see* 8 C.F.R. § 208.7(a)(1). First, an asylum applicant may generally submit their EAD application 150 days after filing their asylum application. Second, DHS must rule on any such EAD application within 30 days if the application for asylum is still pending.

70.     The Broader EAD Rule will change this system by requiring asylum applicants to wait at least 365 days after they submit their asylum application, instead of 150 days, before submitting an EAD application. *See id.* § 208.7(a)(1)(ii) (new) ("365-Day Waiting Period").

71.     The Timeline Repeal Rule will eliminate the requirement that DHS adjudicate an initial EAD application within 30 days of receipt, or on any prescribed timeline or priority basis. *See id.* § 208.7(a)(1) (new).

72.     These changes will delay asylum applicants' access to EADs and deprive them of the certainty and predictability of planning for when they can expect to begin receiving income.

73.     **Second,** the Asylum EAD Rules will impose new ineligibility grounds even though those grounds may not prevent a grant of asylum.

74.     Under the current system, the sole ground for ineligibility for an EAD for asylum applicants is a conviction for an aggravated felony. *See id.* § 208.7(a)(1).

14

75.     The Asylum EAD Rules will make an asylum applicant presumptively ineligible for work authorization if they did not file their underlying asylum application within one year of arrival to the United States, even though asylum laws allow applicants to file past one year by demonstrating justifiable circumstances, *see* 8 U.S.C. § 1158(a)(2)(D). These circumstances may include changed conditions in their home country like a regime change, changed personal circumstances such as coming out as LGBTQ+, or Post-Traumatic Stress Disorder that hampers a person's ability to prepare an application. An asylum applicant who files past one year will nonetheless remain ineligible for an EAD under the Asylum EAD Rules unless and until an asylum officer or an immigration judge decides in the underlying asylum proceeding that the applicant was justified in not filing their asylum application within the first year. *See* 8 C.F.R. § 208.7(a)(1)(iii)(F) (new) ("One-Year Filing Bar").

76.     The Asylum EAD Rules will make an asylum applicant presumptively ineligible for work authorization if they entered without inspection between ports of entry, even though entry without inspection is irrelevant to asylum eligibility, *see* 8 U.S.C. § 1158(a)(1). The applicant will remain ineligible unless and until an officer adjudicating the EAD application determines that the applicant: (1) presented themselves without delay but no later than 48 hours after entry, or attempted entry, to Border Patrol agents or other delegates of the DHS Secretary; (2) indicated an intention to apply for asylum or expressed a fear of persecution or torture; and (3) had "good cause" for the entry. *See* 8 C.F.R. § 208.7(a)(1)(iii)(G) (new) ("EWI Bar").

77.     The Asylum EAD Rules will make an asylum applicant ineligible for work authorization if they have been convicted of or have committed a crime that an officer adjudicating the EAD application believes would bar an asylum grant, even though an asylum officer or immigration judge may later determine that such convictions and crimes do not render the

applicant ineligible for asylum based on a full assessment of criminal records and applicable state, federal, and foreign law. *See id.* § 208.7(a)(1)(iii)(B)-(D) (new) ("EAD Criminal Bar").

78.     These changes will burden the EAD adjudication process and increase delays in receiving EADs.

79.     These changes will prevent applicants from receiving EADs while their applications are pending even if they will ultimately succeed on their asylum claims.  For example, Plaintiff Oasis has a 99% success rate in helping their clients obtain asylum but 80% of their asylum clients do not file their asylum claims within one year of arrival to the United States and over 67% entered the United States without inspection. Thus, many of Plaintiff Oasis's clients will be denied EADs under the Asylum EAD Rules even though they will likely ultimately succeed on their asylum claims.

80.     **Third,** the Asylum EAD Rules will grant DHS new discretion to delay or deny work authorization.

81.     Under the current system, DHS must inform asylum applicants within 30 days if it considers their asylum application to be incomplete, or else deem the application complete and properly filed. *See* 8 C.F.R. § 208.3(c)(3).

82.     Under the current system, applicant-caused delays in the asylum proceedings toll the waiting period for an EAD application but do not serve as a ground for denying an EAD. *See id.* § 208.7(a)(2).

83.     Under the current regulatory scheme, DHS must grant work authorization to asylum applicants who are eligible for an EAD. *See id.* § 274a.13(a)(1).

84.     The Asylum EAD Rules will give DHS discretion to deem an asylum application incomplete, and therefore not filed, at any point in the asylum application process. *See id.* § 208.3(c)(3) (new) ("Deem Complete Removal").

85.     As a matter of policy, DHS deems applications incomplete for minor, technical reasons, such as failing to write "n/a" next to any question that is inapplicable to the applicant or marking the applicant's name and identification number in pen rather than pencil on the back of an accompanying passport photo.

86.     This change will mean that asylum applicants may learn long after they have filed the application that DHS has determined that their asylum application was incomplete and therefore must be refiled, triggering a new waiting period for the EAD application or the One-Year Filing Bar.

87.     The Asylum EAD Rules will give DHS discretion to deny an EAD application if it deems that an "applicant-caused delay" in an asylum proceeding is "outstanding or has not been remedied" on the date that the EAD application is filed. *See id.* § 208.7(a)(1)(iv) (new) ("Applicant-Caused Delay Denial").

88.     DHS has not defined "outstanding" or "has not been remedied," and has provided a broad, non-exhaustive list of circumstances that it may deem to be "applicant-caused delay."

89.     The Asylum EAD Rules will give DHS discretion to deny EADs to those who are eligible for them. *See id.* § 274a.13(a)(1) (new) ("Discretionary Denials").

90.     These changes will increase delays in receiving EADs, deprive asylum applicants of the certainty and predictability of planning for future income, and prevent applicants from receiving EADs while their applications are pending.

91.     **Fourth,** the Asylum EAD Rules will eliminate existing procedural options for certain asylum applicants to obtain work authorization earlier than 180 days from the date of filing their asylum applications.

92.     Under the current system, asylum applicants who have completed the asylum process successfully except for the government's resolution of fingerprint and other final security checks may receive "recommended approvals," permitting the immediate issuance of their EADs. *See id.* § 208.7(a)(1); § 274a.12(c)(8).

93.     Separately, asylum seekers who have passed the credible fear screening (and thus have been found to have a significant possibility that they could establish eligibility for asylum), and who have demonstrated that they should be paroled from custody for "urgent humanitarian reasons" or "significant public interest," 8 U.S.C. § 1182(d)(5)(A), are permitted to apply for work authorization under a separate EAD regulation for parolees that does not require a waiting period. *See id.* § 274a.12(c)(11).

94.     The Asylum EAD Rules will eliminate recommended approvals. *See* 8 C.F.R. § 208.7(a)(1) (new), § 274a.12(c)(8) (new) ("Recommended Approval Removal").

95.     The Asylum EAD Rules will prevent asylum seekers who are paroled from applying for work authorization under the EAD regulation for parolees. *See id.* § 274a.12(c)(11) (new) ("Parolee EAD Removal"). It will require asylum applicants who already have an EAD based on parole to apply for an EAD based on an asylum application under the Broader EAD Rules.

96.     These changes will impose new delays, compounded by other changes in the Asylum EAD Rules, on asylum applicants who DHS had previously determined merit earlier access to work authorization.

97.     **Fifth,** the Asylum EAD Rules will impose a new and redundant biometrics requirement and an accompanying new fee. *See id.* § 208.7(a)(1)(i) (new) ("Biometrics Requirement").

98.     Under the current system, asylum applicants are required to submit to fingerprinting and other biometrics collection in connection with their asylum application, but there is no fee for the collection and asylum applicants are not required to resubmit the same information separately to support their EAD application.

99.     The Asylum EAD Rules will require asylum applicants to attend another biometric appointment, to pay a fee, and to re-submit to the same biometric collection that was required for their asylum application in order to have their EAD application processed.

100.    This change will burden the EAD adjudication process, cause delays, and require asylum applicants to travel to a redundant biometrics appointment and to pay for the processing at a time when their resources are limited because of their inability to work.

101.    **Sixth,** the Asylum EAD Rules will impose new limitations on the validity period of work authorization.

102.    Under the current system, EADs for asylum applicants are available during the time that asylum applicants seek federal court review of a denial of their asylum application, whether through the initial EAD or through a renewal. *See* 8 C.F.R. § 208.7(b).

103.    The Asylum EAD Rules will prevent asylum applicants from continuing to work pursuant to their EADs while they pursue federal court review of a denial of their asylum application. Instead, the Asylum EAD Rules will cap the maximum validity period for each EAD at 2 years, after which an applicant will have to renew, and the EADs will automatically terminate when an asylum officer denies an asylum application, the Board of Immigration Appeals affirms

a denial of an asylum application by an immigration judge, or when a removal order becomes administratively final. *See id.* § 208.7(a)(1)(i), (b) (new) ("Limited EAD Validity"). If an asylum applicant prevails in their federal court review, they must re-apply for an EAD and wait for their application to be processed.

104.    These changes will impose new burdens, uncertainties, and delays on asylum applicants and prevent asylum applicants from continuing to work under an existing EAD while they pursue federal court review to which they are statutorily entitled.

## III.    THE ASYLUM EAD RULES WILL HARM PLAINTIFFS, THEIR CLIENTS, THEIR MEMBERS, AND SOCIETY AS A WHOLE.

105.    The costs of the Asylum EAD Rules to our society are significant.

106.    DHS estimates costs of the Asylum EAD Rules to include lost compensation to asylum applicants exceeding $ 2.3 billion annually.

107.    Even this estimate is low given DHS's reliance on flawed assumptions, the limitations in its data, and its refusal to consider the cumulative and interrelated impacts of the rules.

108.    For asylum applicants, lost compensation means risks of homelessness, hunger, inadequate healthcare, vulnerability to exploitation, and inability to access legal counsel to pursue their right to seek asylum.

109.    Lost compensation for asylum applicants increases burdens on their social support networks, which may include state and local entities, social and legal services organizations, religious groups, and families and friends in the United States.

110.    Lost compensation for asylum applicants means lost productivity for businesses that employ them and lost tax revenue for federal and state governments.

111.    The Asylum EAD Rules have already begun to cause irreparable harm.

112.    In light of the upcoming effective dates for the Asylum EAD Rules, each plaintiff organization has already begun to divert resources to address the problems raised by the rules, including by providing urgent legal services to clients and members who are seeking to file asylum applications or EADs prior to the effective dates, addressing questions from anxious clients and members, and/or educating their staff, clients, and members about the rules.

113.    Plaintiffs ASAP, Centro Legal, Pangea, and Oasis have had to expend resources to prepare for the impact of the Asylum EAD Rules on their clients should they take effect. ASAP, Centro Legal, and Oasis have set aside or significantly reduced other programming—such as other emergency legal aid or legal assistance to vulnerable youth—to prioritize assisting in the filing of EAD applications before the effective dates of the Asylum EAD Rules and advising asylum applicants and attorneys on the impact of the rules.

114.    Although Plaintiff CASA does not ordinarily assist members with their asylum applications, it has shifted its resources at the expense of other programming so that it can help its members file applications before the effective dates of the Asylum EAD Rules, both to preserve their eligibility and to minimize the delay they will now face.

115.    The Asylum EAD Rules will further these harms if they take effect.

116.    Because the Asylum EAD Rules will complicate and prolong the EAD application process, Plaintiffs ASAP, Centro Legal, Pangea, and Oasis will have to permanently set aside or significantly reduce other programming in order to continue providing legal assistance to asylum applicants seeking EADs and to educate their clients and members on the new rules. It will take these legal services organizations much longer—at least twice as long by Centro Legal's estimate—to assist clients and members with the EAD application process under the Asylum EAD Rules than under the current system, including because of the need to screen for, collect evidence

on, and argue against the application of the EAD Criminal Bar or the EWI Bar. The lack of clarity in certain provisions of the rules, such as the vague definition of an "applicant-caused delay" in defensive asylum proceedings that could result in an EAD denial (under the Applicant-Caused Delay Denial), will force plaintiffs to expend additional resources to understand the rules' effect on their members and clients.

117.    Because the Asylum EAD Rules will prolong the EAD process, Plaintiffs ASAP, Centro Legal, Pangea, and Oasis will be forced to keep EAD matters open on their docket for longer and to dedicate resources to affirmatively inquiring about the status of the EAD application with the agency and potentially filing mandamus actions to require an adjudication.

118.    Because the Asylum EAD Rules will result in delay or denial of EADs to asylum applicants, Plaintiffs ASAP, Centro Legal, Pangea, and Oasis will have to dedicate additional legal resources to support their clients and members who now cannot afford paid private legal representation.

119.    The Asylum EAD Rules also make providing asylum representation more difficult and complicated, including by imposing draconian and vague rules on what may constitute "applicant-caused delay" (under the Applicant-Caused Delay Denial) and by eliminating the requirement that DHS notify counsel of any technical problems with the asylum application within 30 days of filing (under the Deemed Complete Removal). Plaintiffs that provide asylum representation will have to spend additional time communicating with clients and USCIS to ensure that DHS has determined that the initial asylum application has been filed and ensuring that they are avoiding what DHS may characterize as "applicant-caused delay" in the asylum process even if the delay might be justified.

120.    Because the Asylum EAD Rules will result in delay or denial of EADs to asylum applicants, Plaintiffs CASA, ASAP, and Oasis will have to dedicate additional resources to providing non-legal support to their members and clients.

121.    ASAP will have to dedicate additional resources to referring members to a wide range of social services.

122.    Oasis will have to dedicate additional resources, including hiring an additional staff member, to providing case management services to their clients.

123.    CASA will have to divert more resources to sustain the financial assistance program that it has offered to its members during the pandemic, which has already distributed more than $740,000 to almost 2,000 of its members. CASA anticipates that many of its asylum-seeking members will not receive EADs promptly under the Asylum EAD Rules and will rely more heavily than under the current EAD system on CASA's financial assistance program for basic life necessities, such as groceries, rent, and healthcare costs.

124.    CASA will also be forced to spend additional resources to re-train staff on advising members about how to demonstrate eligibility for assistance programs, including health care, when they lack an EAD to confirm identity.

125.    The Asylum EAD Rules will threaten some plaintiff organizations' finances.

126.    One-third of Oasis's budget in 2019 came from client revenue. Oasis charges fees using a sliding scale based on a client's income and requires clients to start paying fees only when they are able to do so. Currently, many clients begin paying Oasis for its services after they receive an EAD. Oasis anticipates that its ability to retain staff and stay open as an organization will be jeopardized because Oasis believes that under the Asylum EAD Rules approximately 80% of its clients will be barred from receiving EADs while their asylum applications are pending and the

remaining 20% will be unable to receive EADs until at least 365 days after filing their asylum application.

127.    CASA will also risk loss of funding if the Asylum EAD Rules take effect. CASA operates worker centers for its members that are funded in part by contracts with local governments. These contracts require that a certain percentage of the work placements made by the worker centers involve work-authorized individuals placed in long-term employment positions. If CASA's members are unable to obtain EADs promptly as a result of the Asylum EAD Rules, CASA may not be able to meet the contract requirements, which risks the sustainability of its worker centers for all of its membership.

128.    DHS recognized in the Asylum EAD Rules that the rules will burden nonprofit organizations that serve asylum applicants, like plaintiff organizations, because their clients and members will have to rely more heavily on their assistance.

129.    Given limitations on organizational resources, all of these harms will frustrate the plaintiff organizations' ability to pursue their missions to serve their clients and members, including but not limited to asylum applicants.

130.    While the harms to plaintiff organizations are serious, the harms to the clients and members that they serve will be devastating if the Asylum EAD Rules are allowed to take effect.

131.    CASA is currently providing pro se application assistance to one of its members, M.C., in filing her asylum application. M.C. fled Guatemala with her two daughters after receiving multiple threats to her life as a result of reporting a crime. Since M.C. will have recently filed her asylum application, she will not be eligible to apply for an EAD before the effective date of the Asylum EAD Rules. If the Asylum EAD Rules take effect, MC will be forced to wait an additional

7 months before she can even apply for an EAD, and an indeterminate length of time for the government to process her application.

132.    Another member of CASA, A.O., is a Venezuelan national, who entered the United States in December of 2019 on a nonimmigrant visitors' visa. A.O. was a journalist in Venezuela and her family has been extremely outspoken about their opposition to Venezuela's President, Nicolás Maduro. A.O. and her parents fled to the U.S. after being attacked by Maduro party officials, who tied them up and robbed their house after threatening them. CASA is now providing A.O. with pro se assistance in filing her asylum application, but she too will have to wait a significantly longer time to obtain an EAD under the new Asylum EAD Rules, dramatically impacting her ability to support herself while her application is pending.

133.    In addition to W.L. mentioned above, ASAP's member N.G., filed her asylum application in April 2020. Under the current rules, she would be able to apply for an EAD in September 2020 and would expect to receive a response from the government 30 days later.

134.    N.G. fled Honduras with her young daughter because she and her family experienced targeted violence and death threats after defying a drug cartel. The Honduran police would not have protected her due to their corruption and collusion with drug traffickers. She and her daughter are currently staying in a trailer with a friend and her children, and she has been relying on pandemic-related food benefits from her state to make ends meet. Once she obtains an EAD, she hopes to take up her neighbor's offer to help her find employment at a local factory where they work. If her EAD is delayed or denied as a result of the Asylum EAD Rules, she will not be able to provide more suitable housing for her daughter, alleviate her family's food insecurity, or save money to hire a lawyer for her immigration case.

135.    With the possibility of work authorization so distant and uncertain, some asylum applicants who cannot otherwise support themselves and their families during the asylum application process will have no choice but to abandon their claims and ultimately to return to their home countries—notwithstanding the risk of persecution and even death.

136.    Given the prospect of forced destitution during the asylum application process, some noncitizens fleeing persecution who would be eligible for asylum will be deterred from exercising their right to apply for asylum.

## IV.    THE ASYLUM EAD RULES WERE ISSUED THROUGH ARTIFICIALLY SEGREGATED RULEMAKINGS.

137.    In April 2019, President Trump directed DHS to undertake rulemaking to transform the asylum and the EAD systems as a part of his broader agenda to curtail humanitarian immigration to the United States. *See* Donald J. Trump, Memorandum on Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System (Apr. 29, 2019), *available at* https://www.govinfo.gov/app/details/DCPD-201900251.

138.    DHS began its efforts to dismantle the existing work authorization system for asylum applicants in the fall of 2019 through artificially segregated and staggered rulemakings on overlapping issues, starting by issuing two notices that later became the Asylum EAD Rules ("Asylum EAD Notices").

139.    On September 9, 2019, DHS issued a notice of proposed rulemaking that initiated the public comment period for what later became the Timeline Repeal Rule. *See* Notice of Proposed Rulemaking, Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications, 84 Fed. Reg. 47,148 ("Timeline Repeal Notice").

140.    The Timeline Repeal Notice informed the public that DHS would separately pursue a "broader asylum EAD" rulemaking but claimed that the two rulemakings were "distinct."

141.    The Timeline Repeal Notice limited the content of the comments DHS would consider to comments it deemed related to only that specific proposal.

142.    The comment period for the Timeline Repeal Notice closed on November 8, 2019.

143.    DHS received over 3,200 comments in response to the Timeline Repeal Notice.

144.    On November 14, 2019, six days after the comment period for the Timeline Repeal Notice closed, DHS issued a notice of proposed rulemaking that initiated the public comment period for what later became the Broader EAD Rule. *See* Notice of Proposed Rulemaking, Asylum Application, Interview, and Employment Authorization for Applicants, 84 Fed. Reg. 62,374 ("Broader EAD Notice").

145.    The Broader EAD Notice referenced the Timeline Repeal Notice, and in fact included in its proposal the same change proposed in the Timeline Repeal Notice, but claimed that the two rulemakings were "distinct."

146.    The Broader EAD Notice limited the content of the comments DHS would consider to comments it deemed related to only that specific proposal.

147.    The comment period for the Broader EAD Notice closed on January 13, 2020.

148.    DHS received a total of 1,074 comments in response to the Broader EAD Notice.

149.    In addition to these rulemakings, DHS has issued other proposed rules to limit asylum that interact with the Asylum EAD Rules.

150.    On the same day that it issued the Broader EAD Notice, DHS issued a notice of proposed rulemaking that would, for the first time, require asylum applicants to pay a fee to file an asylum application and to file an initial application for an EAD. *See* Proposed Rule, U.S.

Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 84 Fed. Reg. 62,280 ("Fee Notice"). It also increased the EAD renewal fee and eliminated the availability of any fee waivers. *See id.*

151.    If the Fee Notice is finalized as proposed, it will impose fees on the asylum and EAD process in addition to the fees that will be imposed by the Biometrics Requirement in the Asylum EAD Rules, at a time when asylum applicants will not have work authorization and will not know when they will become work authorized.

152.    On December 19, 2019, DHS issued a notice of proposed rulemaking that would expand criminal bars to asylum eligibility. *See* Joint Notice of Proposed Rulemaking, Procedures for Asylum and Bars to Asylum Eligibility, 84 Fed. Reg. 69,640 ("Asylum Criminal Bars Notice").

153.    If the Asylum Criminal Bars Notice is finalized as proposed, the criminal bars will become the ineligibility grounds that EAD adjudication officers will apply to deny EADs under the EAD Criminal Bar.

154.    On June 15, 2020, DHS issued a notice of proposed rulemaking that would impose significant additional barriers to the asylum process. *See* Joint Notice of Proposed Rulemaking, Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 36,264 ("Broader Asylum Notice").

155.    If the Broader Asylum Notice is finalized as proposed, it will prevent many people from pursuing asylum and will substantially decrease the number of applications for EADs by asylum applicants.

156.    The comment periods for the Fee Notice, the Asylum Criminal Bars Notice, and the Broader Asylum Notice have closed, but DHS has not issued the final rules.

## V.     THE ASYLUM EAD RULES WERE ISSUED BY DEFENDANT WOLF, WHO LACKED LAWFUL AUTHORITY TO DO SO.

157.    As a consequence of President Trump's chaotic effort to block humanitarian immigration to the United States, there has been constantly rotating leadership at DHS.

158.    Indeed, there has been no Senate-confirmed Secretary leading DHS since April 10, 2019 at the latest.

159.    Defendant Chad Wolf issued both of the final Asylum EAD Rules under his purported authority as Acting DHS Secretary.

160.    However, Defendant Wolf is and has been serving as Acting Secretary in violation of *both* the Homeland Security Act ("HSA") and the Federal Vacancies Reform Act ("FVRA").

161.    Accordingly, Defendant Wolf had no authority to issue the final Asylum EAD Rules.

### A.     Defendant Wolf's Service as Acting Secretary Violates the HSA, Which Governs the Order of Succession for the Office.

162.    The HSA governs the order of succession for the office of Acting DHS Secretary. *See* 6 U.S.C. § 113.

163.    Defendant Wolf's service as Acting DHS Secretary violates the HSA because he was not next in the order of succession at the time that he purported to succeed to that office.

164.    Nor was Defendant Wolf next in the order of succession at any time since he purported to begin exercising the authority of Acting DHS Secretary.

165.    The HSA requires that the DHS Secretary shall be "appointed by the President, by and with advice and consent of the Senate." 6 U.S.C. § 112(a)(1).

166.    The HSA mandates that, in the event of the "absence, disability, or vacancy in office" of the Secretary, the Deputy DHS Secretary is first in the order of succession as Acting Secretary and the Under Secretary of Management is second. *Id*. § 113(a)(1)(A), (g)(1).

167.    After the Deputy Secretary and Under Secretary of Management, the HSA allows the DHS Secretary to "designate such other officers of the Department in further order of succession to serve as Acting Secretary." *Id*. § 113(g)(2).

168.    On December 15, 2016, then-DHS Secretary Jeh Johnson issued a memorandum adopting a succession order "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office." Department of Homeland Security, *DHS Orders of Succession and Delegation of Authorities for Named Positions* (Dec. 15, 2016) ("DHS Orders of Succession & Delegation").

**B.      Secretary Nielsen's Resignation Triggered a Line of Unlawful Appointments Under the HSA.**

169.    The line of unlawful successions began when DHS Secretary Kirstjen Nielsen, who had been appointed by the President with consent of the Senate, resigned.

170.    President Trump announced Secretary Nielsen's departure from office on April 7, 2019 by tweet, and at the same time announced that her successor would be Kevin McAleenan, who was then serving as Commissioner of U.S. Customs and Border Protection ("CBP").

171.    Secretary Nielsen announced her resignation later in the day on April 7, 2019 and publicly submitted her resignation letter, which stated that it was "effective April 7th, 2019."

172.    A few hours later in the day on April 7, 2019, however, former Secretary Nielsen announced by tweet that she "ha[d] agreed to stay on as Secretary" until April 10, 2019.

173.    On April 7, 2019, former Secretary Nielsen's effective resignation date, Claire Grady served as the Senate-confirmed Under Secretary for Management, and in that capacity, had been the Acting DHS Deputy Secretary since April 16, 2018.

174.    Pursuant to the text of the HSA and DHS Orders of Succession & Delegation in place at the time of Secretary Nielsen's resignation, Grady became Acting DHS Secretary as soon as former Secretary Nielsen's resignation was effective.

175.    Grady submitted her resignation as Acting DHS Secretary on April 9, 2019, which became effective April 10, 2019.

176.    On April 10, 2019, former Secretary Nielsen, who had resigned three days earlier, purported to issue an amendment to the DHS Orders of Succession & Delegation "in the event [she was] unavailable to act during a disaster or catastrophic emergency." Department of Homeland Security, *DHS Orders of Succession and Delegation of Authorities for Named Positions* (Dec. 15, 2016) *as amended* (Apr. 10, 2019) (emphasis added).

177.    Former Secretary Nielsen's purported amendments, however, left intact the section of the DHS Orders of Succession & Delegation that governed succession in case of the Secretary's "death, resignation, or inability to perform the functions of the Office." *Id.*

**C.      Kevin McAleenan's Succession to the Office was Unlawful Under the HSA.**

178.    On April 11, 2019, Kevin McAleenan, who was then the CBP Commissioner, purported to assume the Office of Acting Secretary.

179.    Under the DHS Orders of Succession & Delegation, however, two other Senate-confirmed individuals were ahead of McAleenan to succeed to that Office: Christopher Krebs, who then served as the Senate-confirmed Under Secretary for National Protection and Programs,

and David Glawe, who then served as the Senate-confirmed Under Secretary for Intelligence and Analysis.

180.    Because McAleenan's purported succession was unlawful under the HSA and DHS Orders of Succession & Delegation, he had no valid legal claim to the Office of Acting DHS Secretary.

181.    Because McAleenan had no valid legal claim to the Office of Acting DHS Secretary, he could not lawfully exercise the authority of that Office, including the following purported actions in paragraphs 182, 183, and 185.

182.    On September 9, 2019, McAleenan purported to cause the DHS to issue the Timeline Repeal Notice as the signing authority.

183.    On November 8, 2019, McAleenan purported to issue a new amendment to the DHS Orders of Succession & Delegation that revised the order of succession "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office." Department of Homeland Security, *Amendment to the Order of Succession for the Secretary of Homeland Security* (Nov. 8, 2019).

184.    McAleenan resigned as Acting DHS Secretary on November 13, 2019.

185.    On November 14, 2019, McAleenan purported to cause the DHS to issue the Broader EAD Notice as the signing authority, although he had resigned the day before.

**D.    Defendant Wolf's Purported Succession to the Office Was Unlawful Under the HSA.**

186.    On November 13, 2019, Defendant Wolf, who had been confirmed by the Senate the same day as the DHS Under Secretary for Strategy, Policy, and Plans after serving in an Acting capacity until then, purported to assume the Office of Acting DHS Secretary upon McAleenan's resignation.

187.     Defendant Wolf's succession was pursuant to McAleenan's unlawful amendment to the DHS Orders of Succession & Delegation, which purported to place the DHS Under Secretary for Strategy, Policy, and Plans fourth in the line of succession after the Deputy Secretary, Under Secretary of Management, and CBP Commissioner to fill the role of Acting DHS Secretary.

188.     Defendant Wolf had and has no valid legal claim to the Office of Acting DHS Secretary. Under the governing DHS Orders of Succession & Delegation, multiple DHS officials were ahead of Wolf to succeed to that Office.

189.     Because Defendant Wolf had no valid legal claim to the Office of Acting DHS Secretary, he could not lawfully exercise the authority of that Office, including the following purported actions in paragraphs 190-91.

190.     On June 22, 2020, Defendant Wolf purported to issue the Timeline Repeal Rule.

191.     On June 26, 2020, Defendant Wolf purported to issue the Broader EAD Rule.

192.     DHS had notice that McAleenan's and Defendant Wolf's service as Acting Secretary was unlawful, including through press accounts that immediately noted the legal problems posed by their service as Acting Secretary and through comments on the proposed Asylum EAD Rules.

193.     On November 15, 2019 Representative Bennie Thomas, Chairman on the House Homeland Security Committee, and Representative Carolyn Maloney, Acting Chairwoman of the House Oversight and Reform Committee, also submitted a letter to the U.S. Government Accountability Office detailing their concerns about McAleenan's and Defendant Wolf's service as Acting Secretary, and copied Defendant Wolf.

**E.       Defendant Wolf's Service as Acting Secretary Also Violates the FVRA.**

194.     The FVRA limits the time period for which any acting officer may fill a vacancy that requires Senate confirmation. *See* 5 U.S.C. § 3346.

195.     Congress enacted the FVRA to prevent the President from avoiding their obligations under the Appointments Clause, which requires certain high-ranking U.S. officials like the DHS Secretary to be appointed through the Senate's advice-and-consent process.

196.     The FVRA provides that an acting officer may serve in a vacancy that requires Senate confirmation "for no longer than 210 days beginning on the date the vacancy occurs," with limited exceptions that are inapplicable here. *Id*. § 3346(a)(1).

197.     After 210 days without a Senate-confirmed officer, the FVRA requires an office to remain vacant until the President submits a new nominee for Senate confirmation. *See id.* § 3348(b)(1).

198.     The FVRA requires that an "action taken by any person who is not acting" in accordance with its requirements "in the performance of any function or duty of a vacant office . . . shall have no force or effect." *Id*. § 3348(d)(1).

199.     Although the FVRA provides guidance on succession when a Senate-confirmed position becomes vacant, it permits another statute to expressly dictate a different means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency that requires Senate confirmation. *See id.* § 3347(a).

200.     In the case of DHS, the HSA expressly governs the order of succession in the agency.  *See* ¶¶ 166-68.

201.    However, the HSA does not expressly extend the FVRA's 210-day limit on the period for an acting official to hold a position that requires Senate confirmation. *See* 5 U.S.C. § 113(g).

202.    On November 3, 2019, the office of DHS Secretary had been vacant for 210 days since April 7, 2019, the effective date of Secretary Nielsen's resignation letter.

203.    On November 6, 2019, the office of DHS Secretary had been vacant for 210 days since April 10, 2019, the date that former Secretary Nielsen purported to leave office.

204.    After November 6, 2019 at the latest, the FVRA required the office to "remain vacant" until the President submitted a new nominee for Senate Confirmation. *Id*. § 3348(b)(1).

205.    After November 6, 2019 at the latest and continuing to today, no officer or employee could perform the functions and duties of the Office of DHS Secretary under the FVRA, unless and until the President submitted a new nominee for Senate Confirmation.

206.    Since Secretary Nielsen left office, and as of the filing of the present complaint, President Trump has not submitted a new nominee for the position of DHS Secretary to the Senate for confirmation.

207.    Defendant Wolf began serving as Acting DHS Secretary on November 13, 2019, after the 210-day period under the FVRA had passed.

208.    Any action that Defendant Wolf has taken during his tenure, including the issuance of the Asylum EAD Rules on June 22, 2020 and June 26, 2020, was taken without authority and has no force or effect under the FVRA.

209.    In addition, any action that McAleenan took after November 6, 2019 at the latest, including the issuance of his amendments to DHS Orders of Succession & Delegation on November 8, 2019, was taken without authority and has no force or effect under the FVRA.

210.    Because McAleenan's amendments to the DHS Orders of Succession & Delegation were without force or effect under the FVRA, Defendant Wolf could not have lawfully assumed the office of Acting Secretary by succession under those amendments.

## VI.    THE ASYLUM EAD RULES VIOLATE THE APA.

211.    The Asylum EAD Rules are legislative rules that will have the force and effect of law after their effective date, and DHS was required to follow the requirements of the APA for notice-and-comment rulemaking in issuing them.

212.    The Asylum EAD Rules are final agency actions because they represent the consummation of the agency's decisionmaking processes—in this case, the rulemaking processes—and because they have direct consequences for hundreds of thousands of asylum applicants and for the plaintiff organizations and others that serve them.

213.    The Asylum EAD Rules are unlawful under the APA, including because:

   a.  DHS failed to adequately consider the interests of asylum applicants and the humanitarian purposes of U.S. asylum laws (*see* ¶¶ 216-23);

   b.  DHS engaged in flawed rulemaking processes that failed to consider the interrelated impact of its segregated rulemakings and policy changes (*see* ¶¶ 224-36);

   c.  DHS failed to reasonably explain the need for the Asylum EAD Rules and the departures from prior factual findings, legal conclusions, and policy positions (*see* ¶¶ 237-51); and

   d.  DHS otherwise engaged in arbitrary and capricious rulemaking and acted without observance of required procedure, in excess of statutory authority and limitations, and otherwise not in accordance with law (*see* ¶¶ 252-73).

214.    Each of the foregoing deficiencies, on its own and together, requires that the Asylum EAD Rules be vacated.

215.    DHS received comments and/or otherwise was on notice during the rulemaking process regarding each of these ways in which the proposed rules are unlawful but did not cure the defects in finalizing the Asylum EAD Rules.

### A.    DHS Failed to Consider the Interests of Asylum Applicants and the Humanitarian Purpose of the Refugee Act.

216.    The APA requires agencies to consider important aspects of the problem in its rulemaking and to articulate a satisfactory explanation for their actions.

217.    In issuing the Asylum EAD Rules, DHS failed to consider the interests of asylum applicants and the humanitarian purposes of the Refugee Act, which are important aspects of the EAD system for asylum applicants.

218.    In responding to comments that raised concerns about the wellbeing of asylum applicants, DHS repeatedly relied on the notion that asylum applicants do not have the right to be granted asylum in the United States or the right to an EAD while their asylum applications are pending, without recognizing that even so it must consider the humanitarian purposes of U.S. asylum laws in changing and issuing its policies.

219.    In responding to comments that expressed concern about preventing or impeding asylum applicants from pursuing asylum, DHS stated repeatedly that the rules do not, as a technical matter, bar anyone from seeking asylum, participating in the adjudication process, or seeking review to which they are entitled, without recognizing and considering the practical effects of its own rules—including that delaying or denying work authorization burdens the right to seek asylum and erects a de facto barrier to pursuing relief.

220.     DHS's principal stated purpose in issuing the Broader EAD Rules was not only to deter frivolous and fraudulent applications, but also to deter bona fide applications that may be denied at the conclusion of the asylum process.

221.     In describing this purpose, DHS failed to recognize and consider that the asylum adjudication process exists to determine which applications are legally meritorious; there is no way for anyone to distinguish between meritorious and non-meritorious applications before the adjudication has taken place.

222.     In responding to comments raising concerns about deterring and hindering asylum applications that will succeed at the end of the process, DHS stated in an irrational and conclusory manner, without any support, that the Asylum EAD Rules will not deter such applications.

223.     The Asylum EAD Rules will deter meritorious asylum applications and undermine the humanitarian purpose of the Refugee Act.

**B.     DHS Deprived the Public of a Meaningful Opportunity to Comment on, and Failed to Consider, the Interrelated Impact of Its Segregated Rulemaking Processes and Other Policy Changes.**

224.     The APA requires agencies to give the public the meaningful opportunity to comment when it engages in rulemaking.

225.     In issuing the Asylum EAD Rules, DHS engaged in rulemaking that was artificially segregated so as to deprive the public of the meaningful opportunity to comment on the interrelated impact of its proposed rules and other policy changes. Accordingly, the public was not able to provide meaningful comments regarding the full impact of each proposed rule against other changes to the asylum landscape that DHS is simultaneously pursuing through multiple rulemakings.

226.    In issuing the Asylum EAD Rules, DHS failed to consider the interrelated impact of its segregated rulemaking processes and other policy changes, even though such interrelated impact is an important aspect of the EAD system for asylum applicants. DHS only considered the impact of each rule change on its own and considered comments regarding each rule as if it would be in effect against the existing asylum landscape, instead of considering the impact of all of the rule changes in the aggregate and the rule changes as they would be in effect in the asylum landscape that DHS is simultaneously changing through multiple rulemakings.

227.    In issuing the Timeline Repeal Rule, DHS categorized comments related to the Broader EAD Notice as "out of scope" and refused to consider comments on the interaction of the two notices.

228.    In responding to comments stating that it is "essentially impossible" to meaningfully comment on the Timeline Repeal Notice without analyzing how the repeal would interact with the Broader EAD Notice (which had not yet been issued at the time that the comment period for the Timeline Repeal Notice closed), DHS recognized that the two Asylum EAD Rules interact but that "to the extent that there is interaction or overlap, DHS will address such concerns if it finalizes the broader rule."

229.    DHS broke that promise when it issued the Broader EAD Rule and refused to consider comments that pointed to the problems with segregated and staggered rulemaking and the interaction of the two rules.

230.    In conducting the cost-benefit analysis on the Broader EAD Rule, as well as in analyzing each rule change, DHS refused to consider the cumulative impact of the rule changes within the Broader EAD Rule or of the interrelated impact of the Timeline Repeal Rule or of other pending rule changes.

231.    For example, in finalizing the EAD Criminal Bar, DHS abandoned its initial proposal to add certain specific criminal bars to EADs and decided instead to align the EAD criminal bars to criminal grounds of ineligibility for asylum. DHS did so even though it is simultaneously pursuing, and has not completed, another rulemaking through the Asylum Criminal Bars Notice that proposes to change the asylum ineligibility grounds. This decision deprived the public of a meaningful opportunity to comment on the new proposal, including whether the new asylum ineligibility grounds that may be adopted as a result of the Asylum Criminal Bars Notice are also appropriate grounds for denying EADs.

232.    In allowing Discretionary Denials, DHS justified granting itself discretion to deny EADs to eligible asylum applicants because it "cannot continue to provide EADs with virtually no eligibility criteria and nearly limitless renewal opportunities," without recognizing that in the same rulemaking it was imposing such limitations on eligibility and renewal opportunities.

233.    In finalizing the Recommended Approval Removal and Parolee EAD Removal, DHS failed to consider the cumulative impact of the Asylum EAD Rules, which indefinitely delay work authorization, on this group of asylum seekers who DHS had previously deemed should receive earlier access to work authorization.

234.    DHS refused to consider the cumulative impact of other policies that the Trump Administration has adopted related to asylum, including but not limited to the Presidential Proclamation banning migrants from applying for asylum if they entered without inspection; the so-called "Migrant Protection Protocols" that force asylum applicants to return to Mexico and remain there for the duration of their asylum proceedings; and an interim final rule that disqualifies people from receiving asylum unless they have already unsuccessfully sought similar protection in another country on their way to the United States.

235.   For example, in responding to comments raising concerns about curtailing asylum applicants' access to attorneys, DHS assumed that low-cost or pro bono legal assistance will be available to unemployed asylum applicants who cannot afford to retain a lawyer without considering how the cumulative impact of parallel rulemakings and other policies burdens the availability of resources.

236.   In responding to comments raising concerns about the lack of socioeconomic support for asylum applicants, DHS assumed that social services provided by state and local governments and nonprofit organizations will be available to support asylum applicants who are not permitted to work through the application process without considering how the cumulative impact of parallel rulemakings and other policies burden these resources.

C.     **DHS Failed to Reasonably Explain the Need for the Asylum EAD Rules and to Explain Changes from Its Prior Positions.**

237.   The APA requires the agency to reasonably explain that there is a problem to be solved in its rulemaking, which includes providing an explanation that makes a rational connection between the facts found and the choices made.

238.   The APA requires the agency to acknowledge and reasonably explain changes from its prior factual findings, legal conclusions, and policy positions.

239.   DHS failed to reasonably explain the need for the Asylum EAD Rules.

240.   In explaining the purpose of the Broader EAD Rule, DHS alleged that the rule was needed to reduce incentives for "frivolous, fraudulent, or otherwise non-meritorious asylum applications," but DHS provided no basis to support the conclusion that these problems exist or that if such problems exist they would be addressed by the Broader EAD Rule.

241.   In support of its position, DHS relied solely on a decades-old body of work that discusses problems in the early 1990s that the current work authorization system was created to

41

address, not problems with the current system—analysis that contradicts the agency's position that the current work authorization system requires and warrants further restriction.

242.    In stating the need for the Broader EAD Rule, DHS alleged that the rule was necessary because the asylum system has not changed in recent years to effectively address incentives for illegal immigration and frivolous asylum filings, but DHS ignored the pending parallel rulemakings and policy changes that it is undertaking to change asylum allegedly for these same reasons.

243.    Similarly, in describing the background for the Timeline Repeal Rule, DHS alleged that the rule was necessary because the current rules do not reflect current operational realities, but DHS did not consider that the changes in the Broader EAD Rule and other parallel rulemakings and policy changes will significantly affect operational realities.

244.    In explaining the purpose of the Timeline Repeal Rule, DHS alleged that the rule was needed to address fraud in the EAD application process, but DHS provided no basis to support the conclusion that problems of fraud exist in the EAD application process.

245.    DHS further alleged that another purpose of the Timeline Repeal Rule was to provide flexibility, but DHS failed to reasonably explain why "flexibility" was needed now when the agency had faced backlogs and fluctuations in application volumes in the past, including at the time of the prior rulemaking. DHS failed to reasonably explain why it departed from its prior decision that the current regulatory system appropriately balances agency flexibility and accountability.

246.    In adopting the Asylum EAD Rules, DHS failed to reasonably explain why it departed from its prior decision that 180 days is adequate to reduce incentives to file fraudulent or frivolous asylum applications for the purpose of obtaining work authorization and that the current

EAD system will appropriately incentivize the agency to adjudicate asylum applications within the 180-day statutory timeline.

247.    In adopting the Asylum EAD Rules, DHS failed to reasonably explain why it departed from its prior decision to adopt 180 days as the time period by which most asylum applicants should be able to obtain work authorization given the humanitarian concerns at stake.

248.    In justifying the 365-Day Waiting Period, DHS alleged that the waiting period for filing an EAD should be extended from 150 days because of current average delays in the asylum proceedings, but failed to reasonably explain why the waiting period should be tied to such data when the asylum laws continue to require the government to adjudicate applications within 180 days and when the failure to meet that timeline is the government's fault.

249.    In imposing the One-Year Filing Bar and the EAD Criminal Bar, DHS failed to reasonably explain why it departed from its previous decision to separate EAD adjudication from asylum eligibility because of the administrative burdens of attempting to duplicate the asylum adjudication process within the EAD adjudication process.

250.    In finalizing the One-Year Filing Bar, DHS failed to explain why it departed from its previous decision to not impose a One-Year Filing Bar for EADs in part because it did not want to encourage people who are in lawful status during their first year of presence in the United States to prematurely submit an asylum application if they were hoping for the situation in their country to improve such that they could return at the end of their lawful stay.

251.    In finalizing the Deemed Complete Removal, DHS failed to reasonably explain why it departed from its previous decision to promptly reject or deem complete applications for asylum in view of the potentially harsh consequences of permitting the agency to reject applications later and on technical grounds.

**D.      DHS Violated the APA in Numerous Other Ways.**

252.     The APA prohibits an agency from relying on incorrect legal analysis in its rulemaking.

253.     In issuing the Broader EAD Rules, DHS violated this mandate by relying on reasoning that conflicts with the asylum laws, including as alleged in paragraphs 254-57.

254.      In imposing the One-Year Filing Bar, DHS stated that it "believes that one year is ample time for a bona fide asylum applicant to submit his or her application." But the asylum laws recognize that sometimes one year is definitely *not* "ample time for a bona fide asylum applicant to  submit [their asylum] application," such as when the circumstances of the applicant or their home country change in ways that materially affect their asylum eligibility, or because of circumstances, including trauma, that might pose barriers to filing within one year. *See* 8 U.S.C. § 1158(a)(2)(D).

255.     In imposing the EWI Bar, DHS stated that it "believes that illegally entering the United States without good cause should be strongly deterred." This "belief" is irreconcilable with the right of all individuals to seek asylum under the asylum laws, including those who entered the country without inspection. *See* 8 U.S.C. § 1158(a)(1). DHS mistakenly imposed a strict "good cause" requirements on asylum applicants in order to obtain an exception to the EWI Bar, failing to understand that under Article 31(1) of the 1951 Refugee Convention, which is binding on the United States through the 1967 Protocol, fleeing persecution is itself good cause to enter a country without inspection.

256.     In imposing Limited EAD Validity and depriving asylum applicants of the opportunity to continue working through the federal review process, DHS stated that the administrative review that occurs prior to judicial review gives "sufficient time and a reasonable

process for asylum seekers to establish that they warrant a favorable exercise of discretion for a grant of asylum." This "belief" is irreconcilable with the right to pursue federal appeals court review under the asylum laws, 8 U.S.C. § 1252(b), and the fact that administrative decisions denying asylum are routinely reversed or vacated on review.

257.   In imposing the Parolee EAD Removal, DHS stated that it sought to distinguish between asylum seekers and people "paroled truly for urgent humanitarian reasons or significant public benefit." This misstates the law, as asylum seekers released from custody receive parole based on a finding of "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

258.   The APA prohibits the agency from relying on unreasonable or irrational explanations in its rulemaking.

259.   In issuing the Broader EAD Rules, DHS violated this mandate by offering internally conflicting explanations for its rule changes, including as alleged in paragraphs 260-61.

260.   In imposing the Biometrics Requirement, DHS first explained that this was necessary because it "is not able to refresh or reuse biometrics that were collected" for the asylum application, but then stated that EAD biometrics will benefit security by allowing the agency to compare "EAD biometrics with those collected [earlier] from the asylum applicant"—thus establishing that DHS in fact *plans* on reusing the earlier-collected biometrics.

261.   In responding to comments that sought an exception to the EWI Bar for victims of human trafficking and smuggling, DHS stated that it believes that such asylum applicants may be able to meet the bar's exception, but it failed to explain how, given that the exception requires asylum applicants to present themselves to a border agent within 48 hours of crossing and indicate an intention to apply for asylum or expressing a fear of persecution or torture, in addition to

meeting an undefined "good cause" standard. Victims of human trafficking and smuggling are often unable to encounter a border agent or other government officers within 48 hours of crossing because they are held captive.

262.    The APA requires an agency to respond to significant comments about its proposals when engaging in rulemaking.

263.    DHS violated this mandate by failing to respond to significant comments submitted in response to the Broader EAD Notice, including as alleged in paragraphs 264-268.

264.    In finalizing the Broader EAD Rules, DHS failed to respond to comments that it unreasonably relied on decades-old research to attempt to justify the Broader EAD Rules.

265.    In imposing the Biometrics Requirement, DHS failed to respond to comments questioning how an asylum applicant can be required to pay a biometric fee for the initial EAD application when the applicant has not been permitted to work yet.

266.    The APA requires the agency to consider reliance interests engendered by the policy that it is changing in its rulemaking.

267.    DHS violated this mandate by failing to consider reliance interests of asylum seekers.

268.    For example, in imposing the Parolee EAD Removal, DHS failed to consider the reliance interests of approximately 13,000 paroled asylum applicants who are already working with EADs and who will have to reapply under the Asylum EAD Rules when their work authorization expires and may be found ineligible. DHS failed to consider that these asylum seekers will lose their jobs while they wait for their new EAD applications to be processed and may not be eligible for another EAD under the Asylum EAD Rules.

269.    The APA requires the agency to consider reasonable alternatives to its rulemaking and reasonably explain its rejection of such alternatives.

270.    DHS violated this mandate by failing to consider reasonable alternatives to the Asylum EAD Rules, including as alleged in paragraphs 271-73.

271.    In issuing the Timeline Repeal Rule, DHS failed to reasonably explain its rejection of alternative time periods for adjudicating the EAD application. DHS alleged that it was rejecting an alternative 90-day timeline for adjudicating EAD applications because of the need for "flexibility," but the desire to avoid all accountability is not a reasonable explanation under the APA.

272.    In imposing the 365 Day Waiting Period and issuing the Timeline Repeal Rule, DHS failed to reasonably explain its rejection of the alternative of imposing a shorter waiting period. DHS alleged that it was rejecting this alternative because it would create an incentive to file a "non-meritorious" asylum application, but failed to reasonably explain why this would be so when asylum applicants would not be guaranteed work authorization within any particular time frame under the Timeline Repeal Rule. DHS alleged that it was rejecting this alternative because it would necessitate the creation of a new system to ensure that EADs would not be issued prior to 180 days as provided by statute, but failed to reasonably explain why a 180-day waiting period would not be a reasonable alternative.

273.    In issuing the Asylum EAD Rules, DHS failed to consider reasonable alternatives to mitigate the alleged problem of "frivolous, fraudulent, or otherwise non-meritorious asylum applications" filed for the purpose of obtaining EADs, such as ensuring prompt processing of asylum claims so that they are adjudicated within the statutorily mandated 180 days.

## CLAIMS FOR RELIEF

### Count One
### The Asylum EAD Rules Should Be Set Aside Because They Violate the APA

274.    All the foregoing allegations are repeated and realleged as though fully set forth herein.

275.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;. . ."  or "(D) without observance of procedure required by law." 5 U.S.C. § 706(2).

276.    Defendants violated the foregoing requirements of the APA in issuing both of the Asylum EAD Rules, and each of the rule changes contained therein, for several independent reasons, each of which is sufficient to require that the Asylum EAD Rules, or each of the rule changes contained therein, be set aside.

277.    First, in issuing the Asylum EAD Rules, Defendants failed to consider the interests of asylum applicants and the humanitarian purpose of the Refugee Act, as they were required to do.

278.    Second, the rulemakings relating to both of the Asylum EAD Rules were not in accordance with the law and were undertaken without observance of procedures required by law because they failed to provide the public adequate notice or a meaningful opportunity to comment on interrelated issues between the two rules and other parallel rulemakings. The Asylum EAD Rules are also arbitrary or capricious as a consequence of Defendants' failure to consider interrelated issues between the two rules and other related parallel rulemakings.

279.     Third, Defendants violated the APA in issuing both of the Asylum EAD Rules, and each of the rule changes contained therein, by failing to reasonably explain the need for the Asylum EAD Rules.

280.     Fourth, Defendants otherwise violated the APA in issuing both of the Asylum EAD Rules, and each of the rule changes contained therein, including because they failed to consider important aspects of the problem and reliance interests, to consider alternatives to the approaches they adopted, to examine relevant data, to acknowledge and/or explain various reversals of positions the agencies have long taken, to respond to significant comments, and/or to articulate a satisfactory explanation for their actions.

281.     Both of the Asylum EAD Rules, or in the alternative each rule change contained therein, should be vacated as violating the APA.

### Count Two
### The Asylum EAD Rules Should Be Set Aside Because
### They Violate the Homeland Security Act ("HSA")

282.     All the foregoing allegations are repeated and realleged as though fully set forth herein.

283.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be…not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

284.     The issuance of the Asylum EAD Notices was an agency action.

285.     The issuance of the Asylum EAD Rules was an agency action.

286.     The issuance of the Asylum EAD Notices and the issuance of the Asylum EAD Rules were acts taken as functions or duties of the Office of the DHS Secretary.

287.     Defendant Wolf holds, and has held at all relevant times relating to the allegations in the complaint, the Office of Acting DHS Secretary in violation of the HSA and the DHS Orders of Succession & Delegation.

288.     The Asylum EAD Rules should be vacated as violating the APA because Defendant Wolf unlawfully held the position of Acting DHS Secretary under the HSA when he issued the Asylum EAD Rules and accordingly any acts that he took were in violation of the HSA and the DHS Orders of Succession & Delegation.

**Count Three**
**The Asylum EAD Rules Should be Set Aside**
**Because They Violate the Federal Vacancies Reform Act ("FVRA")**

289.     All the foregoing allegations are repeated and realleged as though fully set forth herein.

290.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be…not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

291.     Under the FVRA, an "action taken by any person who is not acting" under its requirements "in the performance of any function or duty of a vacant office…shall have no force or effect." *Id*. § 3348(d)(1).

292.     Even assuming Defendant Wolf holds his position as Acting DHS Secretary lawfully under the HSA (which he does not), his appointment is independently in violation of the FVRA.

293.     Defendant Wolf issued the Asylum EAD Rules in the performance of the function or duty of the Acting Secretary.

294.     The issuance of the Broader Asylum EAD Notice was an agency action.

295.     The issuance of the Asylum EAD Rules was an agency action.

296.     The Asylum EAD Rules should be held to have no force or effect under the FVRA and/or vacated as violating the APA.

**Count Four**
**The Asylum EAD Rules Should Be Enjoined Because They Are Ultra Vires**

297.     All the foregoing allegations are repeated and realleged as though fully set forth herein.

298.     Courts have equitable authority to enjoin ultra vires agency action. *See, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

299.     Because Defendant Wolf's service is not authorized by the FVRA, the HSA, or the Appointments Clause of the U.S. Constitution, any actions he or DHS may take under his purported authority, including issuing and implementing of the Asylum EAD Rules, are ultra vires and must be enjoined.

**Count Five**
**The Broader EAD Rule Should Be Set Aside**
**Because It Violates the Regulatory Flexibility Act ("RFA")**

300.     All the foregoing allegations are repeated and realleged as though fully set forth herein.

301.     The Regulatory Flexibility Act ("RFA"), as amended, requires federal administrative agencies to analyze the effects on "small entities" of rules they promulgate, and to publish initial and final versions of those analyses. 5 U.S.C. §§ 603-604.

302.     For purposes of the RFA, the term "small entities" includes small businesses, small nonprofit organizations, and small governmental jurisdictions. 5 U.S.C. § 601(6).

303.     The Broader EAD Rule is a "rule" within the meaning of the RFA. 5 U.S.C. § 601(2).

304.     Each of the Plaintiffs is a "small entity" within the meaning of the RFA and is directly affected by the Broader EAD Rule, which requires them, *inter alia*, to substantially alter their programmatic activities (including the services they provide) and their employment practices.

305.     The Broader EAD Rule's final regulatory flexibility analysis does not comply with the RFA, including because of DHS's factually and legally unsupported and unexplained conclusion that the rule does not directly affect small entities.

306.     Based on that erroneous conclusion, DHS refused to describe and estimate the number of small entities that would be affected by the rule, as required by the RFA, 5 U.S.C. § 604(a)(4); and likewise failed to describe and project the rule's compliance requirements, as is also required, *id.* § 604(a)(5).

307.     DHS independently failed to fulfill the RFA's requirement that the agency describe the significant issues raised by public comments in response to its initial regulatory flexibility analysis (published in the Broader EAD Notice), *id.* § 604(a)(2), choosing instead to limit its inquiry to discussion to a solitary public comment that "referenced small entities," 85 Fed. Reg. at 38623, ignoring that other commenters raised significant issues with DHS' initial regulatory flexibility analysis.

308.     DHS also ignored the RFA's requirement that it describe the steps it has taken to minimize the impact on small entities "consistent with the stated objectives of applicable statutes," and that it provide "a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule" and why each of the other alternatives were rejected. 5 U.S.C. § 604(a)(2).

Rather than considering "the stated objectives of applicable statutes," including the Refugee Act, DHS instead considered only its *own* objectives in promulgating the Broader EAD Rule.

309.    The Broader EAD Rule's final regulatory flexibility analysis was also arbitrary or capricious because its conclusions were not reasonable nor reasonably explained; it failed to respond to significant comments; it failed to consider relevant data about the effects of the rule; it failed to consider alternatives; it failed to explain the alternative it did adopt; and its conclusions were not supported by substantial evidence.

310.    The Broader EAD Rule is therefore unlawful and must be set aside. *See* 5 U.S.C. § 611; 5 U.S.C. § 706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    With respect to Counts 1-4, issue a preliminary injunction under Federal Rule of Civil Procedure 65 or an order to stay or postpone the effective dates of the Asylum EAD Rules under 5 U.S.C. § 705 ("On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings");

2.    Declare unlawful and set aside the Asylum EAD Rules in their entirety, or in the alternative with respect to specific rule changes;

3.    Enjoin Defendants and all those acting on their behalf from enforcing or implementing the Asylum EAD Rules in their entirety, or in the alternative with respect to specific rule changes;

4.    Enter an order vacating the Asylum EAD Rules in their entirety, or in the alternative with respect to specific rule changes;

5.      Award Plaintiffs' counsel attorneys' fees and costs pursuant to 28 U.S.C. § 2412,

and any other applicable statute or regulation; and

6.      Award such other and further relief in favor of Plaintiffs and against Defendants

that the Court may deem just, equitable, and proper.

Dated:  July 21, 2020

Respectfully submitted,

Mariko Hirose*
Kathryn Austin*
Geroline Castillo*
INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
One Battery Park Plaza, 4th Floor
New York, New York 10004
Tel: (516) 701-4620
Fax: (929) 999-8115
mhirose@refugeerights.org
kaustin@refugeerights.org
gcastillo@refugeerights.org


  _/s/ Justin B. Cox_
Justin B. Cox (Bar No. 17550)
INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
PO Box 170208
Atlanta, GA 30317
Tel: (516) 701-4233
Fax: (929) 999-8115
jcox@refugeerights.org

*Attorneys for Plaintiffs*

* *Pro hac vice applications forthcoming*

Conchita Cruz*
Zachary Manfredi*
Dennise Moreno*
ASYLUM SEEKER ADVOCACY PROJECT
228 Park Avenue S. #84810
New York, NY 10003-1502
Tel: (305) 484-9260
Fax: (646) 968-0279
conchita.cruz@asylumadvocacy.org
zachary.manfredi@asylumadvocacy.org
dennise.moreno@asylumadvocacy.org

Richard W. Mark*
Joseph Evall*
Katherine Marquart*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Tel: (212) 351-4000
Fax: (212) 351-4035
RMark@gibsondunn.com
JEvall@gibsondunn.com
KMarquart@gibsondunn.com